FILED

1  Shawn A. McMillan, SBN 208529
   Stephen D. Daner, SBN 259689
2  THE LAW OFFICES OF SHAWN A. MCMILLAN, APC
   4955 Via Lapiz
3  San Diego, California 92122
   Telephone: (858) 646-0069
4  Facsimile: (206) 600-4582

5  Attorneys for Preslie Hardwick,
   Plaintiff herein

6

7

2013 SEP -6 PM 3: 19

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

8       UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

9            CALIFORNIA – SOUTHERN DIVISION – SANTA ANA

10

| | |
|---|---|
| 11  **PRESLIE HARDWICK,** | Case No.:  **SACV13-01390 JST (ANx)** |
| 12  v. | Judge:   Department: |
| 13  **COUNTY OF ORANGE, MARCIA VREEKEN, ELAINE WILKINS, THE ESTATE OF HELEN DWOJAK, SHARON GRIER; and DOES 1 - 100** | **PLAINTIFF'S COMPLAINT FOR DAMAGES FOR:** |
| 14 | |
| 15 | (1)  Violation of Civil Rights (42 U.S.C § 1983); |
| 16 | (2)  *Monell*-Related Claims; (3)  Declaratory Relief |

17                          *Prolog*

18  1.     After a seven-week trial beginning in February 2007, an Orange County jury found

19  social workers and the County of Orange liable under 42 U.S.C §1983 for the

20  unconstitutional removal and continued detention of Kendall and Preslie Hardwick, then

21  9 and 6, from their mother, Deanna Fogarty. The jury found that the removal of the

22  children, including the Plaintiff, from their family home was based on a pervasive pattern

23  of lies and an extensive cover-up. (**Exhibit B**, attached) Deanna was awarded damages

24  she sustained as a result of the misconduct of the social workers and the unconstitutional

25  customs, usages, policies, and practices of Orange County. (**Exhibit A**, attached)  As a

26  result of the identical misconduct Preslie Hardwick was deprived of a meaningful

27  relationship with her mother for approximately six and a half years.

28  ///

1

1

## JURISDICTION AND VENUE

2  2.    Preslie Hardwick brings this civil rights lawsuit pursuant to 42 U.S.C. Section

3  1983 to redress the deprivation by Defendants, at all times herein acting under color of

4  state law, of rights secured to Plaintiff under the United States Constitution, including the

5  First, Fourth, and Fourteenth Amendments, and under federal and state law where

6  applicable.

7  3.    Jurisdiction is conferred on this Court by 28 U.S.C. sections 1343(a)(3) and

8  1343(a)(4), which provide for original jurisdiction in this Court of all suits brought

9  pursuant to 42 U.S.C. section 1983. Jurisdiction is also conferred by 28 U.S.C. section

10  1331 because claims for relief derive from the United States Constitution and the laws of

11  the United States.

12  4.    Because the acts and omissions complained of herein occurred in Orange County,

13  and all living parties currently reside in Orange County, venue is properly reposed in she

14  Central District of California, Santa Ana Division.

15

## PARTIES

16  5.    At all times relevant to this Complaint, Plaintiff Preslie Hardwick was, and is

17  currently, a resident of The COUNTY OF ORANGE, California.

18  6.    At all times applicable herein, the COUNTY OF ORANGE was and is a public

19  entity (COUNTY).

20  7.    At all times applicable herein, the ORANGE COUNTY DEPARTMENT OF

21  CHILDREN AND FAMILY SERVICES (Agency or The Agency) was and is a

22  subdivision or entity of the COUNTY OF ORANGE.

23  8.    At all times applicable herein, social worker Marcia Vreeken (VREEKEN) was an

24  individual residing, on information and belief, in the County of Orange, and an officer,

25  agent, and employee of ORANGE COUNTY and DCFS. Defendant Vreeken is sued

26  herein in both her individual capacity and in her official capacity as an employee of the

27  County of Orange.

28

**Complaint for Damages**

9.     At all times applicable herein, social worker Elaine Wilkins (WILKINS) was an individual residing, on information and belief, in the County of Orange, and an officer, agent, and employee of ORANGE COUNTY and DCFS. Defendant WILKINS is sued herein in both her individual capacity and in her official capacity as an employee of the County of Orange.

10.    At all times applicable herein defendant Helen Dwojak (DWOJAK) was an individual residing, on information and belief, in the County of Orange, and an officer, agent, and employee of ORANGE COUNTY and DCFS. Helen Dwojak recently died. Hence, her estate is named as a defendant herein. At such time as the executor of her estate has rejected Preslie's claim, Plaintiff will move to substitute the esteate representative as the named representative defendants herein.

11.    At all times applicable herein defendant Sharon Grier was an individual residing, on information and belief, in the County of Orange.

12.    On or about September 9, 2011, Plaintiff reached the age of majority such that she became free, for the first time ever, to pursue her claims against the named defendants without fear of reprisal, intimidation or threats to her physical, psychological, and emotional well being. COUNTY OF ORANGE; ORANGE COUNTY DEPARTMENT OF SOCIAL SERVICES; CHILD PROTECTIVE SERVICES and the above identified individuals, and any unknown persons and entities, did conspire and aid and abet each other in the effectuation of their common scheme and plan which resulted in the denial of Plaintiff's rights and privileges under both State and Federal law. This deprivation was accomplished by removing and/or causing Plaintiff, at the time a minor, to be removed and detained from the care, custody and control of her mother Deanna Fogarty on February 17, 2000, and continuing to cause Plaintiff to be detained without lawful justification. In addition, without lawfully obtained court order or exigency Defendants, and each of them, caused Plaintiff to be physically examined, treated, and detained without cause, or consent; and knowingly and intentionally continued to detain Plaintiff from the care, custody, and control of her mother Deanna Fogarty, without just cause, by

3

**Complaint for Damages**

1   concealing evidence, misleading the dependency court, falsifying evidence, giving false

2   testimony, failing to divulge exculpatory evidence, committing perjury, and exercising

3   undue influence over the Plaintiff while she was a minor in order to obtain evidence.

4   13.   Plaintiff is informed and believes and on such basis alleges that each of the above

5   named parties was and is the agent, employee, principal, or employer of each of the

6   remaining defendants and/or vice versa and that at all relevant times, Defendants and each

7   of them were acting under color of law in doing the things herein alleged.  In addition,

8   Plaintiff is informed and believes and on such basis alleges that the defendants named

9   hereinabove, and each of them, are responsible in some manner for the occurrences,

10   damages, and injuries herein alleged, and that each of the above named defendants

11   conspired with, and/or aided and/or abetted each of the remaining defendants in

12   committing the acts herein alleged.

13   14.   Plaintiff is informed and believes and on such basis alleges that each of the above

14   named defendants was acting under color of law in committing the acts herein alleged,

15   and that in doing the things herein alleged defendants, and each of them, were acting

16   within the course and scope of their duties as employees or agents of the County of

17   Orange and/or the Orange County Social Services Agency.

18   15.   Plaintiff is ignorant of the true names and capacities of those Defendants sued

19   herein as DOES 1 through 100, and for that reason has sued such Defendants under such

20   fictitious names.  Plaintiff reserves her rights, and will seek leave of Court to amend this

21   Complaint to identify said Defendants when their identities have been ascertained.

22   Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named

23   Defendants was in some manner liable and legally responsible, in that their conduct

24   caused the damages and injuries set forth herein.

25   16.   Plaintiff is informed and believes and on such basis alleges that at all relevant

26   times, Defendants, and each of them, were the knowing agents and/or alter egos of one

27   another, and that Defendants directed, ratified, and/or approved the conduct of each of the

28   other Defendants, and each of their agents or employees.  Moreover, all of the Defendants

1   agreed upon, approved, ratified, and/or conspired to commit all of the acts and/or

2   omissions alleged in this Complaint.

3   **General Allegations**

4   17.    Deanna Fogarty married Cary Hardwick in April 1989. The marriage produced

5   two daughters, Kendall (9/19/90) and Preslie (9/9/93). Kendall was diagnosed with

6   pervasive developmental disorder, non-specific. Defendants, and each of them, knew

7   Kendall was especially sensitive to changes in her routine. Both children had a close

8   relationship with each other, but their strongest bond was with their mother, Deanna

9   Fogarty.

10   18.    The marriage ended due to Cary's adultery, and addiction to alcohol, drugs, and

11   sex. A Judgment of Dissolution was entered in January 1998. Deanna had primary

12   custody. The children struggled with the divorce, and Cary's remarriage. They became

13   reluctant to visit him. Kendall would scream, cry, and beg not to visit. Deanna put the

14   girls in a workshop for children of divorced parents.

15   19.    On, or about,  November 11, 1999, Dr. Mitchell – Kendall's therapist –  made a

16   suspected child abuse report to the Orange County's Child Abuse Registry "hotline."

17   20.    A social worker investigated. That worker determined it was safe for the children

18   to remain with Deanna.

19   21.    On November 16, 1999 a dependency petition was filed; both Deanna and Cary

20   were named. Deanna was only named in this dependency petition pursuant to

21   Defendant's policy, i.e. their standard operating procedure, to allege "failure to protect"

22   against the non-offending spouse (in this instance Deanna), without any further

23   information, other than the fact there may be evidence that *the other* parent has been

24   neglectful or harmful. More specifically, it was and remains, Defendants' regularly

25   established operating procedure to make allegations in dependency petitions when the

26   agency knows there is no evidence to support the allegations. Sharon Grier was

27   appointed as counsel for Plaintiff herein.

28

**Complaint for Damages**

22.     Social Workers and the Agency *knew* there was *no* evidence to support allegations against Deanna. They also knew that Deanna was a fit and proper parent. In Fact, another worker recommended on November 17, 1999, that the children – including Kendall Hardwick, the Plaintiff herein, remain with Deanna.  Nonetheless, Defendants and each of them repeated the baseless allegations in subsequent amended petitions.  Even to date, there is no known policy prohibiting the County's social workers from knowingly making baseless or false allegations in juvenile dependency petitions.

23.     In or about November 1999, the dependency case was transferred to Rachel Davis, who became the primary social worker on the case.  She completed a thorough investigation and submitted her comprehensive Jurisdictional/Dispositional Hearing Report on December 21, 1999.  There, she recommended the children remain with Deanna because there was a strong bond between her and the children.

24.     Davis reported Kendall to be a "remarkable and reliable witness" consistently throughout the investigation.  There was no evidence to suggest that Deanna even had an inkling about Cary's alleged abuse or failed to protect her children.  To the contrary, the evidence showed Deanna protected her daughters, whom had the highest priority in her life.  At this point, the case was to be transferred to Continuing Services. Cary was only allowed monitored visits.

25.     Some visits with Cary went flawlessly; other times the children would refuse to visit.  Deanna was not comfortable "forcing" visits.  Davis devised a plan to deal with the issue: Deanna would transport the children to their visits, *the children were not to be forced or pressured to visit*; if they did not want to visit with Cary, they would speak to the visitation monitor alone.  These instructions were documented in the agency files. Davis also discussed the plan with Kendall, who agreed to abide by it. Everyone followed Davis's plan.

26.     Soon thereafter, the visitation monitor, Hector Delgadillo, was relieved by Davis. Delgadillo was hired by Cary to assure neutrality, but Davis learned from Dr. Mitchell that Delgadillo secretly allowed Cary to ask Kendall to recant the allegations of abuse.

1   Delgadillo was relieved and social worker Defendant Elaine Wilkins began monitoring
2   Cary's visits at the Social Services Agency office.

3   27.     To this point, *all* social workers got along with Deanna and felt she was
4   cooperative.

5   28.     On January 26, 2000, Davis informed Deanna the case was to be transferred to a
6   new social worker, Defendant Marcia Vreeken.  All investigation was done.  Vreeken's
7   job was to "babysit" the case by "make[ing] sure visits with dad went well."

8   29.     On February 8, 2000 the Petition was dismissed, and a First Amended Petition,
9   naming only Kendall, was filed.

10  30.     On February 13, 2000, Deanna took the children to a scheduled visit with Cary.
11  Surprisingly, Delgadillo was the monitor.  Kendall reacted negatively and refused to visit;
12  Deanna did what was required under Davis's Plan.  Deanna allowed the Kendall to talk to
13  Delgadillo alone; he attempted to coax the children to visit with Cary, but Kendall
14  refused.  Deanna met her obligations under the plan.  Vreeken knew Deanna had met her
15  obligations.

16  31.     A volatile incident occurred on February 15, 2000 at the Agency office.  Deanna
17  brought the children to visit Cary; the visit went well. The children were happy and in
18  good spirits.

19  32.     Immediately after Cary left, Vreeken spoke with the girls and told Kendall she
20  *must* visit with her father.  Kendall was frightened and started crying.  Rosy Reales (the
21  family's longtime nanny) saw Kendall crying while Vreeken spoke to her.  Vreeken
22  attempted to coerce Kendall into visiting her father by threatening that if Kendall did not
23  visit with her father she would be taken away from her mother and "put in a home."

24  33.     Preslie ran away from Vreeken to find Deanna.  Defendant Wilkins went after
25  Preslie, leaving Vreeken alone with Kendall.  Preslie ran into Deanna's interview room,
26  afraid, upset and crying.  She told Deanna what happened.  Deanna became upset and
27  began crying.  Wilkins arrived and saw Preslie, Deanna, and Rosy in the room upset and

28

**Complaint for Damages**

1   crying. Vreeken and Kendall arrived soon after. Kendall's face was discolored, her eyes

2   were puffy; she looked like she'd been crying. Vreeken stood in the doorway by Wilkins.

3   34.    Deanna and Vreeken exchanged words; Vreeken was perturbed and angry.

4   Vreeken admitted she "told [the girls] if they didn't visit with their father, the judge was

5   going to put them in a home." Shocked, Deanna ran to the restroom where she vomited.

6   She, calmed herself, returned to the lobby, and resumed her conversation with Vreeken.

7   The exchange became loud and animated.

8   35.    Deanna asked: "Did I do something wrong? I can't help but feel like I'm being

9   treated like a criminal." Vreeken replied, "What's the matter? Am I not *warm and fuzzy*

10  enough for you?" Deanna pleaded with Vreeken: "[P]lease, I want to follow your

11  directions. I want to do what's right for my kids, and I don't want to lose them." Vreeken

12  replied, "you better call your attorney."

13  36.    In her first court report on February 17, 2000, Vreeken failed to disclose her

14  threats to the children, the resulting conflict, and that the February 13th visit was not

15  "missed" but rather had been terminated by the monitor because of Kendall's negative

16  reaction to him. Vreeken only reported the *fact* of the "missed" February 13th visit,

17  missed phone calls, and how "well" the visit with Cary went on February 15th. Dwojak

18  approved the report. The court read and considered it.

19  37.    At the February 17, 2000 hearing, referee Bischoff spoke off-the-record with

20  Vreeken and Wilkins, who both falsely stated Deanna "missed" the February 13th visit,

21  and falsely claimed Deanna told the children that Cary was trying to take them away.

22  Contrary to what Vreeken represented to referee Bischoff, Deanna did *not* tell her

23  children their father was trying to take them away from her, and the visit hadn't been

24  "missed."

25  38.    The social workers understood their position of power and trust with the court, and

26  that it was their word against Deanna's. Defendants, and each of them, did not disclose it

27  was *Vreeken* – not Deanna –  who made inappropriate statements to the children. Vreeken

28  and Wilkins knew Deanna fully complied with her obligation to produce the children for

1   the February 13th visit (and visitation in general), but concealed this fact from the

2   dependency court.

3   39.    At the time of the hearing on February 17, 2000 Kendall was in no danger

4   remaining in Deanna's custody, and Defendants knew it but intentionally and maliciously

5   kept the information from the dependency court.  Defendants, and each of them,

6   knowingly and intentionally failed to disclose that Deanna met her obligations and did

7   protect and properly supervise the girls.

8   40.    Based on Vreeken's and Wilkins's fabricated story and suppression of facts, the

9   court observed, "it may well be that you are right and you didn't say these things, but

10  from the evidence I have before me right now, it looks like you are" using these children.

11  The juvenile court referee was moved by the social worker's story to order the

12  "forthwith" removal of the Plaintiff, Preslie Hardwick, and her sister Kendall, from the

13  custody, care, and comfort of her mother and from her family home.

14  41.    Vreeken and Wilkins forcibly seized Kendall and Preslie on February 17, 2000.

15  After snatching Kendall, Vreeken and Wilkins went to Preslie's school with a uniformed

16  police officer to grab Preslie.  Preslie was screaming and crying for her mother as she hid

17  under the principal's table. Preslie continued "wailing" as they took her and her sister

18  away.

19  42.    Vreeken, with the knowing approval of Dwojak, after Dwojak had been fully

20  informed of all of the above facts and circumstances, "documented" the tale told on

21  February 17th in a Second Amended Petition, filed February 23, 2000. There, they alleged

22  "[o]n or about February 15, 2000, the mother told children that the father was trying to

23  take them away from her and put the children in a foster home." This was a lie, and

24  Vreeken and Dwojak knew it.  Defendants, and each of them, concealed that it was

25  Vreeken – not Deanna – who threatened the children on February 15, 2000. They also

26  alleged Deanna's statements "have caused the children to be fearful of their father" and

27  made them refuse to visit with or telephone him several times. Defendants, and each of

28  them, also knew this statement was false.

43.     Vreeken, after fully informing Dwojak of the totality of the circumstances alleged above and with the knowledge and approval of Dwojak, lied again in her Detention Hearing Report, filed February 23, 2000. There she reported that the children required continued detention due to a "substantial danger to their psychological and emotional health," despite knowing there was no such danger. These court reports were prepared by Vreeken and approved by Dwojak. Court reports, and court report addendums, were (and are still) Defendants' primary method of communicating with the juvenile court, and they expected the court to rely on their reports. In fact, these "court reports" are regularly accepted into evidence and form the basis for juvenile court decisions – and Defendants are aware that the statements they make in such reports carry the same weight as testimony offered live in court.

44.     Defendants detained Plaintiff and her sister until May 19, 2000.  First, they were taken to Orangewood, a *temporary* children's shelter, for more than a month. Deanna was allowed only supervised visits.  The Agency put the Plaintiff in therapy without Deanna's knowledge or consent.

45.     On February 23, 2000, the juvenile dependency court authorized Defendants to return the children to Deanna, but Defendants refused to do so despite defendants' knowledge that Plaintiff and her sister had been wrongfully detained.  Defendants angst toward Deanna was so great that they even refused placement with Rosy (the children's long time nanny,) or any other friend or relative, no matter how willing or qualified.

46.     After the March 1, 2000, pre-trial conference in the dependency matter, Deanna met with Vreeken to discuss getting the children back.  A heated discussion ensued regarding the events of February 15, 2000. Vreeken angrily threatened Deanna stating: "*If you don't submit to me, you'll never see your kids again*."

47.     To show her willingness to make good on her threats, on March 21, 2000, Vreeken, with the approval and assistance of Dwojak and Grier, moved the Plaintiff away from family and friends to foster care, where she stayed until May 19, 2000.  Just before

**Complaint for Damages**

1    that, Vreeken approached Deanna and told her the plan. Deanna's contact with Kendall

2    was limited further.

3    48.    Kendall, Preslie's sister, experienced an immediate and marked emotional

4    deterioration. On March 31, 2000, Dr. Mitchell reported to the Agency that Kendall was

5    decaying rapidly. Specifically, Mitchell reported:

6         "Kendall...shows signs of emotional regression. She was

7         tearful throughout the session, begging to go home. Her

          affect was flattened which is a sign of emotional blunting.

8         Kendall appears terrified in her new school and pleaded to

9         return to her mother's home... She doesn't know how much

10        longer she can cope and visibly shook while relating this..."

11   49.    Defendants knew of Plaintiff's emotional collapse. Yet, while testifying in the

12   juvenile trial that afternoon, Vreeken refused to acknowledge the children were mentally

13   deteriorating, and denied receiving Mitchell's letter. Defendants' court reports instead

14   stated the children were *doing well*. Dwojak retrieved the Mitchell letter only when

15   Deanna demanded she do so, but when Vreeken testified, she refused to disclose to the

16   juvenile court that there was any problem with the children – for the time, she actively

17   suppressed the fact. Defendants delayed reporting the deteriorating condition of the girls

18   for as long as possible. Girer, despite being Kendall's attorney elected to do nothing to

19   protect her interests or rescue her from the situation. Instead, Grier knowingly and

20   willingly aided and assisted Vreeken and Dwojak in the effectuation of their plan to

21   oppress Deanna by subjecting her children, including Plaintiff, to emotional torture. Grier

22   even went so far as to violate the attorney-client privilege by disclosing confidential

23   communications between herself and the children (her clients) to the remaining social

24   worker defendants as part of the joint effort to punish Deanna.

25   50.    On April 19, 2000, Vreeken and Dwojak briefed Deanna's new visitation monitor,

26   Gina Scolari, saying Deanna was a former Miss. California who was born with a silver

27   spoon in her mouth, and was used to getting her way. They made similar statements to

28   Deanna's lawyer during a different and unrelated conversation. Dwojak described the

1  case as a "headache," and told the children's uncle "the entire family is crazy." These

2  personal attacks were untrue and inappropriate. Minor's counsel, Sharon Grier, parroted

3  Defendants' statements in conversations with Scolari. Plaintiff is informed and believes

4  and based thereon alleges that Sharon Grier knowingly and voluntarily collaborated with

5  Vreeken and Dwojak in their unlawful effort to prolong Kendall's detention away from

6  her mother and family home, by among other things, disclosing attorney-client privileged

7  material to the social worker defendants, and misrepresenting or otherwise suppressing

8  the deteriorating condition of the children.

9  51.    As word of Deanna's predicament spread, family members, friends, and

10  government officials from other municipalities registered concerns with the Agency. The

11  Agency did not investigate the allegations or complaints by Deanna, the Mayor of Irvine,

12  and others and refused to *consider* Deanna's point of view. Dwojak ratified Vreeken's

13  and Wilkins's conduct, and in fact participated in directing the course of the case and

14  made critical decision regarding the baseless denial of relative placement, among other

15  things.

16  52.    Dwojak didn't *care* what actually happened on February 15th, and never considered

17  removing Vreeken, a friend of many years, from the case. Nobody at the Agency took

18  Deanna's complaints seriously; despite the fact that complaints of social worker perjury

19  are "ubiquitous." The Agency didn't investigate written complaints made by Peter

20  Hermes (Deanna's trial counsel), or Kevin Hardwick (Cary's brother) despite their

21  complaints and concerns having been sent to the upper echelons of the Agency.

22  53.    Instead of disciplining, or counseling Vreeken and Wilkins for their lies,

23  suppression, and other misconduct in this matter, all of which the County had knowledge,

24  Vreeken was *promoted* to Supervisor in 2001. The County has never disciplined a worker

25  for such behavior. In fact, after the trial in Deanna Fogarty-Hardwick v. County of

26  Orange et al., the County of Orange indemnified Defendants Vreeken and Dwojak against

27  Deanna's punitive damages award, and paid the award in full on Defendants' behalf. This

28

**Complaint for Damages**

1   is further evidence of Orange County's ratification of Defendants' proven misconduct.

2   (See attached **Exhibit C**)

3   54.    Both Preslie and Kendall were emotionally shattered and Deanna was broken

4   down. On May 19, 2000, Deanna signed a "Voluntary Case Plan," and the dependency

5   case was dismissed in order to get both Preslie and Kendall released from foster case so

6   they could gain some stability and normalcy in their lives. The children were very

7   troubled by their ordeal, and Deanna saw the "Plan" as an opportunity to get them out of

8   the Agency's grasp immediately. Deanna saw no choice but to sign the "Plan," in which

9   she agreed "to participate in the services outlined" there.

10   55. The Plan includes a temporary parenting schedule under which Deanna and her

11   counsel understood the children would shortly be returned to her care.

12   56.    For the next five years, Deanna would be embroiled in litigation involving the

13   Plan, and Kendall would not be returned to the care of her mother or her family home.

14   The Case Plan was to be monitored by the family court, the Agency's family reunification

15   unit and Sharon Grier, minor's counsel. Grier was a long time friend of Vreeken, and at

16   the behest of Vreeken was given control over approving Deanna's visitation monitors.

17   Further, Plaintiff is informed and believes and on such basis alleges that Sharon Grier

18   followed the case into family court at the behest of the Agency, Vreeken, and Dwojak to

19   ensure that their scheme to deprive Deanna and her children, including Plaintiff, of their

20   constitutional rights had maximum impact.

21   57.    Dr. Rogers, who evaluated the case for the Agency, also followed the case into

22   family court. Despite the fact that Deanna completed the Case Plan, Kendall was not

23   permitted to return to her mother's care. Although Deanna's visits were only to be

24   monitored for a short time, Grier – Vreeken's long time friend and social services

25   representative in family court – intentionally delayed.  Deanna was monitored for *two*

26   *years*, until the beginning of 2002. Even then, Preslie's time with Deanna was limited to

27   20%. Preslie's ordeal continued until June 2006 when she finally was permitted to return

28   to her family home and the care of her mother – at least on a part time basis.

**Complaint for Damages**

58.    Defendants, and each of them, relied upon intentionally false statements, fabricated evidence, and perjury as part of their successful effort to convince the juvenile court to remove Kendall from the care of her mother and her family home.  The outfall of these efforts was that Kendall was separated from her mother for approximately six and one half years, all in violation of her constitutional rights.

### First Cause of Action for Violation of Civil Rights (42 U.S.C. §1983)

(Fourteenth Amendment and Fourth Amendment
Against Defendants Vreeken, Dwojak, Wilkins, Grier, and Does 1 through 50, Inclusive.)

59.    Plaintiff realleges, and incorporates herein as if set forth in full, paragraphs 1 through 54 above.

### Count One (Procedural Due Process, Unlawful Seizure, and Familial Association)

By Plaintiff Hardwick
Against Defendants Vreeken, Wilkins
and Does 1 through 50, Inclusive

60.    Under the circumstances of this case, outlined above, Plaintiff had the right to be free from unreasonable seizure under the Fourth Amendment of the Constitution of the United States, which right is "clearly established" such that a reasonable social worker in Defendants' situation would know it is wrong to interfere in a child's right to remain with its parents in the absence of exigent circumstances, and that such right may not be impinged upon without first obtaining a warrant or other court order to do so.

61.    It is equally well established that a person in Plaintiff's position has a constitutional right not to be seized pursuant to court orders obtained by fraud or artifice.

62.    In the absence of exigent circumstances, and without any evidence to suggest that Preslie was in imminent danger of suffering serious bodily injury at the hands of her mother DEFENDANTS, and each of them, acting under color of law, agreed, and/or conspired to deceive the juvenile dependency court in order to obtain an order authorizing the seizure of Preslie from her family and comfort and care of her mother Deanna Fogarty.  Thereafter, Defendants, and each of them acting on aforesaid scheme, did unlawfully seize and detain  Plaintiff from the care of her mother.  Defendants' conduct

14
**Complaint for Damages**

1  was without proper justification or authority, and without probable cause, consent,

2  exigency, or lawfully obtained court order. Further, Defendants' actions were taken with

3  deliberate indifference to Plaintiff's rights.

4  63.    As a direct and proximate result of these DEFENDANTS' actions, Plaintiff has

5  suffered, and will continue to suffer economic, physical, mental, and emotional injury, all

6  to an extent and in an amount subject to proof at trial.

7  64    Defendant Vreeken, Dwojak, and Wilkins are vicariously responsible for the

8  conduct of each other and DOES 1 through 50, inclusive, under applicable statutory and

9  case law.

10  65.    On information and belief, Vreeken, Dwojak, Wilkins, and DOES 1 through 50,

11  inclusive, and each of them, acted with malice and with the intent to cause injury to

12  Plaintiff and her mother, or acted with a willful and conscious disregard of the rights of

13  Plaintiff in a despicable, vile, fraudulent, and contemptible manner. Therefore, Plaintiff is

14  entitled to an award of punitive damages for the purpose of punishing these defendants,

15  and each of them, and to deter them and others from such conduct in the future.

16                          **Count Two**
   **(Substantive Due Process, The Right to be Free From the Use of Deception in**
17                **Judicial Proceedings, and Familial Association)**

18                    Against All Individual Defendants
                    and Does 1 through 50, Inclusive
19
20  66    Plaintiff is informed and believes and thereon alleges that the right to familial

    association guaranteed under the Fourteenth Amendment is "clearly established" such
21
    that a reasonable social worker in Defendants' situation would know it is unlawful to
22
    remove a child from the care, custody, and control of its parents or to question, threaten,
23
    examine, or search a child in the absence of exigent circumstances.  In addition,  there is a
24
    clearly established due process right not to be subjected to false accusations on the basis
25
    of false evidence that was deliberately fabricated by the government such that a
26
    reasonable social worker in Defendants' situation would know it is unlawful to lie,
27

28

1    fabricate evidence, and/or suppress exculpatory evidence in sworn affidavits, sworn

2    petitions, court reports or Juvenile Dependency Petitions filed with the court.

3    67.    In doing the things alleged hereinabove, Defendants and each of them, interrupted

4    and impaired the familial rights of Plaintiff by unlawfully removing her from the custody

5    and care of her mother and continuing to detain her despite there knowledge that she was

6    removed and detained based on Defendants' lies, suppressions, and fabrications. As to

7    Defendant Grier, she knowingly, intentionally, and voluntarily collaborated with the

8    remaining defendants, and each of them, in effectuating their unlawful scheme/plan to

9    keep Plaintiff from the care, custody, and control of her mother, and out of her family

10   home for as long as possible.

11   68.    In doing the things alleged hereinabove Defendants, and each of them, were acting

12   under color of state law. They did these things without proper justification or authority,

13   and without probable cause, or exigency. Further, DEFENDANTS' actions were taken

14   with deliberate indifference to Plaintiff's due process rights and/or rights to uninterrupted

15   familial association and/or privacy. As to Sharon Grier, her conduct was also undertaken

16   in direct breach of her fiduciary duties to her clients, Preslie and Kendall Hardwick.

17   69.    Defendants, and each of them, maliciously conspired to violate the civil rights of

18   the Plaintiff, including violation of the Plaintiff's rights found in the Fourteenth

19   Amendment of the United States Constitution, by, but not limited to, removing, detaining,

20   and continuing to detain, Plaintiff from the care, custody, and control of her mother,

21   without proper or just cause and/or authority; by subjecting minor Plaintiff to physical

22   examinations without consent, authority, or the presence of her parents; by the use of

23   coercion and duress to obtain evidence and testimony; and by maliciously falsifying

24   evidence, and presenting fabricated evidence to the court, and maliciously refusing to

25   provide exculpatory evidence during the pendency of the dependency proceedings in

26   violation of Government Code §820.21, and violating the Constitutional rights of

27   Plaintiff.

28

70.     By these actions, Defendants, and each of them, interfered and/or attempted to interfere with Plaintiff's constitutional rights to familial association under the Fourteenth Amendment.

71.     As the direct and proximate result of these Defendants' actions, Plaintiff has suffered, and will continue to suffer economic, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial.

72.     On information and belief, Defendants, and each of them acted with malice and with the intent to cause injury to Plaintiff, or acted with a willful and conscious disregard of the rights of Plaintiff in a despicable, vile, and contemptible manner. Therefore, Plaintiff is entitled to an award of punitive damages only against the individual Defendants for the purpose of punishing them and to deter them and others from such conduct in the future.

## Second Cause of Action 42 U.S.C. §1983 - Monell-Related Claims

(By Plaintiff Preslie Hardwick
Against County of Orange
and Does 1 through 50, Inclusive)

73.     Plaintiff realleges, and incorporates herein as if set forth in full, paragraphs 1 through 72 above.

74.     Defendant County of Orange, including through its entity Social Service Agency, established and/or followed policies, procedures, customs, usages and/or practices (hereinafter referred to collectively as "policy" or "policies") which policies were the moving force behind the violations of Plaintiff's constitutional rights as alleged hereinabove, including those arising under the Fourth and Fourteenth Amendments to the United States Constitution, by and through, but not limited to, the following policies, practices, customs and/or procedures:

      a.      the custom of detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious physical injury), court order and/or consent;

**Complaint for Damages**

b.  the custom of removing children from their family and their homes without first obtaining a warrant or other court order when no exigency exists;

c.  the custom of examining (medically) children without exigency, need, or proper court order, and without the presence and/or consent of their parent or guardian;

d.  the custom of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated;

e.  the custom of using trickery, duress,  fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with the Plaintiff's rights, including those as to familial relations; and

f.  by acting with deliberate indifference in implementing a policy of inadequate training, and/or by failing to train its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to child abuse and dependency type proceedings.

g.  by acting with deliberate indifference in implementing a policy of inadequate supervision, and/or by failing to adequately supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to child abuse and dependency type proceedings.

h.  The policy of making false allegations in a Juvenile Dependency Petitions, i.e. alleging that a parent has failed to protect a child under Welfare and Institutions Code §300(b), where there is no evidentiary basis to support the

1    charge.  Such a similar practice by Orange County has been enjoined by

2    court order all with a deliberate indifference to the rights of the accused

3    parent and the affected child.  With regard to this particular practice,

4    Plaintiff alleges on information and belief that the conduct of Defendants in

5    this case is not an "isolated incident."  Rather, it is a well established

6    custom, practice, and usage of the agency and its workers of which the

7    County has knowledge yet has deliberately failed to ameliorate the problem

8    through the promulgation of policies to regulate the conduct of its social

9    workers.  Moreover, the County has failed to implement training and

10   oversight for its workers to prevent them from engaging in such

11   unconstitutional conduct.  See **Exhibits A** (Judgment), and **B** (Appellate

12   Opinion) attached hereto.

13   (This list is not exhaustive due to the pending nature of discovery and the

14   privileged and protected records of investigative and juvenile dependency

15   type proceedings.  Plaintiff reserves his right to amend this pleading as

16   more information becomes available).

17   75.    On information and belief, Plaintiff alleges that the above policies and practices

18   are part and parcel of an effort by the County of Orange to fraudulently boost its

19   intervention statistics in order to obtain greater State and Federal funding for its social

20   services programs.

21   76.    County of Orange breached its duties and obligations to Plaintiff by, including but

22   not limited to, failing to establish, implement and follow the correct and proper

23   Constitutional policies, procedures, customs and practices; by failing to properly select,

24   supervise, train, control, and review its agents and employees as to their compliance with

25   Constitutional safeguards with deliberate indifference; and by knowingly, or with

26   deliberate indifference, permitting Vereeken, Dwojak, Wilkins and DOES 1 through 50,

27   inclusive, to engage in the unlawful and unconstitutional conduct as herein alleged.

28

**Complaint for Damages**

77.     County of Orange knew, or should have known, that by breaching the

above-mentioned duties and obligations that it was foreseeable that said failure would,

and did, cause Plaintiff to be injured and damaged, and her constitutional rights to be

impaired, by the wrongful policies and acts as alleged herein, and that such breaches

occurred in contravention of public policy and Defendants' legal duties and obligations to

Plaintiff; and that such policies, practices, customs and procedures were the moving force

behind the constitutional violations alleged herein above.

78.     These actions, and/or inactions, of County of Orange were the direct and

proximate cause of Plaintiff's injuries, as alleged herein; and as a result, Plaintiff has

sustained general and special damages, to an extent and in an amount to be proven at trial.

### Third Cause of Action for Declaratory Relief

Against All Defendants
And Does 1 through 50, Inclusive

79.     Plaintiff realleges, and incorporates herein as if set forth in full, paragraphs 1

through 78 above.

80.     As stated herein, Plaintiff, as a citizen and individual, is protected by the laws of

the State of California, as well as those of the United States Constitution, including the

Fourth and Fourteenth Amendments thereto.

81.     As stated herein, Defendants, and each of them, have wrongfully, unlawfully, and

with deliberate indifference to the rights of Plaintiff, and with utter disregard of

Defendants' duties and obligations to Plaintiff, acted, practiced and/or adopted policies,

practices, procedures and/or customs which are in violation of the rights of Plaintiff,

including those to be free from governmental interference as to her privacy and familial

associations, and from unreasonable searches or seizures, including those relating to child

abuse allegations and related actions and  proceedings.

82.     Defendants have failed to acknowledge their improper, unlawful and

unconstitutional actions, conduct and policies at the time of the incidents at issue in the

present action, and  Plaintiff is informed and believes, and on that basis alleges, that

**Complaint for Damages**

1  presently Defendants have not changed or modified such actions, conduct and/or policies

2  to conform to law despite several warnings from appellate courts to do so.

3  83.    Defendants' wrongful and unlawful conduct, actions and/or policies, unless and

4  until forced to promulgate policies, by order of this court, will cause, and continue to

5  cause, great and irreparable injury to Plaintiff, and other individuals and citizens, in that

6  Defendants will continue to act in accordance with said unlawful policies, and with

7  deliberate indifference to their duties and obligations under state and federal law,

8  including those under the Fourth and Fourteenth amendments as alleged herein above.

9  84.    Based on information and belief, Plaintiff alleges that as presently applied by the

10 County of Orange, those portions of the Welfare and Institutions Code which County of

11 Orange claims allow the misconduct set out above are unconstitutional in the way they are

12 applied pursuant to the regularly established customs, policies, and practices of the

13 County of Orange.

14 85.    Plaintiff has no adequate remedy at law to prevent or prohibit Defendants from

15 continuing, and/or repeating, their unlawful and unconstitutional conduct and policies

16 other than through injunctive relief, and therefore seek an order directing the County of

17 Orange to promulgate policies and implement training to prohibit its social workers from,

18 but not limited to, the following:

19         a.    Detaining and/or removing children from their family and homes without

20               exigent circumstances (imminent danger of serious physical injury), court

21               order and/or consent;

22         b.    Removing children from the care of their family and from their homes

23               without first obtaining a warrant when no legally recognized exigency

24               exists;

25         c.    Examining children without exigency, need, or proper court order, and

26               without the presence of their proper custodian and/or guardian;

27         d.    Removing and detaining children, and not returning them, beyond a

28               reasonable period after the basis for detention is negated;

21

**Complaint for Damages**

e.  Using trickery, duress, fabrication and/or false testimony or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court; and

f.  Acting with deliberate indifference to the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to child abuse and dependency type proceedings.

g.  Aiding and abetting in the violation of civil rights guaranteed to individuals, including those under the Fourth (protecting against unreasonable search and seizure) and Fourteenth (protecting against invasion of autonomy privacy) Amendments, by engaging in the aforementioned conduct;

h.  Conspiring to violate civil rights guaranteed to individuals, including those under the Fourth (protecting against unreasonable search and seizure) and Fourteenth (protecting against invasion of autonomy privacy) Amendments, by engaging in the aforementioned conduct.

**Prayer**

**Plaintiff demands a jury trial as to the issues so triable.**

WHEREFORE, Plaintiff prays for judgment against Defendants, as to all causes of action, as follows:

1.  General damages and special damages according to proof;

2.  As against only the individual defendants, and not any municipality or public entity, punitive damages as allowed by law;

3.  Attorneys fees pursuant to 42 U.S.C. §1988, and any other appropriate statute;

4.  Injunctive relief, both preliminary and permanent, as allowed by law, (including preliminary injunctive relief based upon a separate application); or alternatively that the Welfare and Institutions Code, as applied by The

**Complaint for Damages**

1  County of Orange in the filing and pursuit of its juvenile dependency

2  petitions be declared unconstitutional as applied;

3      5.    Costs of suit incurred herein; and

4      6.    Such further relief as the Court deems just and proper.

5  DATED: September 14, 2010

6

7

8                        Shawn A. McMillan, Esq.
                      Stephen D. Daner, Esq.

9                        Samuel H. Park, Esq.
                      THE LAW OFFICES OF SHAWN A. MCMILLAN, APC
                      Attorneys for Preslie Hardwick, Plaintiff herein

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Complaint for Damages**

# EXHIBIT A

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 14 2007

ALAN SLATER, Clerk of the Court

*Kathleen Hale*

BY KATHLEEN HALE

ELECTRONICALLY
RECEIVED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CIVIL COMPLEX CENTER
May 14 2007
ALAN SLATER, Clerk of the Court

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE, CIVIL COMPLEX CENTER

| | |
|---|---|
| DEANNA FOGARTY-HARDWICK | Case No. 01CC02379 (Case Assigned to Hon. Ronald L. Bauer, Dept. CX103) |
| Plaintiffs, | |
| v. | [PROPOSED] JUDGMENT |
| COUNTY OF ORANGE, MARCIA VREEKEN, ELAINE WILKINS AND HELEN DWOJAK, | |
| Defendants. | |

This action came on regularly for trial before the jury, with the Court sitting in equity as to Plaintiff's Fourth Cause of Action seeking an injunction, on February 13, 2007 in Department CX103 of the above entitled Court, the honorable Ronald L. Bauer, Judge presiding. Plaintiff Deanna R. Fogarty-Hardwick appeared in person and was represented by and through her counsel of record Shawn A. McMillan, Esq. and Sondra S. Sutherland, Esq. Defendants County of Orange, Marcia Vreeken, Elaine Wilkins, and Helen Dwojak appeared and were represented by Glen Stebens with the law firm of Byron, Beam, Brobeck, Borges, and Rosa, LLP.

1

[PROPOSED] JUDGMENT

OVER

1   A jury of twelve persons was impaneled and sworn to try case. Witnesses were sworn and

2   testified.

3   After hearing the evidence and arguments of counsel, the jury was duly instructed by the

4   Court and the case was submitted to the jury with directions to return their verdict on the matters

5   submitted.  The jury deliberated and thereafter returned into court with its verdict consisting of

6   the special issues submitted to the jury and the answers given thereto by the jury, which said

7   verdict was filed with the clerk and entered upon the minutes.  True and correct copies of the

8   jury's verdicts are attached hereto as **Exhibit A**, and are incorporated herein by this reference.

9   It appearing that by reason of said special verdict: Plaintiff Deanna R. Fogarty-Hardwick is

10  entitled to judgment against defendant The County of Orange in the amount of $4,521,570.00,

11  with interest to accrue thereon as allowed by law; Deanna R. Fogarty-Hardwick is entitled to

12  judgment against defendant Marcia Vreeken in the amount of $119,186.00, which amount

13  includes the jury's award of punitive damages, with interest to accrue thereon as allowed by law;

14  and Deanna R. Fogarty-Hardwick is entitled to judgment against Helen Dwojak in the amount of

15  $278,100.00,  which amount includes the jury's award of punitive damages, with interest to

16  accrue thereon as allowed by law.

17  Defendant Elaine Wilkins is entitled to judgment that plaintiff take nothing from her.

18  Subsequent to the Jury's return of its verdict, the Court held a further hearing on May 14,

19  2007, as to Plaintiff's Fourth Cause of Action for injunctive relief.  Shawn A. McMillan, Esq.

20  appeared and argued on behalf of Plaintiff Deanna Fogarty-Hardwick who was also present in

21  court, and Glen Stebens appeared and argued on behalf of defendant County of Orange.  The

22  Court having considered all evidence and argument presented finds that all statutory predicates to

23  the exercise of its equitable powers have been met, and that Plaintiff has met her burden of proof

24  in relation to her Fourth Cause of Action seeking injunctive relief.  Accordingly, the Court

25  entered an injunction against the County of Orange Social Services Agency, a true and correct

26  copy of which is attached hereto as **Exhibit B** and is incorporated herein in its entirety by this

27

28

2

[PROPOSED] JUDGMENT

1   reference.

2   **NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:**

3   That, in accordance with the jury's verdicts, plaintiff Deanna R. Fogarty-Hardwick have

4   judgment against defendant The County of Orange for the sum of $4,521,570.00 with interest

5   thereon at the maximum rate allowed by law; That plaintiff Deanna R. Fogarty-Hardwick have

6   judgment against defendant Marcia Vreeken for the sum of $119,186.00 with interest thereon at

7   the rate of ten percent per annum; That plaintiff Deanna R. Fogarty-Hardwick have judgment

8   against defendant Helen Dwojak for the sum of $278,100.00 with interest thereon at the rate of

9   ten percent per annum;

10  That defendant Elaine Wilkins shall have judgment against Deanna Fogarty-Hardwick, who

11  shall take nothing from defendant Elaine Wilkins.

12  **IT IS FURTHER ORDERED** that Defendant County of Orange, Social Services Agency,

13  and its employees, agents and persons acting on its behalf, are hereby permanently enjoined and

14  restrained from including allegations in a juvenile dependency petition under Cal. Welf. & Inst.

15  Code §300 against any parent or guardian of a child without some reasonable and atticulable

16  evidence giving rise to a reasonable suspicion that the child has been abused, neglected or

17  abandoned *by the accused parent or guardian*, or is in imminent danger of abuse, neglect or

18  abandonment by that parent.

19  **IT IS FURTHER ORDERED** that Defendant County of Orange, Social Services Agency,

20  and its employees, agents and persons acting on its behalf, are hereby permanently enjoined and

21  restrained from requiring a parent or guardian of a child to sign its "Agency-Parent Temporary

22  Agreement" or releases of confidential information (e.g., medical, psychological psychiatric,

23  employment) unless the agency has some reasonable and articulable evidence giving rise to a

24  reasonable suspicion that the parent whose records or information are sought has abused,

25  neglected or abandoned the child, or the child is in imminent danger of abuse, neglect or

26  abandonment by that parent.

27

28

1    The Court reserves jurisdiction to modify or dissolve the injunction as may be required by the

2  interest of justice.

3    Deanna Fogarty-Hardwick shall recover her costs of suit including reasonable attorney's fees

4  as allowed pursuant to 42 U.S.C. §1988. The Court retains jurisdiction to determine such

5  amounts. Plaintiff is to file her memorandum of costs within the time prescribed by statute. The

6  issue of prevailing party attorney's fees shall be determined by noticed motion.

7

8    APPROVED AS TO FORM:

9

10   _____
     Glen Stebens, Esq.
     Counsel for all Defendants                     Date:
11

12   _____                    Date:

13   Robert M. Dato, Esq.
     Counsel for Defendants
14

15   _____
     Shawn A. McMillan, Esq.
16   Counsel for Plaintiff                           Date: 05-14-07

17

18   IT IS SO ORDERED
                                                     Ronlad L. Bauer, Judge of the Superior Court
19
                                                     Date: 16 May 2007
20

21

22

23

24

25

26

27
                                            4
28                            [PROPOSED] JUDGMENT

# EXHIBIT A

# ORIGINAL

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 23 2007

ALAN SLATER, Clerk of the Court

BY A. KNOX

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE, COMPLEX CIVIL CENTER

| | |
|---|---|
| DEANNE FOGARTY-HARDWICK, ) | CASE NO. 01CC02379 |
| ) | |
| Plaintiff, ) | **VERDICT FORM #1** |
| ) | |
| v. ) | |
| ) | |
| COUNTY OF ORANGE, MARCIE ) | |
| VREEKEN, ELAINE WILKINS, ) | |
| HELEN DWOJAK, ) | |
| ) | |
| Defendants. ) | |

We answer the questions submitted to us as follows:

1. Did Marcie Vreeken intentionally violate the plaintiff's right to familial association or right to privacy?

_10_ Yes _2_ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here,

(6)

answer no further questions, and have the presiding juror sign and date this form.

2. Did Marcie Vreeken violate plaintiff's right of familial association or right of privacy while acting or purporting to act in the performance of her official duties?

____10 Yes   2   No

3. Was Marcie Vreeken's conduct a substantial factor in causing harm to Deanna Fogarty-Hardwick?

____9 Yes   3   No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. What are Deanna Fogarty-Hardwick's damages?

a. Past economic loss:        $ 12,344

b. Future economic loss: $ 1,092

c. Past noneconomic loss: $ 69,300

d. Future non-economic loss: $ 34,660

TOTAL $ 117,386

Signed: _Barbara Hodgson_
              Presiding Juror

Dated: _March 23 2007_

(When signed/After all verdict forms have been signed], this verdict form must be delivered to the [clerk/bailiff/judge].

⑦

ORIGINAL

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 23 2007

ALAN SLATER, Clerk of the Court

BY A. KNOX

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE, COMPLEX CIVIL CENTER

| | | |
|---|---|---|
| DEANNE FOGARTY-HARDWICK, | ) | CASE NO. 01CC02379 |
| | ) | |
| Plaintiff, | ) | VERDICT FORM #2 |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF ORANGE, MARCIE | ) | |
| VREEKEN, ELAINE WILKINS, | ) | |
| HELEN DWOJAK, | ) | |
| | ) | |
| Defendants. | ) | |

*We answer the questions submitted to us as follows:*

1. Did Elaine Wilkins intentionally violate the plaintiff's right to familial

association or right to privacy?

___2___ Yes ___10___ No

If your answer to question 1 is yes, then answer question 2. If you answered no,

stop here, answer no further questions, and have the presiding juror sign and date this

(8)

form.

      2. Did Elaine Wilkins violate plaintiff's right of familial association or right of privacy while acting or purporting to act in the performance of her official duties?

_____Yes _____No

      3. Was Elaine Wilkins's conduct a substantial factor in causing harm to Deanna Fogarty-Hardwick?

_____Yes _____No

      If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

      4. What are Deanna Fogarty-Hardwick's damages?

        a. Past economic loss:        $_____

        b. Future economic loss: $_____

        c. Past noneconomic loss: $_____

        d. Future non-economic loss: $_____

                TOTAL $_____

Signed: _Barbara Hodgen_
        **Presiding Juror**

Dated: _March 23, 2007_
(When signed/After all verdict forms have been signed], this verdict form must be delivered to the [clerk/bailiff/judge].

(9)



**ORIGINAL**



FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 23 2007

ALAN SLATER, Clerk of the Court

BY A. KNOX

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE, COMPLEX CIVIL CENTER

| | |
|---|---|
| DEANNE FOGARTY-HARDWICK, ) | CASE NO. 01CC02379 |
| ) | |
| Plaintiff, ) | **VERDICT FORM #3** |
| ) | |
| v. ) | |
| ) | |
| COUNTY OF ORANGE, MARCIE ) | |
| VREEKEN, ELAINE WILKINS, ) | |
| HELEN DWOJAK, ) | |
| ) | |
| Defendants. ) | |

We answer the questions submitted to us as follows:

1. Did Helen Dwojak intentionally violate the plaintiff's right to familial association or right to privacy?

_10_ Yes _2_ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here,

*10*

answer no further questions, and have the presiding juror sign and date this form.

2. Did Helen Dwojak violate plaintiff's right of familial association or right of privacy while acting or purporting to act in the performance of her official duties?

_10_ Yes _2_ No

3. Was Helen Dwojak's conduct a substantial factor in causing harm to Deanna Fogarty-Hardwick?

_10_ Yes _2_ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. What are Deanna Fogarty-Hardwick's damages?

   a. Past economic loss:     $ _28,802_

   b. Future economic loss: $ _2,548_

   c. Past noneconomic loss: $ _161,700_

   d. Future non-economic loss: $ _80,850_

TOTAL $ _273,900_

Signed: _Barbara Hodgen_
        **Presiding Juror**

Dated: _March 23, 2007_

(When signed/After all verdict forms have been signed], this verdict form must be delivered to the [clerk/bailiff/judge].

ORIGINAL



FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 23 2007

ALAN SLATER, Clerk of the Court

BY A. KNOX

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE, COMPLEX CIVIL CENTER

DEANNE FOGARTY-HARDWICK,                  )    CASE NO. 01CC02379
                                          )
                    Plaintiff,            )    VERDICT FORM #4
                                          )
          v.                              )
                                          )
COUNTY OF ORANGE, MARCIE                   )
VREEKEN, ELAINE WILKINS,                   )
HELEN DWOJAK,                             )
                                          )
_____Defendants.       )

We answer the questions submitted to us as follows:

1. Did Marcie Vreeken's, Elaine Wilkins' or Helen Dwojak's conduct violate plaintiff's

rights of familial association for right of privacy?

_10_ Yes _2_ No

If your answer to question 1 is yes, then answer question 2. If you answered no, stop here,

(12)

answer no further questions, and have the presiding juror sign and date this form.

2. Did the conduct of Marcie Vreeken, Elaine Wilkins or Helen Dwojak occur as a result of the official policy or custom of the County of Orange?

_11_ Yes _1_ No

If your answer to question 2 is yes, then answer question 3. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3. Was Marcie Vreeken's, Elaine Wilkins' or Helen Dwojak's conduct a substantial factor in causing harm to Deanna Fogarty-Hardwick?

_10_ Yes _2_ No

If your answer to question 3 is yes, then answer question 4. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4. What are Deanna Fogarty-Hardwick's damages?

a.   Past economic loss: $ _185,155_

b.   Future economic loss: $ _16,580_

c.   Past noneconomic loss: $ ~~1,039,500~~ 1,289,500

d.   Future noneconomic: $ ~~519,750~~ 769,750

TOTAL ~~1,760,785~~ 2,260,785

Signed: _Barbara Hodgen_   Dated: _March 23, 2007_
Presiding Juror
[When signed/After all verdict forms have been signed], this verdict form must be delivered to the [clerk/bailiff/judge].

# ORIGINAL

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 23 2007

ALAN SLATER, Clerk of the Court

BY A. KNOX

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE, COMPLEX CIVIL CENTER

| | | |
|---|---|---|
| DEANNE FOGARTY-HARDWICK, | ) | CASE NO. 01CC02379 |
| | ) | |
| Plaintiff, | ) | VERDICT FORM #5 |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF ORANGE, MARCIE | ) | |
| VREEKEN, ELAINE WILKINS, | ) | |
| HELEN DWOJAK, | ) | |
| | ) | |
| Defendants. | ) | |

We answer the questions submitted to us as follows:

1. Was County of Orange's training or supervision inadequate to train and/or supervise its employees to properly handle usual and recurring situations?

_10_ Yes _2_ No

2.  Was County of Orange deliberately indifferent to the need to train and/or supervise its employees adequately?

___*10*___ Yes ___*2*___ No

If your answer to question 2 is yes, then answer question 3.  If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

3.  Was the failure to provide proper training and/or supervision the cause of the deprivation of Deanna Fogarty-Hardwick's right of familial association?

___*10*___ Yes ___*2*___ No

If your answer to question 3 is yes, then answer question 4.  If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

4.  Was County of Orange's failure to adequately train and/or supervise its employees a substantial factor in causing harm to plaintiff?

___*10*___ Yes ___*2*___ No

If your answer to question 4 is yes, then answer question 5.  If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

5.  What are Deanna Fogarty-Hardwick's damages?

    a.  Past economic loss: $ *185,155*

    b.  Future economic loss: $ *16,380*

    c.  Past noneconomic loss: $ ~~*1,039,500*~~  *1,289,500*

    d.  Future noneconomic loss: $ ~~*519,750*~~  *769,750*

*15*

TOTAL ~~1,760, 785~~ 2,260,785

Signed: *Barbara Hodges*   Dated: *March 23, 2007*
         Presiding Juror

[When signed/After all verdict forms have been signed], this verdict form must be delivered to the [clerk/bailiff/judge].

16

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 23 2007

ALAN SLATER, Clerk of the Court

BY A. KNOX

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE, COMPLEX CIVIL CENTER

| | | |
|---|---|---|
| DEANNE FOGARTY-HARDWICK, | ) | CASE NO. 01CC02379 |
| | ) | |
| Plaintiff, | ) | VERDICT FORM #6 |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF ORANGE, MARCIE | ) | |
| VREEKEN, ELAINE WILKINS, | ) | |
| HELEN DWOJAK, | ) | |
| | ) | |
| Defendants. | ) | |

We answer the questions submitted to us as follows:

Regardless of the award of damages in verdict form numbers 1 – 5 what are the total

damages suffered by plaintiff, Deanna Fogarty-Hardwick in each of these categories?

(17)

a.   Past economic loss: $ _411,456_

b.   Future economic loss: $ _36,400_

c.   Past noneconomic loss: $ _2810,000_

d.   Future noneconomic loss: $ _1,655,000_

Signed: _____
          Presiding Juror

Dated: _March 23, 2007_

⑱

# ORIGINAL

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 23 2007

ALAN SLATER, Clerk of the Court

BY A. KNOX

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE, COMPLEX CIVIL CENTER

|  |  |
|---|---|
| DEANNE FOGARTY-HARDWICK, | ) CASE NO. 01CC02379 |
| Plaintiff, | ) |
| | ) **SPECIAL VERDICT RE: MALICE** |
| v. | ) **OPPRESSION OR FRAUD** |
| | ) |
| COUNTY OF ORANGE, MARCIE | ) |
| VREEKEN, ELAINE WILKINS, | ) |
| HELEN DWOJAK, | ) |
| Defendants. | ) |

We answer the questions submitted to us as follows:

1. Did Marcie Vreeken act with malice, oppression or fraud?

___9___ Yes ___3___ No

2. Did Elaine Wilkins act with malice, oppression or fraud?

___1___ Yes ___11___ No

19

3. Did Helen Dwojak act with malice, oppression or fraud?

_9_ Yes _3_ No

Signed: _Barbara Hodgm_
Presiding Juror

Dated: _March 23, 2007_

(When signed/After all verdict forms have been signed], this verdict form must be delivered to the [clerk/bailiff/judge].

20

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 27 2007

ALAN SLATER, Clerk of the Court

BY J. FRAUSTO

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF ORANGE, CIVIL COMPLEX CENTER

| | |
|---|---|
| DEANNE FOGARTY-HARDWICK, | Case No. 01CC02379 |
| Plaintiffs, | |
| v. | VERDICT FORM RE: PUNITIVE DAMAGES |
| COUNTY OF ORANGE, | |
| Defendants. | |

1. As to defendant Marcie Vreeken, what amount of punitive damages do you award?

   $ *1,800.00*

2. As to defendant Helen Dwojak, what amount of punitive damages do you award?

   $ *4,200.00*

Signed: *Barbara Hodgen*

   Presiding Juror

Dated: *March 27, 2007*

When signed, this verdict form must be delivered to the bailiff.

(21)

# EXHIBIT B

22

 

1  Sondra S. Sutherland, Esq. (CSB #185374)
   LAW OFFICES OF SONDRA S. SUTHERLAND
2  2440 Bear Rock Glen
   Escondido, California 92026
3  Telephone: (760) 761-1155
   Facsimile: (760) 761-1188
4  E-Mail: sondra@ssslegal.com

5  Attorneys for Plaintiff,
   DEANNA R. FOGARTY-HARDWICK

6

7

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 1 4 2007

ALAN SLATER, Clerk of the Court
 Frausto
BY J. FRAUSTO

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF ORANGE, CIVIL COMPLEX CENTER

10

11  DEANNA FOGARTY-HARDWICK &        ) Case No. 01CC02379 (Case Assigned to
    ROES 1-5,                        ) Hon. Ronald L. Bauer, Dept. CX103)
12                                   )
                Plaintiffs,          ) Date Action Filed   : 2/15/01
13                                   ) Trial Date          : 2/13/07
          v.                         )
14                                   ) PERMANENT INJUNCTION
    COUNTY OF ORANGE, et al.,        )
15                                   )
                Defendants.          )
16

17

18         The court, having considered Plaintiff's request for a permanent injunction, came on

19  for trial in the above-captioned court commencing February 13, 2007. Sondra S. Sutherland,

20  Esq. and Shawn A. McMillan, Esq. appeared on behalf of Plaintiff, Deanna R. Fogarty-

21  Hardwick, and Glen A. Stebens, Esq. appeared on behalf of Defendants, County of Orange

22  Social Services Agency, Marcie Vreeken, Helen Dwojak and Elaine Wilkins. Satisfactory

23  evidence having been presented,

24         IT IS ORDERED THAT Defendant County of Orange, Social Services Agency, and

25  its employees, agents and persons acting on its behalf, are enjoined and restrained from

26  including allegations in a juvenile dependency petition under Cal. Welf. & Inst. Code § 300

27  against any parent or guardian of a child without some reasonable and articulable evidence

28  giving rise to a reasonable suspicion that the child has been abused, neglected or abandoned

23



1  *by the accused parent or guardian*, or is in imminent danger of abuse, neglect or

2  abandonment by that parent.

3          IT IS FURTHER ORDERED THAT Defendant County of Orange, Social Services

4  Agency, and its employees, agents and persons acting on its behalf, are enjoined and

5  restrained from requiring a parent or guardian of a child to sign its "Agency-Parent

6  Temporary Agreement" or releases of confidential records or information (e.g., medical,

7  psychological, psychiatric, employment) unless the agency has some reasonable and

8  articulable evidence giving rise to a reasonable suspicion that the parent whose records or

9  information are sought has abused, neglected or abandoned the child, or the child is in

10  imminent danger of abuse, neglect or abandonment by that parent.

11          The Court reserves jurisdiction to modify or dissolve the injunction as may be

12  required by the interests of justice.

13

14  Dated: *14 May 2007*

15                                                         Hon. Ronald L. Bauer, Judge
                                                         Orange County Superior Court

16

17

18

19

20

21

22

23

24

25

26

27

28

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE | FOR COURT USE ONLY |
|---|---|

**Deanna Fogarty-Hardwick v. County of Orange, et al**

| | |
|---|---|
| Shawn A. McMillan    CBN 208529 | 858-646-0069 |
| The Law Offices of Shawn A. McMillan, APC<br>4955 Via Lapiz<br>San Diego, CA  92122-1922 | 206-600-4582 fax |

| ATTORNEY FOR<br>Plaintiff Deanna Fogarty-Hardwick | HEARING<br>Judge: Hon. Ronald L. Bauer<br>Dept.: CX103 | |
|---|---|---|
| | | Civil Number<br>01CC02379 |

## PROOF OF SERVICE BY MAIL & FAX

I, Shawn A. McMillan, declare that: I am over the age of 18 years and not a party to the case; I am employed in the County of San Diego, California, and my business address is 4955 Via Lapiz, San Diego, California.

I served the following document(s)

### 1. [PROPOSED] JUDGMENT

Upon defendants by sending via facsimile transmittal and the number listed below and by placing a true copy of each document in an envelope addressed to defendant's counsel of record as follows:

| | |
|---|---|
| Glen A. Steben<br>Beam, Brobeck, West, Borges, & Rosa, LLP<br>600 West Santa Ana Blvd, Ste. 1000<br>Santa Ana, CA 92701 | Tel: 714-558-3944<br>Fax:714-568-0129 |
| Robert M. Dato<br>Theodora Oringher Miller & Richman PC<br>535 Anton Blvd 9FL<br>Costa Mesa, CA 92626-7109 | Tel: (714) 549-6200<br>Fax: (714) 549-6201 |

I then sealed the envelope and, with postage thereon fully pre-paid, I deposited it with the United States Postal Service this same day in San Diego, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and executed in the City of San Diego, California.

Dated: May 14, 2007               Signature: _____
                                           Shawn A. McMillan

25

# EXHIBIT "B"

---

# EXHIBIT "B"



**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

COURT OF APPEAL-4TH DIST DIV 3
F I L E D

JUN 1 4 2010

Deputy Clerk

| | |
|---|---|
| DEANNA FOGARTY-HARDWICK, | |
| Plaintiff and Respondent, | G039045 |
| v. | (Super. Ct. No. 01CC02379) |
| COUNTY OF ORANGE et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Ronald L. Bauer, Judge. Reversed in part and remanded with directions.

Buchalter Nemer, Robert M. Dato and Efrat M. Cogan; Beam, Brobeck, West, Borges & Rosa, Byron J. Beam and Glen A. Stebens, for Defendants and Appellants.

Law Offices of Shawn A. McMillan, Shawn A. McMillan, Sondra Sutherland and Jody Hausman; Law Offices of Donnie R. Cox, Donnie R. Cox and Dennis B. Atchley, for Plaintiff and Respondent.

The County of Orange, along with two of its social workers, Marcie Vreeken and Helen Dwojak (collectively the County), appeals from a substantial monetary judgment in favor of Deanna Fogarty-Hardwick for damages caused by the County's violation of her federal civil rights.[1]  Specifically, the County was found liable based upon improper conduct by the social workers, which caused Fogarty-Hardwick to lose custody of her two daughters in a dependency proceeding.[2]

Although the County makes numerous arguments challenging liability in this case, none of them is persuasive.  Similarly, we reject the County's challenge to the amount of damages awarded, and to the trial court's use of a "multiplier" in connection with its award of attorney fees to Fogarty-Hardwick.

However, we do conclude the trial court erred by awarding injunctive relief against the County, and remand the case to the trial court with directions to strike that injunctive relief from the judgment.  In all other respects, the judgment is affirmed.

### FACTS

Fogarty-Hardwick and her former husband separated in 1995, and obtained a status-only judgment of dissolution in early 1998.  The couple has two daughters, K. and P.  K. is autistic.  Initially, Fogarty-Hardwick had primary custody of the girls, with her former husband having custody three weekends per month.  However, in late 1999,

---

[1]      Section 1 of the Civil Rights Act of 1871, provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." (42 U.S.C. § 1983, rev. stat. § 1979.)

[2]      The County has filed two requests for judicial notice.  The first was filed in conjunction with its opening brief on appeal, and asks us to judicially notice portions of the records in the underlying dependency court and family court proceedings.  The County contends the documents provide evidentiary support for arguments advanced in the opening brief.  The second request was filed in conjunction with the County's reply brief, and asks us to judicially notice a different part of the record in the dependency case, which it contends would refute evidence relied upon by Fogarty-Hardwick in her respondent's brief.  None of these portions of the dependency case record was in evidence at trial; nor does the County contend it asked the trial court to take judicial notice of them.  We consequently deny both requests for judicial notice.

2

the husband made a motion in the family court for full custody, claiming he had difficulty coparenting with Fogarty-Hardwick.

In November of 1999, Fogarty-Hardwick brought K. to the therapist who had been engaged to help the girls "adjust[] to their father's recent remarriage." They reported to the therapist that Fogarty-Hardwick's former husband had sexually abused K. The therapist was under a mandatory duty to report such allegations to authorities, and she did so.

As a result of the therapist's report, the Orange County Social Services Agency (SSA) filed a dependency petition alleging the two daughters were at risk of serious physical harm or illness, and sexual abuse. At the initial detention hearing on November 19, 1999, the court ordered the children remain in the custody of Fogarty-Hardwick, with her former husband allowed monitored visitation. Although another social worker was initially assigned to the case, Vreeken succeeded her in fairly short order. Dwojak was Vreeken's supervisor, and also had some direct involvement in the handling of the case.

Unfortunately, there were problems with the former husband's visitation, and disputes arose as to who was responsible for those problems. Among other things, the daughters were uncooperative, and apparently expressed unwillingness to visit with their father. Additionally, K. made allegations of misconduct against one of the monitors, and he was replaced for a period of time.

On February 8, 2000, SSA filed an amended petition, adding allegations that K. had been placed in the middle of her parents' deteriorating relationship; that Fogarty-Hardwick had made derogatory comments to her, causing her to suffer "anxious attachment" to Fogarty-Hardwick; and that Fogarty-Hardwick's "hypervigilant attitude" toward her former husband and his new wife had caused K. to suffer emotional distress.

On February 13, 2000, Fogarty-Hardwick brought her daughters to a monitored visit with their father. The daughters resisted, and although the monitor tried

3

to coax them, he was unsuccessful, and Fogarty-Hardwick ultimately took them home.
Two days later, Fogarty-Hardwick brought the girls for another monitored visit at the
SSA office.   The visit itself went well, but in its wake, Vreeken spoke with both girls,
telling them they were *required* to visit with their father, and "if they didn't visit with
their father, the judge was going to put them in a home." This caused both girls to
become frightened and start to cry.  P. ran to get her mother, leaving K. alone with
Vreeken.  When Vreeken brought K. to join P. and Fogarty-Hardwick, K.'s face was
discolored and her eyes were swollen.

  Vreeken informed Fogarty-Hardwick (apparently outside of the children's
presence) that she had told the children they would be placed in a home if they didn't
visit with their father, which upset Fogarty-Hardwick to such a degree that she vomited.
She begged Vreeken for guidance as to what more she could do, because she didn't want
to lose her daughters.  Vreeken responded with "you'd better call your attorney."

  On February 17, 2000, two days after that disastrous meeting, the court
held a hearing on the allegations of the amended petition.  In connection with the hearing,
the court had an off-the-record discussion with counsel, and also a discussion with
Vreeken.  Vreeken made false allegations against Fogarty-Hardwick, including assertions
that she had caused her daughters to skip a mandatory visit with their father, and that she
had told the children that their father was trying to take them away from her.  In reality, it
was Vreeken, and not Fogarty-Hardwick, who had made inappropriate comments to the
children, including the threat that if they did not visit with their father, they would be put
"in a home." The social workers also alleged Fogarty-Hardwick had been responsible for
turning K. against the visitation monitor.

  Although Fogarty-Hardwick denied all these things, the court nonetheless
concluded, based upon the evidence of Fogarty-Hardwick's conduct as reported by the
social workers, that she was "using these children." The court emphasized "[t]here is no
question in my mind, based on what I have got right now before me, that that's what's

going on." The court acknowledged that Fogarty-Hardwick denied engaging in the conduct the social workers had accused her of, and noted: "it may well be that you are right and you didn't say these things, but from the evidence I have before me right now, it looks like you [did.] And just as at the detention hearing, I have got to be looking out for the welfare of these children. I have got to do that today, too, based on what I have before me right now. . . . I think I have no other choice but to do that. [¶] So I am going to find that it's of immediate and urgent necessity for the protection of these children that they be removed from your home . . . ." The children were taken into SSA custody that same day.

The social workers then filed a second-amended petition on February 23, 2000, in which they reiterated, as official allegations, the false claims they had made to the court at the February 17 hearing.

After the girls were removed from Fogarty-Hardwick's custody, they were placed in the Orangewood Children's Home, where they remained for more than a month. Fogarty-Hardwick was restricted to supervised visitation. Although the court authorized SSA to return the girls to Fogarty-Hardwick's custody on February 23, 2000, the social workers refused to do so. Instead, on March 21, 2000, the girls were moved to foster care, where they remained until May of 2000.

Meanwhile, on March 1, 2000, after a trial setting conference, Vreeken engaged in a highly charged conversation with Fogarty-Hardwick concerning the false claims made by the social workers about Fogarty-Hardwick's conduct. Vreeken got angry, and threatened that if Fogarty-Hardwick did not "submit" to her will, she would "never see [her] kids again." And while both girls, and especially K., exhibited significant emotional distress in their placement, which was reported to SSA by their therapist, that information was not conveyed to the court by the social workers. Instead, Vreeken falsely claimed, under oath in testimony before the court, that the children were doing well.

Both social workers also demeaned Fogarty-Hardwick to others involved in the case, portraying her as a spoiled beauty queen who was born with all the advantages and was used to getting her way.

In May of 2000, the dependency court ordered an evaluation of the children by a licensed family therapist, in an effort to determine the truth of K.'s assertion that her father had molested her, and the extent to which the parents' conduct was otherwise causing the children to suffer emotional distress. In her report, the therapist concluded that neither parent would knowingly abuse the children, and neither posed any significant risk of physical harm to the children. She believed K.'s accusation of sexual abuse had been "too coincidental" to be credible, and did not appear "spontaneous." The therapist did not conclude that Fogarty-Hardwick had made any conscious effort to encourage K. to make a false claim of sexual abuse, but believed that due to K.'s autism, she was less able to differentiate between her own experiences and what she had been told. Thus, Fogarty-Hardwick's own fears and preoccupation with the issue had unduly influenced K.'s perceptions.

The therapist also found that both parents had inflicted some degree of emotional abuse on the children, by virtue of their difficult relationship, but that the father was more able to differentiate between his own needs and those of his children, and was thus better at shielding the children from his emotional issues.

The therapist concluded that while Fogarty-Hardwick's visits with the children should remain monitored, her former husband should be allowed unrestricted contact.

Ultimately, on May 19, 2000, Fogarty-Hardwick signed a voluntary case plan, which provided the dependency case would be dismissed, and the children released from foster care, upon certain conditions. Specifically, the children would be released into the temporary custody of their father, and Fogarty-Hardwick would be restricted to

monitored visitation, which could be increased, and the terms liberalized, as she complied with the requirements of the plan.

Fogarty-Hardwick believed that her acquiescence in the plan was necessary to get her children out of foster care, and felt that she had no choice but to agree, given the difficulties suffered by the children while in foster care. Once the plan was signed, the dependency case was dismissed, and the custody issue was transferred back to the family court.

Despite Fogarty-Hardwick's complaints, and the concerns expressed by others about the handling of this dependency case, SSA did not investigate the situation or consider assigning different social workers to the matter. Neither of the social workers involved was disciplined. Instead, Vreeken was promoted to supervisor in 2001.

The custody proceedings in family court were protracted, and the court did not enter a final custody order until December of 2001. In that order, it awarded legal and physical custody of the children to Fogarty-Hardwick's former husband. However, as the County acknowledges, while the family court concluded that no sexual abuse had occurred, it "believed Deanna thought the [child abuse] accusation to be true . . . ," and thus made no determination she had acted in bad faith in connection with the dependency proceedings.

Fogarty-Hardwick finally regained shared custody of her daughters in June of 2006. She had filed this lawsuit in February of 2001, alleging tort causes of action based upon state law, as well as causes of action under federal law, which sought damages based upon alleged violations of her constitutional right to familial association. The basis of these causes of action was Fogarty-Hardwick's allegation that the County's social workers had relied upon "intentional[ly] false statements," fabricated evidence, and "perjury" as part of a successful effort to convince the juvenile court to remove her daughters from her custody and place them in foster care.

7

Fogarty-Hardwick also alleged the social workers deliberately withheld information from the court concerning the emotional detriment suffered by her daughters while in foster placement, and thereby convinced the court to extend the children's placement. Fogarty-Hardwick also asserted the County had a policy of "deliberate indifference" to the rights of parents in her situation, and as a result of that policy, the County failed to supervise, control or direct the conduct of its social workers.

The County challenged several iterations of Fogarty-Hardwick's complaint, and relied upon collateral estoppel and absolute immunity under state law as the bases for its demurrer to her second amended complaint. Although the trial court sustained that demurrer in its entirety without leave to amend, this court determined the ruling was correct only as to the state law tort claims. Rather than relying upon the arguments made by the trial court in sustaining the demurrer, we concluded Fogarty-Hardwick had failed to state a cause of action under state law. However, we also concluded the causes of action based upon the alleged violation of Fogarty-Hardwick's federal civil rights had been properly alleged, and reversed the judgment with directions to overrule the demurrer with respect to those claims. (*Fogarty-Hardwick v. County of Orange* (Mar. 29, 2004, G030302) [nonpub. opn.].)

In that prior opinion, we noted that while the County had relied upon absolute immunity in its original appellate briefs, it had omitted any reference to the defense in a supplemental brief filed in response to this court's invitation for further briefing with respect to the federal civil rights claims. We suggested the omission reflected the County's recognition that a then-recent decision of the Ninth Circuit Court of Appeals, *Miller v. Gammie* (9th Cir. 2002) 335 F. 3d. 889, "holds that social workers have absolute immunity only for the quasi-prosecutorial decision to institute dependency proceedings. Beyond that, the burden is on a social worker defendant to show that other functions he or she performed are similar to conduct accorded absolute prosecutorial immunity at common law." (*Fogarty-Hardwick v. County of Orange, supra,* G030302, p.

8

14.) We then noted that the claims asserted by Fogarty-Hardwick included conduct occurring after the initiation of the dependency case, and thus that "the demurrer to the federal claims cannot be sustained on this ground." (*Id.* at p. 15.) We specifically left it to the trial court, on remand, "to sort out which of the individual defendants may be protected by absolute (or qualified) immunity, should that issue be raised by the County upon a proper motion." (*Ibid.*)

In its answer to the second amended complaint, the County pleaded the affirmative defense of qualified immunity, but did not plead the defense of absolute immunity. The parties then conducted discovery.

In April of 2006, the County moved for summary judgment, arguing (among other things) that (1) all of the wrongful conduct alleged against the social workers qualified as "quasi-prosecutorial," and was thus protected by absolute immunity; and (2) the alleged conduct fell within the absolute testimonial privilege. Deanna opposed the motion, arguing the defense of absolute immunity had been waived by the County's failure to plead it, and the court denied the motion in October of 2006.

In December of 2006, less than a month before trial was scheduled to commence, the County filed a noticed motion for leave to amend its answer to include the defense of "absolute, judicial, prosecutorial and testimony privilege of federal law." In doing so, the County specifically requested the court to exercise its discretion to allow the late amendment "in the furtherance of justice." Fogarty-Hardwick opposed the attempt, arguing she would be prejudiced by the late addition of an absolute immunity defense. The trial court agreed, and denied the motion.

At the completion of trial, the jury returned special verdicts in favor of Fogarty-Hardwick. The jury found that both Vreeken and Dwojak "intentionally violate[d] the plaintiff's right to familial association or right to privacy"; that they did so "while acting or purporting to act in the performance of their official duties"; and that their conduct was a substantial factor in causing harm to Fogarty-Hardwick. In

9

connection with the misconduct of Vreeken, the jury answered the question "What are Deanna Fogarty-Hardwick's damages?" with a total of $117,386, including past and future economic loss, and past and future non-economic loss.  In connection with the misconduct of Dwojak, the jury answered the same question by concluding Fogarty-Hardwick's "damages" totaled $273,900 including past and future economic loss, and past and future non-economic loss.

In a separate special verdict form the jury concluded that Vreeken and Dwojak's conduct occurred "as a result of the official policy or custom of the County of Orange," and in connection with that verdict, the jury concluded Fogarty-Hardwick's damages were $2,260,785, including past and future economic loss, and past and future non-economic loss.

The jury also concluded that the County was "deliberately indifferent to the need to train and/or supervise its employees adequately," and that failure was both the cause of Fogarty-Hardwick's loss of familial association and a substantial factor in causing harm to her.  In connection with that special verdict, the jury concluded Fogarty-Hardwick's damages totaled $2,260,785, including past and future economic loss, and past and future non-economic loss.

With respect to damages specifically, the jury returned a special verdict concluding that "regardless of the award of damages in [the other verdict forms] . . . , the total damages suffered by" Fogarty-Hardwick were $411,456 in past economic losses; $36,400 in future economic losses; $2,810,000 in past non-economic losses; and $1,655,010 in future non-economic losses.  These "total damage" numbers add up to $4,912,866 – the same total reached by adding up the separate damage amounts assessed against each defendant (including *both* damage amounts of $2,260,785 assessed against the County.)

Finally, the jury found that both Vreeken and Dwojak acted with "malice, oppression or fraud." The jury assessed punitive damages against Vreeken in the amount of $1,800, and against Dwojak in the amount of $4,200.

The court entered judgment in favor of Fogarty-Hardwick and against: (1) Vreeken in the amount of $119,186; Dwojak in the amount of $278,100; and the County of Orange in the amount of $4,521,570. The court also issued an injunction prohibiting SSA from (1) "including allegations in a juvenile dependency petition under Cal. Welf. & Inst. Code § 300 against any parent or guardian of a child without some reasonable and aticulable [sic] evidence giving rise to a reasonable suspicion that the child has been abused, neglected or abandoned *by the accused parent or guardian*, or is in imminent danger of abuse, neglect or abandonment by that parent"; or (2) requiring a parent or guardian to sign its "'Agency-Parent Temporary Agreement'" or releases of confidential information (e.g., medical, psychological[,] psychiatric, employment) unless the agency has some reasonable and articulable evidence giving rise to a reasonable suspicion that the parent whose records or information are sought has abused, neglected or abandoned the child, or the child is in imminent danger of abuse, neglect or abandonment by that parent."

After the entry of judgment, the County moved for a judgment notwithstanding the verdict, arguing that defendants were entitled to absolute immunity under federal law. The County acknowledged the court had earlier refused to allow this defense, but asserted the issue had been properly raised and was supported by the evidence adduced at trial. The County also moved for a new trial, arguing the court had abused its discretion in denying its pretrial motion to add the defense of absolute immunity to its answer. The court denied both motions, and, in doing so, reiterated its conclusion the County had waived the defense of absolute immunity.

11

I

The County first argues Fogarty-Hardwick's claims are barred in their entirety, because this case represented an attempt to "relitigate" the issue of custody, which was already "fully litigated" in both the dependency and family law cases.

We disagree. The County's argument ignores the fact that custody orders are, by their nature, sui generis. A court's analysis of what custody arrangement would be in the best interests of the children is based upon an evaluation of facts and circumstances as they exist *at the time the order is made*, and such orders – even if deemed "permanent" – may be altered and modified based upon a significant change in circumstances affecting the court's evaluation of what custody arrangement is currently in the child's best interests. (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256; Fam. Code, §§ 3011, 3020, 3022, 3087.) Thus, a custody order establishes nothing more than what arrangement is in the children's best interests, in light of the circumstances found to exist on the date it issued.

Consequently, the fact a family court ultimately ordered that Fogarty-Hardwick's former husband would retain custody of her two daughters in December of 2001 – a year and a half after he had been given temporary custody (and Fogarty-Hardwick only limited visitation) as a result of the dependency case – *in no way* establishes that the same order would also have been made back in February of 2000, when Fogarty-Hardwick herself still enjoyed primary custody.

Clearly, the dependency case itself was an enormous change in circumstances. Even aside from the change in custody that directly resulted from it, we are certain the court in the family law case would have presumed the dependency case had been handled appropriately; that the juvenile court's decision to remove the girls from Fogarty-Hardwick's custody and place them in foster care had been based upon truthful and sufficient evidence, and that the stipulated termination of that dependency

12

proceeding reflected both parents' voluntary acquiescence in the conditions imposed upon them.

None of those very significant presumptions would have played any part of a custody determination made by the family court in February of 2000. Consequently, there is simply no basis for assuming the family court would have taken custody away from Fogarty-Hardwick, and awarded it to her husband, had it been asked to rule on the issue at that time.

Likewise, the stipulated termination of the dependency case, which awarded temporary custody of the girls to Fogarty-Hardwick's former husband, is an insufficient basis to support a finding of collateral estoppel. Even more so than the later custody order, the stipulated termination of the dependency case was very much *the product* of the particular circumstances and events leading up to it – and specifically of the social workers' misconduct in that case.

Had the social workers not wrongfully caused the girls to be taken from Fogarty-Hardwick's custody and placed in foster care, there is nothing in the record suggesting she would have voluntarily agreed to relinquish custody. To the contrary, Fogarty-Hardwick testified she did so *only* because she felt coerced by the social workers, and believed she had no other choice if she wanted to free her daughters from foster care. Because the outcome of the dependency case was irretrievably prejudiced by the very misconduct which is at the core of this case, it cannot be cited as evidence of what would have happened in the absence of that misconduct. We cannot engage in the kind of "boot-strapping" that would allow the County to rely upon the outcome of the tainted dependency case as a basis to avoid liability for the very acts which tainted it.

*Buesa v. City of Los Angeles* (2009) 177 Cal.App.4th 1537, cited by the County in a letter filed after briefing was completed, does not alter our collateral estoppel analysis. According to the County, *Buesa* stands for the proposition that "perjury" can never form the basis of a collateral attack on a judgment. As applied here, the County's

13

argument seems to be that the specific dispositional order depriving Fogarty-Hardwick of custody in the dependency case is presumed to be "correct," and cannot be collaterally attacked on the basis it was obtained through perjured testimony. *Buesa* is distinguishable.

In *Buesa*, police officers filed an action for damages against the City of Los Angeles, based upon the wrongful termination of their employment. The court dismissed the action, citing collateral estoppel based upon an earlier writ of mandate action in which the officers unsuccessfully sought a court order requiring the city to reinstate them. The "central issue" in the mandate action had been the officers' contention that the disciplinary action which resulted in their terminations was barred by the statute of limitations contained in the Public Safety Officers Procedural Bill of Rights Act, commonly referred to as POBRA. (Gov. Code, § 3300 et seq.) (*Id.* at p. 1548.) However, the City successfully contended that limitations period had been tolled for a sufficient period to render the disciplinary action timely.

In the subsequent damages action, the officers alleged the court's calculation of the tolling period in the mandate action was based upon the perjured testimony of a city witness, and sought damages (rather than reinstatement of their employment) as a result of the City's violation of their rights under POBRA. Thus, in *Buesa*, the officers had simply filed two successive actions – the first seeking equitable relief, and the second seeking damages – based upon the *identical assertion* that the city had previously violated their rights when it initiated disciplinary action in violation of the POBRA statute of limitations. The officers' assertion of perjury in the mandate proceeding was nothing more than a justification for allowing them to *relitigate* the same statute of limitations issue in the damages case, so it amounted to an assertion the prior mandate judgment should be disregarded on the basis of *intrinsic* fraud, which has never been an acceptable basis for attacking a final judgment. (*Pico v. Cohn* (1891) 91 Cal. 129; *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1.)

14

In this case, by contrast, Fogarty-Hardwick did not initiate successive proceedings, each seeking relief against the same party, based upon the same prior acts of misconduct and the same injury. Stated simply, her injuries *arose out of* the proceeding in which the perjury occurred, i.e., the corrupted dependency proceeding, and she had no ability to assert any claim based upon those injuries within *that proceeding*. Collateral estoppel will not be applied unless "the party against whom the earlier decision is asserted had a 'full and fair' opportunity to litigate the issue." (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 90.) And it will not be applied "if injustice would result or if the public interest requires that relitigation not be foreclosed." (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 902, disapproved on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888.)

More fundamentally, the County's attempt to give collateral estoppel effect to the dispositional order in a dependency case ignores the special nature of such proceedings, which may include successive "final" orders which are not really intended to be *final* in the manner of an order issued in other cases.

Dependency cases are, by their nature, fluid, and specifically intended to address the present and future interests and needs of the affected children. As explained in *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, all juvenile court orders made during the pendency of the case, even those deemed "final" and no longer subject to appeal, are considered inherently changeable pursuant to Welfare and Institutions Code section 388, and are thus not entitled to the same res judicata or collateral estoppel effect that attach to other judgments. "In light of the ongoing nature of the proceedings and the express statutory authority permitting modification, principles of res judicata and collateral estoppel do not bar a modification of a [final] dispositional order . . . ." (*Id.* at p. 879.)

Moreover, the fluid nature of dependency proceedings, and the paramount need to protect the well-being of the children, require these proceedings to move very

15

quickly in response to alleged changes in circumstances, especially with respect to any assertion a child is currently at risk of harm. "Dependency proceedings are part of a comprehensive statutory scheme geared toward expediency, largely to serve the dependent child's best interests. (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1152.) 'Of the many private and public concerns which collide in a dependency proceeding, time is among the most important.' (*Ibid.*)" (*In re Claudia E.* (2008) 163 Cal.App.4th 627, 635.)

Unfortunately, a rule requiring the rigid application of collateral estoppel to the intentionally fluid interim decision-making of a dependency court, would inevitably encourage parties to litigate more aggressively, and even to launch collateral challenges to those decisions during the pendency of the proceeding. In this case specifically, the County is arguing that Fogarty-Hardwick was bound by the court's February 17, 2000 order, removing her children from her custody, because she never had that ruling overturned. But given the nature of Fogarty-Hardwick's challenge to that ruling – that it was based upon the social workers' falsified evidence – her only avenue for doing so would have been to file a writ of habeas corpus; such a claim would not be cognizable in an ordinary appeal. Thus, what the County is proposing is a rule which requires a parent to engage in collateral attacks on the validity of prior dependency orders (and on the integrity of the social workers), during the dependency case itself, if they wish to preserve any civil claims.

We conclude that such a requirement would be inconsistent with the special nature of dependency proceedings and would interfere with the interests intended to be served in those proceedings. The better policy is to encourage all participants in a dependency action to maintain their focus *on the children*, and to work together as much as possible to quickly address *their* needs on a going-forward basis. To the extent *that focus* requires a parent to directly challenge the actions or motivations of a social worker, then such a challenge would be appropriate. But a requirement that such a challenge be

16

fully litigated *in the dependency proceeding*, merely to preserve the parent's right to maintain a future damages action, would not be.[3] (See *In re Claudia E., supra*, 163 Cal.App.4th at p. 637 [characterizing the habeas corpus remedy as "a time-consuming process that is inimical to the expedient processing of cases and one which most likely will be impractical in the crowded dependency system."].)

In *People v. Percifull* (1992) 9 Cal.App.4th 1457, the appellate court relied upon the special nature and purposes of a dependency case in denying collateral estoppel effect to a dependency court's judgment exonerating a parent of a charge he had committed an act which also constituted the felony of child cruelty. The court noted that while a conviction of the parent on that felony charge would be "inconsistent" with the judgment of the juvenile court, according collateral estoppel effect to that judgment would be inappropriate considering the extent to which "the two proceedings serve different public interests and purposes . . . ." (*Id.* at p. 1461.)

We conclude a similar analysis is proper here. The goal of the dependency case was to protect the children, and the court's need to act quickly to fulfill that goal would have been undermined by a rule essentially requiring Fogarty-Hardwick to pursue any claim for perjury or falsification of evidence she might wish to bring against the social workers prior to the conclusion of that proceeding.

## II

The County also argues the judgment must be reversed because while it grudgingly admits Fogarty-Hardwick provided the jury with sufficient evidence to demonstrate the social workers committed egregious acts of misconduct in the

---

[3]     And of course, the natural tendency of a parent who wishes to maintain (or regain) custody of the children would be to curry favor with the social workers, not alienate them. In this case, even after the relationship between Fogarty-Hardwick and Vreeken had broken down, Fogarty-Hardwick continued to seek guidance from Vreeken, and to try to satisfy her concerns relating to the underlying issues. That spirit of cooperation – even in a flawed relationship – is to be encouraged, and would be undermined by the initiation of collateral litigation which questioned the social worker's professionalism and integrity.

dependency case,[4] it also contends the circumstances of this case demonstrate, as a matter of law, that the misconduct did not *cause* Fogarty-Hardwick to lose custody of her children in the dependency case.

The County first contends that events occurring after the children were removed from Fogarty-Hardwick's custody in the dependency case, including the stipulated termination of that dependency case, in which the children were released to the custody of Fogarty-Hardwick's former husband, and the family court's ultimate award of custody to the former husband – demonstrate Fogarty-Hardwick was destined to have lost custody in any event.

We find the contention, which amounts to a restatement of the collateral estoppel argument, unpersuasive. As we have already explained, the outcome of the dependency case, as well as the later award of permanent custody to Fogarty-Hardwick's former husband in 2001, were both profoundly influenced by the dependency court's initial decision to remove the children from Fogarty-Hardwick's custody; and that order was, in turn, caused by the misconduct of the social workers. There is no compelling reason to conclude that, in the absence of the misconduct, those subsequent custody orders would have been the same.[5]

Second, the County relies upon civil rights claims arising out of criminal cases, and argues that a rule developed therein which requires a reversal or vacation of

---

[4]     As the County concedes, "[Fogarty-Hardwick] demonstrated (if the testimony is to be believed) that in this one instance, social workers lied and fabricated evidence in connection with the dependency proceedings relating to [her] children."

[5]     Based upon the same analysis, we also reject the County's related assertion that Fogarty-Hardwick's claim for damages was "cut off" as of the date she signed the voluntary case plan which provided for termination of the dependency case and an award of temporary custody to her former husband. There was substantial evidence supporting the inference Fogarty-Hardwick would never have agreed to such an arrangement in the absence of the social worker's misconduct, and that her acquiescence was anything but "voluntary." Similarly, the family court's subsequent award of permanent custody to the husband did not preclude Fogarty-Hardwick's claim for damages past that time. As we have explained, that order must have been significantly affected by the events and outcome of the dependency case; it would thus be more properly construed as evidence of her *continuing damages*.

18

the criminal judgment itself to demonstrate the plaintiff was directly harmed by the underlying misconduct, should be applied to dependency proceedings as well.

The contention is based upon *Heck v. Humphrey* (1994) 512 U.S. 477, in which the Supreme Court held "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a [42 U.S.C. section 1983] plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. [section] 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under [42 U.S.C. section 1983]." (*Id.* at pp. 486-487.)

But as the Supreme Court explained in *Heck*, its conclusion was based upon "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments . . . ." (*Heck v. Humphrey, supra,* 512 U.S. at p. 486.) And of course, that principle is not applicable here, for the obvious reason that a dependency case is not a criminal action. Moreover, the numerous avenues to challenge a criminal conviction listed in *Heck* are not necessarily available in a dependency case – as far as we are aware, there is no procedure for "expungement" of a dependency dispositional order – and even though a writ of habeas corpus might be theoretically available (at least during the time the child actually remains in detention),[6] we have already explained why requiring a parent to resort to such a remedy, merely to preserve a subsequent claim for damages, is inconsistent with the goals of the dependency proceeding. We therefore decline to extend this rule applicable to criminal convictions and sentences to the challenged ruling in the underlying dependency case.

---

[6]     As a general rule, release of the detained individual would render a request for habeas corpus relief moot. (*In re Stinnette* (1979) 94 Cal.App.3d 800, 803.)

Finally, the County argues that the oral statements made by the dependency court, explaining its decision to remove Fogarty-Hardwick's children from her custody in February of 2000, demonstrate the decision was not actually motivated by the social workers' lies, but was instead based upon the court's concern that Fogarty-Hardwick "was using her children and thus interfering with visitation."

There are several problems with this assertion as a basis for challenging the jury's finding of causation, not least of which are (1) that the contention effectively asks us to *interpret* the court's comments in a manner which favors the County, which is inconsistent with our obligation to indulge all inferences in favor of the judgment; and (2) that one of the lies told by the social worker was that Fogarty-Hardwick *had caused her daughters to miss a visit with their father,* which would presumably have provided direct support for the court's conclusion she was "interfering with visitation."

But the most significant problem with the County's contention is that it amounts to an attack on the sufficiency of the evidence to support causation – an attack launched without acknowledging the heavy burden imposed on an appellant who does so.

"An appellate court "'must *presume* that the record contains evidence to support every finding of fact . . . .'" (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887, italics added; see *Brown v. World Church* (1969) 272 Cal.App.2d 684, 690, ["'a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact'"].) It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence. (*Brown v. World Church, supra,* 272 Cal.App.2d 684, 690.) This burden is a 'daunting' one. (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328-329.) 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable,* and *show how and why it is insufficient.* [Citation.]' [Citation.] '[W]hen an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient.

He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.' (*Hickson v. Thielman* (1956) 147 Cal.App.2d 11, 14-15.)" (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.)

Moreover, the appellant's burden to provide a fair summary of the evidence "grows with the complexity of the record." (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290.) The record before us is quite substantial (including 14 volumes of reporter's transcript, and 11 volumes of clerk's transcript.) And yet the County supports its attack on the sufficiency of the evidence to support causation with nothing more than a single piece of evidence, which it asks us to *interpret* favorably to it. We find the effort inadequate and the argument unpersuasive.

### III

The County next argues its liability to Fogarty-Hardwick is precluded by the defense of absolute immunity. In doing so, however, the County simply addresses the merits of that defense, making the somewhat controversial assertion that it should be applied to all misconduct of a social worker in connection with a dependency court proceeding (but see *Miller v. Gammie, supra,* 335 F.3d. 889 [explaining why qualified immunity is the defense more generally applicable in such cases]; and *Beltran v. Santa Clara County* (9th Cir. 2008) 514 F.3d. 906, 908 [concluding social workers "are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute."])

However, what the County does not do is acknowledge that the trial court deemed the absolute immunity defense to have been *waived* in the proceedings below (See *Collyer v. Darling* (6th Cir. 1996) 98 F.3d 211, 222 ["Given that the defense of absolute immunity was not affirmatively pleaded or argued . . . and in light of the

21

significant distinctions between qualified and absolute immunity claims, this defense was affirmatively waived . . . ."].) And having failed to acknowledge the waiver determination made below, the County has made no effort to demonstrate the trial court abused its discretion in making it.

In particular, the County does not even *mention* in its opening brief on appeal that it failed to plead absolute immunity as a defense in its answer, or that it moved to add the defense to its answer only shortly before trial. We find it quite remarkable that opening brief does not acknowledge that the court denied that motion as untimely, and that the County did not include that order as part of the record on appeal.[7]

"One of the essential rules of appellate law is that '[a] judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]' (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) It is the duty of the appellant to present an adequate record to the court from which prejudicial error is shown. (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1533.)" (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 865.)

Here, we are required to begin with the presumption the court ruled correctly when it denied the County leave to add the absolute immunity defense to its answer prior to trial. The County having failed to even claim, let alone establish, that ruling amounted to error, we must affirm the trial court's determination the defense of absolute immunity was waived.

IV

The County also contends liability was precluded by the defense of qualified immunity, but its argument seems to be predicated on the idea that Fogarty-Hardwick had to satisfy a distinct burden of proving causation in connection with the

---

[7]     The County's motion to amend its answer is included in the record, along with Fogarty-Hardwick's opposition. The County admits, in its reply brief, that the motion was denied.

22

defense – apparently a different element of causation than the one she satisfied in connection with her prima facie case – and that she purportedly failed to do so.

Specifically, the County relies on *Ramirez v. County of Los Angeles* (2005) 397 F.Supp.2d 1208, which it contends stands for the proposition that in order to "defeat qualified immunity" in a case where governmental actors falsified information to the court and deceived the court, . . . a plaintiff would have to show "that but for the dishonesty, the challenged action would not have occurred." But Ramirez says no such thing. To the contrary, *Ramirez* addresses a police officer's motion for summary judgment based upon the affirmative defense, and thus necessarily involves only *what the officer must prove* in order to justify such relief.

Significantly, what *Ramirez* ultimately concludes is that a police officer who knowingly falsified evidence in support of a search warrant application, in circumstances where he should have known the evidence was otherwise insufficient to support the warrant, was not entitled to rely upon qualified immunity as a defense. In doing so, the court quoted the rule set forth in *Branch v. Tunnell* (1991) 937 F.2d. 1382, 1387: "'If an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, ... he cannot be said to have acted in an objectively reasonable manner,' and the shield of qualified immunity is lost."

Thus, the *Ramirez* decision simply reflects an understanding that the essence of the federal defense of qualified immunity is the *reasonableness*, or "good faith," of the defendant's conduct. The defense is applicable in situations where defendants establish that their actions, even if harmful to plaintiff's constitutional rights, were nonetheless carried out in good faith. As explained by the Supreme Court, "[q]ualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo* (1980) 446 U.S. 635 [fn. omitted]. Decisions of this

23

Court have established that the 'good faith' defense has both an 'objective' and a 'subjective' aspect. The objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.' *Wood v. Strickland* (1975) 420 U.S. 308, 322. The subjective component refers to 'permissible intentions.' *Ibid.* Characteristically the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or if he took the action with the malicious intention* to cause a deprivation of constitutional rights or other injury . . . .' *Ibid.* (Emphasis added.)" (*Harlow v. Fitzgerald* (1982) 457 U.S. 800, 815, fn. omitted.)

In this case, the jury specifically concluded that Vreeken and Dwojak lied, falsified evidence, and suppressed exculpatory evidence – all of which was material to the dependency court's decision to deprive Fogarty-Hardwick of custody – and that they did so with malice. These findings are clearly sufficient to satisfy the Supreme Court's definition of circumstances in which "qualified immunity would *not* be available."

There was no error in the rejection of qualified immunity in this case.

V

The County also claims, in conclusory fashion, that Fogarty-Hardwick failed to demonstrate "that the County had a policy of condoning perjury in reports or testimony." As the County asserts, such a failure of proof would preclude any finding of liability against the County itself, since "[i]n order to hold a public entity liable, a plaintiff must show that a public official or employee acted pursuant to an official policy and custom." (*Monell v. Department of Social Services* (1978) 436 U.S. 658.) This amounts to a contention that the judgment against the County was unsupported by substantial evidence.

24

However, in asserting this claim, the County has once again failed to make any effort to satisfy its burden to summarize the evidence on the point, favorable and unfavorable, and show how and why it is insufficient. Indeed, the County supports its attack on the substantial evidence with nothing more than a bare assertion that Fogarty-Hardwick "did not prove or submit evidence to show a municipal policy that condoned or encouraged lying or fabricating evidence." The assertion is then followed by an intriguing acknowledgment that Fogarty-Hardwick "may point to defendants' requests for admission that the social workers acted pursuant to municipal policy or custom" in support of the contention that such policies existed, but then suggests that this discovery should be construed favorably to the County, in accordance with its own *assumptions* employed in responding. But there is not a single citation to the record contained within this argument, which (including a discussion of legal authorities) occupies less than one and a half pages of the County's opening brief.

Under these circumstances, we have no choice but to conclude the County waived its claim of insufficiency of the evidence to support the existence of a policy. But even if we were to consider the issue on the merits, we would almost certainly have to reject it in any event. In accordance with the usual procedures on appeal we simply could not, as the County requests, indulge inferences *in its favor* based upon what it contends were its unspoken assumptions in responding to discovery. We are obligated to indulge all inferences in favor of the judgment.

Assuming, as the County states, it represented in discovery that its social workers (whom the jury concluded had lied and fabricated evidence) "acted pursuant to municipal policy and custom," that admission would be sufficient to sustain the challenged finding.

VI

The County next asserts the trial court erred in granting Fogarty-Hardwick's motion in limine to exclude evidence she "coached or influenced" her

25

children in connection with claims of sexual abuse against their father. The County asserts this motion was based upon the assertion that such evidence was barred by collateral estoppel, and argues the court erred in granting it because the County was neither a party, nor in privity with any party to the prior proceeding relied upon by Fogarty-Hardwick as the basis of the estoppel.

The County correctly states the requirements for application of collateral estoppel. "The doctrine [of collateral estoppel] applies 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943, quoting *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) Moreover, we would agree the County was neither a party to, or in privity with, any party to the prior action, which was the marital dissolution action between Fogarty-Hardwick and her former husband.

However, once again the County has crafted an argument without fully acknowledging what *actually occurred* in the trial court below. This time, what the County fails to acknowledge is that collateral estoppel was *not the only basis* for Fogarty-Hardwick's motion to exclude the evidence. She also relied upon a hearsay objection, as well as Evidence Code section 352.[8]

As previously noted, we are obligated to indulge all presumptions in favor of the court's ruling. As a consequence, where the record does not establish the

---

[8]     Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

reasoning employed by the court in reaching its decision, we must presume the court based its ruling on whatever argument asserted best supports it.[9] Hence, in order to persuade us the trial court erred in excluding the evidence, the County was required to demonstrate why none of the arguments relied upon by Fogarty-Hardwick was sufficient to support that decision. Because it made no attempt to do so in its opening brief, we presume the ruling was correct.[10]

## VII

The County's last attack on the judgment is based on the assertion the jury's award of damages was excessive, and reflected a disguised award of punitive damages against a governmental entity. In its brief, the County simply pointed to the total compensatory damages assessed against all of the defendants, characterized that total as unusually high and disproportionate to Fogarty-Hardwick's alleged damages,[11] and suggested we infer from the "sheer size" of the award "that the jury acted in a punitive fashion."

However, we found that assertion unpersuasive,[12] and found ourselves more troubled by the significant disparities *among* the damage amounts awarded in the various special verdicts relating to each defendant, and by the fact those special verdicts seem to

---

[9]   There is nothing in the record before us establishing the court actually relied upon the collateral estoppel theory in its ruling.

[10]   The County concedes in its reply brief that Fogarty-Hardwick's motion was grounded on multiple legal arguments. It then argues, for the first time, that (1) the hearsay objection had no merit, and (2) the evidence it sought to rely upon was "not cumulative." The County cannot make these assertions of legal error, for the first time, in a reply brief. But even if we were to consider the points, we would conclude the argument comes up short.

[11]   The disproportionate argument concocted by the County is simply untrue and misleading. The County purported to compare a relatively small *portion* of the economic damages claimed by Fogarty-Hardwick (her medical expenses), against the entire award – including the entirety of both economic and non-economic damages – made by the jury. But Fogarty-Hardwick's economic damages also included the significant legal expenses she had incurred during the years-long custody fight she was forced to wage after she was improperly deprived of custody in the dependency case. In fact, the total amount of *economic* damages alleged by Fogarty-Hardwick at trial (including both medical and legal expenses) actually exceeded the amount of *economic* damages awarded to her by the jury. In addition to those economic damages, Fogarty-Hardwick also sought compensation for her significant emotional distress, and it was the jury's award of those *non-economic* damages which accounts for the bulk of the overall liability assessed.

[12]   Indeed, at oral argument, the County's attorney expressly conceded that $5 million was *not* an unreasonable amount of damages to compensate for the loss of one's children for a period of several years and the concomitant breakage suffered in those relationships.

hold each defendant *separately liable* for those different damage awards.  To reiterate, the damage amounts contained in the special verdicts against each defendant include two *separate* awards of $2,260,785 in damages against the County (as compared to only $117,000 against Vreeken herself, and $274,000 against Dwojak, Vreeken's supervisor), and those awards add up to the "total" amount of damages the jury determined Fogarty-Hardwick had suffered.  There is no overlap in the numbers, and no joint liability imposed for any damages.  While the overall amount of the judgment was not a concern, these disparities did seem to raise the specter of a "punishment" levied against the County for the actions of its employees.

Consequently, we ordered the parties to provide us with supplemental briefing to address the following issues:

(1)    What evidence in this case, or legal authority, supports the jury's conclusion that the damages suffered by Fogarty-Hardwick in this case were divisible, or that a distinct portion of her damages was caused by each defendant and not the others?

(2)    What evidence in this case, or legal authority, supports the jury's conclusion that the County of Orange caused Fogarty-Hardwick to suffer a greater amount of damage than did Vreeken and/or Dwojak themselves?

(3)  What evidence in this case would support the conclusion that the "official policies and customs" of the County of Orange, and/or its failure to train or supervise its employees, caused harm to Fogarty-Hardwick which was distinct and separate than the harm caused by the misconduct of Vreeken and Dwojak?

(4)  What evidence in this case, or legal authority, supports the jury's conclusion that the "official policies and customs" of the County of Orange caused Fogarty-Hardwick to suffer different damages than those caused by its failure to train or supervise its employees?

In response to each of these questions, the County gave new definition to the word "laconic" – merely stating in conclusory fashion that it is unaware of any legal

28

authority or any evidence which would support the distinct damage awards made by the jury in this case, while making no effort to argue its position or to explain why such distinctions might undermine the validity of the compensatory verdicts.

Fogarty-Hardwick, by contrast, made a significant effort to explain why the damage awards in the special verdicts should be upheld. Among other things, Fogarty-Hardwick suggested she suffered "a series of independently compensable injuries" over the course of the events underlying this case.

Fogarty-Hardwick also asserted that the separate damage awards can be appropriately viewed as an "apportionment of fault" among the defendants, and argued the jury could have reasonably concluded the County – which both promulgated the misguided policies which gave rise to the misconduct alleged in this case and failed to adequately supervise its employees – had substantially more responsibility for the effects of that misconduct than did the social workers themselves. Fogarty-Hardwick asserts "the jury's power to apportion fault is as broad as its duty to resolve conflicts in the evidence and assess credibility," citing *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1234.)

Fogarty-Hardwick concedes that no apportionment of fault was requested in this case, but argues that the damage amounts assessed against each defendant – which add up to the total amount of damages which the jury expressly found had been inflicted on Fogarty-Hardwick – demonstrate that the jury actually engaged in the apportionment on its own initiative. She further contends that because the legally appropriate outcome would have been to hold all defendants liable, jointly and severally, for the *entire* $4,912,866 compensatory award, defendants were not harmed by the apportionment, and we should thus uphold the verdicts as rendered.

We agree. In *Jackson*, the court first noted that "[w]hen a plaintiff has suffered a single or indivisible injury, the general rule is that 'each tortfeasor is jointly and severally liable for the entire amount of damages.' [Citation.]" (*Jackson v. City of*

29

*St. Louis* (8th Cir. 2008) 220 F.3d 894, 897.) There is nothing in this case to suggest that a deviation from that general rule would be appropriate. As all parties conceded at oral argument, the County inflicted harm on Fogarty-Hardwick only through the actions of its employees, the social workers. Because those social workers acted pursuant to the policies put in place by the County, it was proper to hold the County directly liable for the damages caused by their actions – but the measure of those damages was *the same* for both employees and employer. And since the jury explicitly found that the overall amount of those damages was $4,912,866, it would have been appropriate to hold all defendants liable, jointly and severally, for that amount.

The fact the jury apportioned Fogarty-Hardwick's damages among the several defendants, rather than holding each liable for the entire amount, might theoretically be harmful to Fogarty-Hardwick (who is not complaining), but we cannot see how it harmed defendants. And indeed, in its response to Fogarty-Hardwick's supplemental brief on the point, the County makes no assertion it was harmed by apportionment. We consequently affirm the damage awards as stated in the judgment.

VIII

And finally, the County attacks the court's award of $1.6 million in attorney fees, arguing the court erroneously double-counted the complexity of the case when it relied upon that factor both as a basis for assigning a lodestar amount, and as a basis for applying a multiplier of 2.5 to that amount. The County contends that as a result of this error, we should remand the case to the trial court, "for a proper determination of attorneys' fees."

The contention is supported by a single case citation, *Ketchum v. Moses* (2001) 24 Cal.4th 1122, in which our Supreme Court is quoted as stating "the difficulty of the question involved [is] *usually* already encompassed by the lodestar." Unfortunately, we cannot locate that quote within *Ketchum*.

30

And other than that somewhat equivocal (and apparently nonexistent) quotation, the County offers no discussion or analysis of the rule it seeks to invoke, either as applied in *Ketchum* or in any subsequent case; nor does it engage in any meaningful analysis of the court's ruling in this case. Thus, the County has completely failed to demonstrate why this case would necessarily run afoul of *Ketchum*. The issue is waived.

IX

The final issue in this case is one we raised on our own motion, and on which we requested the parties provide supplemental briefing. As part of the judgment, the court granted injunctive relief which "permanently" restrains the County, SSA and their employees from (1) "including allegations in a juvenile dependency petition under [Welfare and Institutions Code section] 300 against any parent or guardian of a child without some reasonable and aticulable [*sic*] evidence giving rise to a reasonable suspicion that the child has been abused, neglected or abandoned *by the accused parent or guardian*, or is in imminent danger of abuse, neglect or abandonment by that parent"; and (2) "requiring a parent or guardian of a child to sign its 'Agency-Parent Temporary Agreement' or releases of confidential information (e.g., medical, psychological[,] psychiatric, employment) unless the agency has some reasonable and articulable evidence giving rise to a reasonable suspicion that the parent whose records or information are sought has abused, neglected or abandoned the child, or the child is in imminent danger of abuse, neglect or abandonment by that parent."

We requested the parties address the propriety of this injunctive relief, with particular attention to: "(1) whether the injunctive relief imposes obligations on SSA which are actually or potentially inconsistent with those imposed on it by statute; (2) whether and to what extent the trial court in this case has jurisdiction to control the future conduct of SSA in dependency matters filed in the juvenile court; and (3) whether the injunctive relief granted in this case is, as a practical matter, enforceable."

31

The County responded with a spirited attack on the injunctive relief, arguing it was fatally inconsistent with statutory requirements; the court lacked jurisdiction to impose it; and the order was unenforceable. These assertions are not unexpected; what is surprising is that the County didn't make any of them in its opening brief.

Fogarty-Hardwick defends the injunctive relief as a necessary and appropriate response to the evidence adduced in this case, and argues it represents a proper exercise of the trial court's discretion. We conclude the injunctive relief must be stricken from the judgment.

As Fogarty-Hardwick herself asserts, SSA has only the powers conferred on it by statute, and must comply with the provisions of the Welfare and Institutions Code in its handling of dependency cases. And while a court might properly restrain SSA from acting in a manner which exceeds or is inconsistent with its statutory mandate, it cannot order SSA to do anything which is *different* from that mandate.

In this case, the first injunctive order states SSA is prohibited from including in a dependency petition any "allegations . . . against any parent or guardian of a child without some . . . reasonable suspicion that the child has been abused, neglected or abandoned *by the accused parent or guardian*, or is in imminent danger of abuse, neglect or abandonment by that parent." Although the language is not a model of clarity, we presume it is intended to prohibit SSA from making jurisdictional allegations against parents like Fogarty-Hardwick, who the initial dependency petition alleged had "failed to protect" her child from sexual abuse by Fogarty-Hardwick's former husband, but who was not alleged to have personally "abused, neglected or abandoned" the child.

However, such a blanket prohibition is inconsistent with the statute governing dependency jurisdiction. Welfare and Institutions Code section 300 specifies the circumstances under which a child may be declared a dependent child, and those circumstances include where "[t]he child has suffered, or there is a substantial risk that

32

the child will suffer, serious physical harm or illness, as a result of the *failure or inability*
of his or her parent or guardian to adequately *supervise or protect* the child *or* the *willful*
*or negligent failure* of the child's parent or guardian to *adequately supervise or protect*
the child from the conduct of the custodian with whom the child has been left . . . ."
(Welf. & Inst. Code, § 300, subd. (b), italics added.)

   Under this provision, it is clear that a parent's mere "failure or inability" to
"adequately supervise or protect" the child is distinguished from the parent's "willful or
negligent" failure to do so, and that the Legislature intended *either* circumstance would
be a sufficient basis for imposing dependency jurisdiction. Were we to allow the first
injunctive order in this case to stand, it would impermissibly restrict SSA's ability to rely
upon the mere "failure or inability" of a parent (absent any negligence) to protect the
child from being harmed by others. We cannot do that. To the extent the statutory
standard is considered to be overly broad or too insubstantial a basis for imposing
dependency jurisdiction, that complaint is properly directed to the Legislature, and is not
a proper subject of injunctive relief.

   As for the second injunctive order issued in this case – prohibiting SSA
from "requiring" a parent or guardian to sign an "Agency-Parent Temporary Agreement"
for the release of confidential information absent a "reasonable suspicion" that the parent
in question has "abused, neglected or abandoned the child" – the same considerations
pertain. As the County points out, Welfare and Institutions Code section 16010,
subdivision (f), specifically requires the court, at the initial hearing, to direct "each parent
to provide to the child protective agency complete medical, dental, mental health, and
educational information, and medical background, of the child *and of the child's mother*
*and the child's biological father if known*." (Italics added.) The statute imposes this
requirement without regard to the perceived culpability of the parent in question. Thus,
we cannot uphold an injunctive order which prohibits SSA from requiring parents to sign

33

releases for such mandatory information in cases where it lacks "reasonable suspicion" that the parent has personally "abused, neglected or abandoned the child."

The injunctive orders are also problematic on jurisdictional and enforcement grounds, as well. By their terms, the orders purport to control the conduct of SSA in *future cases* pending before the *dependency* court. As the County points out, once the dependency court establishes jurisdiction over a particular child, "all issues regarding his or her custody shall be heard *by the juvenile court*." (Welf. & Inst. Code, § 304, italics added.) Thus, there are inherent jurisdictional complications presented when an ordinary civil court, exercising its jurisdiction in a tort case, purports to impose blanket restrictions on the manner in which *all future dependency cases* can be handled. Moreover, it appears that enforcement of these orders would be impossible. The future conduct to be enjoined will not, and cannot, be monitored by Fogarty-Hardwick, nor can it otherwise be routinely supervised by the court which issued this order, because juvenile dependency matters are required to be kept confidential. (Welf. & Inst. Code, § 827.)[13]

And while Fogarty-Hardwick seeks to characterize the injunctive relief issued in this case as merely a means of assisting SSA in "promulgat[ing] written policies" and "provid[ing] training" on these issues, that is not what the injunctive orders provide. They explicitly impose restrictions on the conduct of SSA in future dependency court cases. That goes far beyond the mere facilitation of internal policymaking or training. The injunctive relief provisions of the judgment are consequently stricken.

However, our decision to strike the injunctive relief from the judgment should not be viewed by the County as a sign we view it as insignificant. Quite the contrary is true. The fact that a very well respected member of the superior court bench viewed the issuance of injunctive relief as necessary here highlights the egregiousness of

---

[13]     Welfare and Institutions Code section 827, subdivision (a)(1)(L) allows a juvenile case file to be inspected by "A judge, commissioner, or other hearing officer assigned to a family law case with issues concerning custody or visitation, or both, involving the minor," but does not permit any other judicial officer to have access, merely because he purported to issue an injunction which permanently affects all juvenile cases.

defendants' conduct in this case.  Stated plainly, the outcome of this case cannot be dismissed as merely the unfortunate product of a runaway jury.  The evidence adduced at trial obviously caused both the jury *and the judge* to conclude not only that something seriously wrong was done to Fogarty-Hardwick in this case, but also that the wrongful conduct was *not an isolated incident*.  That conclusion is something the County should be taking *very* seriously.

The judgment is reversed and the case is remanded to the trial court with directions to strike the injunctive relief from the judgment.  In all other respects, the judgment is affirmed.  Fogarty-Hardwick is to recover her costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


O'LEARY, J.


MOORE, J.


35

# EXHIBIT "C"

# EXHIBIT "C"

# M E M O

May 11, 2007

TO:       SSA Staff

FROM:   Ingrid Harita, Director
          Michael Riley, Chief Deputy Director

SUBJECT:      Recent Court Actions

As you are all aware, recently an Orange County Superior Court jury returned a verdict against the Social Services Agency and two of our employees in the amount of $4,912,856.

This lawsuit arises out of allegations made by the plaintiff against SSA and the social workers who were involved in the handling of her family's dependency action. The lawsuit is still in progress with another court hearing set to take place on 5-14-07. There will be no final judgment in the case until after that hearing so the information we can share at this time is limited because we cannot jeopardize any subsequent actions the County deems necessary in this case.

You need to be aware that when the claim was initially filed back in 2000, Risk Management conducted an investigation into what transpired during the dependency action. It was determined at that time that the social workers involved in this case acted entirely appropriately and certainly were within the scope of their employment throughout the events that transpired in this case. Once the lawsuit was filed, the County provided a defense attorney for all the parties involved and the County will continue to provide defense counsel to all of the parties throughout the rest of this case. A united defense was and is being presented that is protecting the County and the individual employees involved.

Many questions have arisen that cannot easily be addressed in this email. However, you all need to be aware that the actions you take while in the course and scope of your employment as a County social worker entitle you to be defended at the County's expense if you are named in a lawsuit as a result of doing your job. California Government Code section 825. The Government Code requires the County to provide you with a defense in any such case, and unless there is a reservation of rights, requires the County to pay any general damages against the County or the employees that may be awarded in the case.

The pending case also included a small punitive damages award against two of the individual social workers involved. The Government Code does not require the County to pay punitive damages, but generally permits the County to pay punitive damages awarded against an employee when the Board of Supervisors determines the action took place in the scope of employment, the employee acted in good faith, and payment is in the best interests of the County.

It is the longstanding policy of the Social Services Agency, CEO Risk Management, the County Counsel's office and the Board of Supervisors to stand behind County employees who undertake their job performance in good faith on behalf of the County and the people we serve.