UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING

CERTIFIED TRANSCRIPT

| | |
|---|---|
| PRESLIE HARDWICK, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| vs. ) | SACV NO. 13-1390-JLS (ANx) |
| ) | |
| COUNTY OF ORANGE, MARCIA VREEKEN, ) | |
| ELAINE WILKINS, THE ESTATE OF ) | |
| HELEN DWOJAK, SHARON GRIER; and ) | |
| DOES 1-100, ) | |
| ) | |
| DEFENDANTS. ) | |
| _____) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, MAY 23, 2017

8:29 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*DEBORAH D. PARKER, U.S. COURT REPORTER*

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, PRESLIE HARDWICK:

                    ROBERT R. POWELL
                    POWELL & ASSOCIATES
                    925 WEST HEDDING STREET
                    SAN JOSE, CALIFORNIA 95126
                    (408) 553-0201

                    DENNIS R. INGOLS
                    LAW OFFICE OF DENNIS R. INGOLS
                    111 NORTH MARKET STREET
                    SUITE 300
                    SAN JOSE, CALIFORNIA 95113
                    (408) 601-0126


    FOR THE DEFENDANTS, COUNTY OF ORANGE, MARCIA
    VREEKEN, ELAINE WILKINS, THE ESTATE OF HELEN
    DWOJAK, SHARON GRIER; AND DOES 1-100:

                    NORMAN J. WATKINS
                    PANCY LIN
                    LYNBERG & WATKINS
                    1100 TOWN & COUNTRY ROAD
                    SUITE 1450
                    ORANGE, CALIFORNIA 92868
                    (714) 937-1010

I N D E X

PLAINTIFF'S WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

 DEANNA FOGARTY            186

```
 1        SANTA ANA, CALIFORNIA; TUESDAY, MAY 23, 2017; 8:29 A.M.
 2                              -oOo-
 3        (The following proceedings were had outside the
 4         presence of the jury:)
 5              THE COURT:  Good morning.
 6              All right.  My understanding is that we may have
 7        some issues to address before we bring the jury up.  What
 8        are those?
 9              MR. POWELL:  The first is, there was an order
10        yesterday about making witness binders.
11              THE COURT:  Stand, please.
12              MR. POWELL:  Oh, may I -- well, may I ask that
13        until I have to stand later in the presence of the jury that
14        I not, because my back is really, really bad.  As of last
15        Friday, I was literally going to possibly be asking for a
16        continuance.  I've doped up on Advil, doing what I can, but
17        it's really, really bad, Your Honor.
18              THE COURT:  All right.
19              MR. POWELL:  Thank you.
20              THE COURT:  So, go ahead.
21              MR. POWELL:  Okay.  The Court made the order about
22        exhibit binders per witness, which makes sense, especially
23        given what we've seen, but that brought out to light the
24        issue of, like, a lot of civil trial transcripts from before
25        that will be used, will be read, will be used to refresh
```

08:29:56 10
08:30:09 15
08:30:21 20
08:30:35 25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

08:30:40 1   recollection.

2           What I've done in an abundance of caution for at

3   least the first witness, I've printed her entire prior civil

4   trial testimony that I plan to use, so it's -- at the ready

08:30:49 5   I've --

6           *(Court Reporter requests clarification for the*

7           *record.)*

8           THE COURT:  Slow down just a --

9           *(Court Reporter requests clarification for the*

08:31:00 10          *record.)*

11          THE COURT:  At the ready.

12          MR. POWELL:  So it's at the ready.  And I guess

13  that's it.  That's one of the issues.

14          THE COURT:  All right.  So in terms of deposition

08:31:09 15  transcripts that you may be using throughout the course of

16  the trial for either impeachment purposes or reading from

17  the testimony as the witnesses' prior testimony, that should

18  be available to the witness.  To the extent you're going to

19  ask the witness to look at anything, it needs to be up there

08:31:29 20  whether it's within the binder or you've provided everyone

21  with a separate transcript in advance.  If it's -- it needs

22  to be up there.  Because what we don't want is time spent

23  where in the middle of your examination, you know, then it's

24  may I approach, may I hand the witness this, may I give the

08:31:47 25  Court that.  It's going to take up too much time.  So you

08:31:52   1   just need to have it, whether that is in the binder or

2   otherwise, available at the witness stand and here on the

3   bench and with opposing counsel.  You just need to have that

4   done in advance of each witness.

08:32:05   5           MR. POWELL:  Okay.  So then, possibly, as a

6   solution to that when one of us coming in and we know who's

7   coming, we go and get those that -- that are, you know,

8   coincide with the person and what we might pull out.

9   "Those" meaning, let the record reflect the 28 volumes of

08:32:23  10   exhibits, and -- that has civil trial transcripts in it.

11   The deposition binders, I don't know where those ended up,

12   but I know they were dropped off the other day.

13           And if those can be set there, that's what you

14   mean, right?

08:32:34  15           THE COURT:  Well, except that means -- as long as

16   you have it separated out so that it's easy for each

17   witness, otherwise it's going to take too long and then

18   you're just going to have it in the binder itself.  I was

19   really talking about deposition transcripts.  To the extent

08:32:50  20   you have to pull out from these 28 binders some trial

21   transcripts then, no, you're going to need to figure out

22   what you need to have and put it in the binder -- witness

23   binder.

24           MR. POWELL:  So that is --

08:33:02  25           THE COURT:  I was thinking of deposition

08:33:04    1    transcripts or actual transcripts that you have that are

            2    separate from the 28 binders.  Those, obviously, you can

            3    have.  You can just have on the stand.  But if we're talking

            4    about things that are buried as exhibits in those 28 binders

08:33:20    5    then, no, you do need to have that separated out and put in

            6    the witness binder.

            7                MR. POWELL:  Can we use for an exhibit the

            8    binders, the 28 binders, and just tag them with, like, a

            9    Post-it note for that witness that we're going to use that

08:33:31   10    day?  You know, we just come in, spend a minute, find the

           11    ones, tag them and set them on, whatever, where they sit?

           12                THE COURT:  We can see how that works, as long as

           13    it's tagged in advance and it's sitting on the -- on the

           14    witness stand and not something that they have to turn

08:33:51   15    around, you know, Ms. Smith and look at --

           16                MR. POWELL:  Lift the eight pound --

           17                THE COURT:  Exactly.  We're not -- and search for

           18    the right binder.  No, we're not going to do that.  If

           19    you've got it clearly tabbed and sitting on the witness

08:34:04   20    stand, that's fine.  My goal is not to create red tape.  My

           21    goal is -- in a bureaucracy, my goal is simply to make sure

           22    that we are proceeding efficiently and that we're not

           23    wasting any time.  So we'll see how that works.  And I'm

           24    fine to start with that.  Okay.

08:34:21   25                MR. POWELL:  And then the other -- another is,

*DEBORAH D. PARKER, U.S. COURT REPORTER*

08:34:23  1   there was request on a ruling yesterday -- because we're

2   working out of a condo.  We filed a request to waive the

3   lodging of the double-marked-up depositions and

4   double-marked-up civil trial transcript portions, because of

08:34:36  5   an printing error.  It was filed yesterday afternoon.

6           THE COURT:  I saw that.  I mean, it's one of those

7   things where I'm not going to issue an order saying, *Yes,*

8   *that's fine*, simply because it looks like it was -- these

9   are my trial orders that have been out for a long time,

08:34:54  10  lodging and things like that.  The fact that it's late at

11  night the night before and you have a printer error, it just

12  means that you did it at the last minute.  That's not a

13  reason for me to issue an order saying everything is fine.

14  If you have an error and you didn't get something done,

08:35:10  15  it's -- it's -- I'm not sure what you want me to do.  What

16  are you -- what are you looking for from the Court?

17          MR. POWELL:  Well, counsel and I agree that

18  neither of us need these particular ones that we're talking

19  about today.  They'll be available today.

08:35:24  20          THE COURT:  Okay.

21          MR. POWELL:  But, please, understand, Your Honor,

22  since we are working remotely from a condo, of course, we

23  brought a printer and all that, but we do have technical

24  problems.  Everything we need to do, we have to do it from a

08:35:35  25  printer and it made no logic -- since I would be here ahead

*DEBORAH D. PARKER, U.S. COURT REPORTER*

9

08:35:37  1    of time -- to put all that and load it all up in San Jose

2    and drive it here.  So that's how we've been operating.

3    We'll catch up.  We'll catch up when we get through the

4    first three days.  We'll catch up, but that's what's

08:35:50  5    happening.

6              THE COURT:  All right.

7              MR. POWELL:  Next issue.

8              THE COURT:  Whatever you have next.

9              MR. POWELL:  Go ahead, Norm, if you want.

08:36:00 10              MR. WATKINS:  Thank you, Your Honor.

11         I gave counsel a heads-up.  I just -- I mean,

12    there's no *in limine* ruling on this, but I want to be

13    perfectly upfront, because it may be sensitive.

14              Kendall Hardwick has given a deposition, and in

08:36:15 15    the deposition she testified that -- in fact, she was

16    testifying under order of court that the lawsuit that she

17    had, which is identical to this one, she dismissed because

18    it was all false and she was under extreme pressure by her

19    mother and the lawyer to continue with it.  And I think that

08:36:37 20    that's relevant and I intend -- I intend to use that.  I

21    gave Counsel a heads-up I intended to do so.

22              THE COURT:  All right.  And -- and you're just

23    letting the Court know and then if there's an objection to

24    it, you'll raise that.

08:36:57 25              When do you intend to use that?  In your

*DEBORAH D. PARKER, U.S. COURT REPORTER*

08:37:00  1  case-in-chief?

2          MR. WATKINS:  Probably in opening.

3          THE COURT:  You're going to reference it in

4  opening?

08:37:05  5          MR. WATKINS:  Yes.

6          THE COURT:  All right.  Any response?

7          MR. POWELL:  That's fine, Your Honor.  But is that

8  all you had on that, Norm, because this is related?

9          The other issue we have, Your Honor, as between

08:37:15 10  us, these -- the next two revolve around Kendall Hardwick.

11  She's unavailable to us -- our office.  We have no idea

12  where she's living.  We tried through our client, her

13  sister, who they have no contact, but they have like a

14  triangulated contact through the father to obtain an address

08:37:34 15  to serve her.  He wouldn't give it to us, so we've told them

16  for a long time, she's available to us.  They, apparently --

17  I don't know how.  Maybe through Mr. Hardwick -- were able

18  to serve her as I understand it, and they say, she's coming.

19  I'm not waiting for Kendall to come.  She's unavailable to

08:37:53 20  me.

21          THE COURT:  No, I'm sorry.  If all you're saying

22  is that you tried to get an address through her father,

23  that's not sufficient to constitute unavailability.  I mean,

24  you have to show that you did what normal investigation is

08:38:06 25  to try to locate her address and serve her.  Asking her dad

*DEBORAH D. PARKER, U.S. COURT REPORTER*

08:38:11  1    to let you know is not sufficient to constitute

2    unavailability is she's otherwise present.  That just

3    rewards insufficient service.

4              MR. POWELL:  There's more.

08:38:22  5              THE COURT:  Okay.  Well, that was all you gave me.

6              MR. POWELL:  She's in Nevada.  That much we

7    learned, so she's out of my subpoena jurisdiction anyway.

8    She's more than 150 miles.  According to the dad, she's in

9    Las Vegas.  She's outside of my jurisdiction.  So she's at

08:38:37 10    this time in history, a friendly witness to the defendants;

11    very hostile witness to me.  And I think father is just

12    being protective, but I think that makes her unavailable as

13    well.  And I intended -- I intended -- I intend to actually

14    make her, like, my second witness from deposition readings,

08:38:54 15    because she didn't give just one deposition in this case.

16    She's given two depositions.  Not in this case but two

17    depositions.

18              THE COURT:  All right.  Anything?

19              MR. WATKINS:  Your Honor, we located Kendall

08:39:09 20    Hardwick online and served her with a subpoena.  And as we

21    understand it, it's her -- she can probably ignore that

22    subpoena.  We've given her all the expenses, the travel

23    expenses and everything else.  We've had no communication

24    with her, but we have been advised by her father that it is

08:39:33 25    her intention to honor that subpoena.  And --

*DEBORAH D. PARKER, U.S. COURT REPORTER*

08:39:38  1          THE COURT:  Well, if she wants to honor it and get

2    here in time for the plaintiff's case in chief, that's fine.

3    But if she's -- is she in Nevada?

4          MR. WATKINS:  She is.

08:39:53  5          THE COURT:  And as you said --

6          MR. WATKINS:  I believe she is.

7          THE COURT:  And as you said, she can probably

8    ignore the subpoena.  Unless she's here and available -- and

9    truly available, then he can use the transcript.  Now you of

08:40:08 10   course -- if she shows up, you can have her testify.  If she

11   shows up early -- she's available early, then she can

12   testify in his case-in-chief, but I don't think the

13   plaintiff is required to wait to decide what she wants to do

14   only to find out at the end that she's decided maybe not to

08:40:28 15   show up, unless you have some other solution other than

16   crossing your fingers.

17         MR. WATKINS:  We'll have to cross our fingers.

18   Excuse me.

19         Well, the solution I would offer, we both

08:40:41 20   designated pretty much the same material from her

21   deposition.  At least, that's the last version I've seen of

22   the designations.  I believe that we may have information on

23   that by this afternoon.  She may be here today.  I've

24   encouraged that.  And if that happens, then we've got no

08:41:06 25   problem because she's not the first witness, as I understand

08:41:09  1  it.  But I understand the Court's thinking on it, and I'll

2  see what I can do.  If --

3          THE COURT:  If she's here by today, that's fine.

4  That will solve the problem.  If she's not, then at the time

08:41:30  5  that her testimony is needed as part of the case-in-chief,

6  you can address it via prior testimony.

7          MR. WATKINS:  If I may.  If I knew when plaintiff

8  wanted to put her up, that would be a help.

9          THE COURT:  All right.  I believe you had said

08:41:49 10  might be my second witness, so you have to -- do you have --

11  you have another witness first, presumably, right?

12          MR. POWELL:  Yeah, Fogarty-Hardwick.  I don't know

13  if I mentioned it to you, but she's got a long estimate.

14  It's like 8.56 hours, or something like that.  Six hours by

08:42:08 15  defendants alone.

16          THE COURT:  What I do, as I indicated before, is I

17  give you license to put on a witness.  If you think they

18  need to be on for a long time, I tend not to interrupt you

19  and say, *Why in the world do we need this witness on this*

08:42:27 20  *long?*  But when you get to the end of your time, you're at

21  the end of the time.  And if the witness has just been

22  rambling, or repetitive, or off on some tangent, then that's

23  it.  You've just eaten up your time.  It's as easy as that.

24  I've given you an eight-day time limit.  You get four days

08:42:48 25  each.  I've told you how many hours that is.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

08:42:51   1          MR. POWELL:  So I think what you started with was,

2     when do I -- I would put her on after.  And especially using

3     transcripts of depositions, it would be very easy to then

4     transition to doing that.  So that is my intent.  And I've

08:43:02   5     told them that a long time now.

6          THE COURT:  All right.  Well, it sounds like if

7     she's here by the end of the day today, or depending upon

8     how long this first witness takes or the beginning of the

9     day tomorrow, because we still have to select the jury.  You

08:43:20  10     have the opening statements.  I do some pre-instruction, but

11     we should be definitely well into the testimony today, so --

12     of the first witness.

13          MR. WATKINS:  Thank you, Your Honor.

14          MR. POWELL:  The last issue, Your Honor:

08:43:34  15          It also has to do with Kendall Hardwick.  That's

16     the use of videos.  I met and conferred with counsel.  We

17     both agree there's been -- there's objections at points in

18     the depositions that would, of course, relate to the videos

19     and there's been no ruling on the objections.  And as you

08:43:53  20     can imagine, it would be a clunky process to move along once

21     I'd say "objection" as an area approaches, so it's a problem

22     as for the 2014 video depo and the --

23          THE COURT:  And we have those deposition

24     transcripts lodged now?

08:44:12  25          MR. POWELL:  Yeah.  Yes.  And part of the thing

08:44:14  1   that's coming today, yes, is the double-marked-up -- is the

2   double-marked-up.

3            But, yes, the depositions are lodged.

4            THE COURT:  When were those lodged?

08:44:23  5   MR. POWELL:  Counsel lodged them yesterday.

6            THE COURT:  All right.  So that's when I first got

7   the deposition transcripts, right?

8            Okay.  And you're asking whether I have a ruling

9   on objections?

08:44:33  10  MR. POWELL:  No.  I'm pointing on that there is an

11  issue with the double-marked-up.  When you asked about did

12  she lodge the depositions, those are nice clean -- there's

13  nothing on them.  We, of course, went through the Court's

14  standing order and did the process of a deposition where

08:44:45  15  we -- especially, unavailables -- where we marked it up.

16  And so, Kendall Hardwick is one of those people, because I

17  considered her unavailable and still do.

18           And so that coincides, obviously, with her video

19  depo.  But as you can -- as you well, I'm sure, understand

08:45:00  20  that the video depo issue is a little bit harder when it

21  comes to getting objections.  If we had a little mini-ruling

22  on the objections ahead of time or something, maybe the

23  videos could be played later, but I want to make clear, as

24  far as I'm concerned, both videos, if played in their

08:45:17  25  entirety, are fine with me.  Both videos, if played in their

08:45:22  1   entirety, are fine with me, if he wishes to do that.

2            THE COURT:  Well, we typically don't have

3   objections played in front of the jury, if the Court --

4   whether I'm sustaining or overruling because then, if I

08:45:36  5   sustain the objection, it doesn't make any sense.

6            So are there objections included in those

7   transcripts?

8            MR. WATKINS:  There are, Your Honor, by both

9   sides.

08:45:46  10           THE COURT:  All right.  I'll take a look at those

11  and then you can cut your videos accordingly.

12           MR. WATKINS:  I may be corrected on that.

13           THE COURT:  We don't have any witnesses in the

14  courtroom, do we, now?  Just making sure.  All right.

08:46:08  15           MR. POWELL:  We agreed on that request.  It was

16  another order, but we agree on that.

17           MR. WATKINS:  To exclude witnesses.

18           MR. INGOLS:  Your Honor, what I have lodged in

19  terms of deposition transcripts are the originals.  They do

08:46:19  20  not have markings in them.  The markings are being prepared

21  by Mr. Powell's office, and I think that's what he was

22  alluding to before when he was talking about the printing

23  mishap.

24           THE COURT:  Do I have what you need me to rule on

08:46:34  25  with regard to objections?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

08:46:37  1          MR. INGOLS:  You do not.

       2          THE COURT:  Okay.  Then I can't rule and you can't

       3   play anything until I've ruled on those.

       4          MR. POWELL:  We'll get them for sure at the lunch

08:46:45  5   hour.  We'll have them for you by 1:00 -- 1:30.

       6              Another thing that counsel -- is that okay?

       7          THE COURT:  It is.  And when I get my -- when I

       8   have the opportunity to get off the bench and I'm not

       9   presiding over a trial or handling other matters, I will

08:46:58  10   rule on your objections.  And then after that, you can use

      11   them.

      12          MR. POWELL:  Okay.  And then, the final thing -- I

      13   informed counsel of this on Saturday morning.  My client is

      14   limiting her claims to the damages flowing from the acts of

08:47:13  15   judicial deception and, of course, the resulting seizure as

      16   to the 17th and the judicial deception claim as to the 31st,

      17   but -- of March -- I'm sorry -- but all -- waiving any claim

      18   of damages thereafter.  It's just the damages flowing from

      19   those events.  It should, I would think, limit the scope of

08:47:35  20   the trial, but we'll see.  There's different approaches.

      21          THE COURT:  All right.

      22          MR. POWELL:  And they've been advised.

      23          MR. WATKINS:  I first heard about this a day ago,

      24   I think.  Obviously, he can order his proof as he sees fit.

08:47:52  25   I don't have any problem with that.  I don't know that it

08:47:56  1   changes much, but --

2              THE COURT:  All right.  Well, any relevance

3       objections can be made during trial then.

4              All right.  We're going to be bringing the jury up

08:48:07  5   in just a few minutes.  Once we have a jury, I am very

6       mindful of their time.  And so, if in the future, like

7       today, you have any issues that need to be addressed, we'll

8       address them in the morning beforehand.  We can stay late

9       and address them afterwards.  And we can take a portion, you

08:48:29 10   know, of the break at lunch to address issues.  I tend not

11      to use breaks in the morning or the afternoon for that

12      purpose, because the main purpose of that break is to let my

13      court reporter rest her fingers for a few minutes and her

14      brain and if we're out here, she can't do that.  That's why

08:48:51 15   you should always be, of course, thinking ahead.  And if you

16      have an issue that you anticipate, those are the times we'll

17      deal with it.  I am not very lenient on sidebars.  So if you

18      ask for a sidebar during testimony, I'm likely, unless it's

19      something that I can see absolutely key, to say no.

08:49:13 20             MR. POWELL:  Would you like that if, you know, at

21      the end of the day we talk and we see an issue coming and do

22      our meeting and conferring that we send an e-mail later that

23      night that would be in your in-box in the morning, or would

24      you not want that?

08:49:25 25             THE COURT:  To the chambers e-mail, saying that

*DEBORAH D. PARKER, U.S. COURT REPORTER*

08:49:29   1    you would like to have me on the bench by 8:30, yes.

2              MR. POWELL:  More of giving you a heads-up, like

3    here's an issue --

4              THE COURT:  Yes.

08:49:33   5    MR. POWELL:  Here's what plaintiff says.  Here's

6    what defendant says, so you have a minute --

7              THE COURT:  Absolutely.

8              MR. POWELL:  Okay.

9              THE COURT:  Any heads-up that you can give me

08:49:40  10    during the trial makes for better rulings and a more

11   efficient process.  So, absolutely.

12             I'm going to step off the bench.  In a few minutes

13   we'll have our --

14        *(Pause.)*

08:49:53  15             THE COURT:  So that we can actually get started by

16   9:00.  That's perfect.  I think we have how many?

17             THE CLERK:  I believe we have 38.

18             THE COURT:  We have 38 prospective jurors.  We

19   will select eight, as I've told you before.  Keep in mind

08:50:07  20   you're doing a mini-opening statement for them, which will

21   be no more than five minutes.  And we're using the Arizona

22   Blind Strike Method, so you will get the listing of all the

23   jurors in the order in which they will be eventually seated.

24             All right.

08:50:26  25             THE CLERK:  All rise.

08:54:00  1        *(Recess taken from 8:54 a.m. to 9:06 a.m.)*

       2              THE CLERK:  Calling Case SACV 13-1390-JLS, Preslie

       3   Hardwick versus County of Orange, et al.

       4              Counsel, please state your appearances for the

09:06:27  5   record.

       6              MR. POWELL:  Good morning, Your Honor and members

       7   of the jury.

       8              My name is Robert Powell.  I am here with my

       9   associate and co-counsel, Dennis Ingols, and my client is

09:06:38 10   Preslie Hardwick, plaintiff.

      11              THE COURT:  Good morning.

      12              MR. WATKINS:  Good morning, Your Honor.

      13              Norm Watkins for defendants and my partner here,

      14   Pancy Lin.

09:06:48 15              Joined with me are I-tech gurus, Roger and

      16   Ms. Murphy to help us with jury selection.

      17              My clients here:  Elaine Wilkins -- if you could

      18   rise -- and Marcie Vreeken right next to her.

      19              Thank you, Your Honor.

09:07:10 20              THE COURT:  Good morning.

      21              All right.  Ladies and gentlemen, welcome to

      22   Courtroom 10A, United States District Court for the Central

      23   District of California.  I always begin with a show of

      24   hands.  I want to know how many of you, when you received

09:07:25 25   that summons in the mail, you felt like you won the lottery.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:07:31  1      (Laughter.)

2           THE COURT:  Oh, I have hands.  I've never had

3      those hands before.  This may be the first time in my

4      15-year history as a judge where someone has raised their

09:07:42  5      hand.

6           No, I do understand that you are not here because

7      you have nothing else going on in your life.  I understand

8      you're here because of an obligation that you felt when you

9      received that summons.  But I am going to make a relatively

09:08:01  10      bold proclamation and say, *Well, you may have something else*

11      *to do.  You don't have anything better to do.*

12           And the reason that I say that -- well, I will not

13      digress.  When we get into trial and we're moving along,

14      we're going to be very efficient, but I'm going to digress

09:08:19  15      now.  I'm going to tell you a story, and it's a little bit

16      of an explanation as to why we have the Sixth and Seventh

17      Amendments right to a jury trial in both criminal cases and

18      in civil cases.  The right to a jury trial was so important

19      that it had to be enshrined in our Constitution.  And I'm

09:08:40  20      going to all the way back to the year 1670, in England, to

21      give you a little bit of background as to why.

22           In the summer of 1670, William Penn, who was a

23      Quaker, was preaching nonconformist religious views out on

24      the streets of London.  And he was gathered up and put on

09:09:01  25      trial at the Old Bailey, London's old central courthouse,

09:09:06 1   criminal court.  He demanded to know what he was charged

2   with and he was told he was charged with just violating the

3   common law.

4          During the trial whenever he tried to ask

09:09:16 5   questions or make objections, he was removed from the

6   presence of the jury and confined in a corner, an enclosed

7   corner of the room where he couldn't see or hear anything

8   that was going on and couldn't ask any questions.

9          So at the conclusion of the trial, the jury came

09:09:31 10  back with a verdict of not guilty.  Well, the judge was

11  outraged and he commanded that the jury retire again and

12  return a verdict of guilty.  And once again, they came back

13  and they came back with a verdict of not guilty.

14         At some point after this happened more than once,

09:09:52 15  he ordered the jury to be confined to the hole in

16  Newgate Prison and held there without food or water until

17  they could return a proper verdict.  Three times they went

18  out and came back and each time with a verdict of not

19  guilty.  I think, he eventually find them and, perhaps, let

09:10:12 20  them go.  No, he ordered -- I see my own notes.  He ordered

21  them imprisoned until the fines were paid.

22         Of course, why do I tell you this story?  It is

23  not because if you don't return a proper verdict I'm going

24  to confine you to a hole.  No, that won't happen.  I don't

09:10:30 25  determine what the proper verdict is.  It is to tell you why

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:10:33   1   we find in this country the principle of jury independence

2   so important.  There is no one else in this room who can do

3   what you will do as jurors, which is be the judges of the

4   facts in this case.  I can't do that.  My staff can't do

09:10:54   5   that.  Certainly, the parties can't.  We rely on members of

6   the public, our citizens, to come in -- peers -- and decide

7   the facts of a case.  And it's in that manner that you will

8   then return a verdict.  And that's the only thing -- that is

9   something that only you can do.  And so, without you -- I

09:11:18   10   know it sounds like a cliche now, but if you're selected on

11   a jury, I'll remind you of this at the end of the trial and

12   I usually get nods of agreement.  Without you, the wheels of

13   justice would grind to a halt.  We couldn't do what we do

14   here.

09:11:33   15          And so with that, I want to thank you for being

16   ready, willing and able to serve as a juror, and I'm going

17   to ask my courtroom deputy clerk to please swear in the

18   prospective jurors.

19          THE CLERK:  Ladies and gentlemen, please stand and

09:11:50   20   raise your right hand to be sworn.

21          (Prospective jury sworn.)

22          THE PROSPECTIVE JURORS:  I do.

23          THE CLERK:  Thank you.

24          You may be seated.

09:12:08   25          THE COURT:  All right.  Now, the next thing that

09:12:10  1   we are going to do is going to make you feel like we're

2   playing a game of musical chairs, but I promise you we're

3   not.  We have a purpose to this.  We are going to seat you

4   in a particular order.  The way that we select a jury in

09:12:24  5   this courtroom may be somewhat different than what you're

6   used to, if you've been a prospective juror in other

7   courtrooms before, so we ask that you bear with us.  When

8   your name is called -- do I have a -- do I have an extern

9   who's here?

09:12:43  10          THE CLERK:  Yes, Your Honor.

11          THE COURT:  Oh, there you are.  All right.  We

12   have externs who are from prestigious law schools.  We have

13   our extern from UCI here in -- here in Orange County.  And I

14   believe I have another extern in the back who is from

09:13:00  15   U.C.L.A.  They go to prestigious law schools.  They learn

16   important things.  They learn all about our legal system.

17   And, yet, I have them here in the role of -- we call it the

18   "Vanna White" role, although we know all she did was turn

19   numbers [sic].  They are directing, though.  They are

09:13:19  20   traffic cops, and they're going to direct.  So, please,

21   follow -- follow her lead when she directs you where to sit

22   and feel free to come out from the -- because you're going

23   to have to go up there, and this is her first time.  The

24   summer has just begun, so be kind.

09:13:39  25          You're going to have to go up there.  And then as

25

09:13:41  1  people come through, you'll direct them where to sit.

 2  She'll direct you into the box at first.  And then you'll be

 3  in the seats over here in the back.  And, again, just please

 4  follow directions when your name is called.

09:13:55  5           THE CLERK:  Juror No. 1, Judith Creel, C-r-e-e-l.

 6           THE COURT:  We're going to start with the back

 7  seat up here in the rear corner, and --

 8           THE CLERK:  Juror No. 2, Jourdana Gergis,

 9  G-e-r-g-i-s.

09:14:23 10          Juror No. 3, Sue McCann, M-c C-a-n-n.

11          Juror No. 4, Jeffrey Abbott, A-b-b-o-t-t.

12          Juror No. 5, Jesse Tapia, T-a-p-i-a.

13          Juror No. 6, Martin Zola, Z-o-l-a.

14          Juror No. 7, Phuong-Chi Nguyen, N-g-u-y-e-n.

09:15:08 15          Juror No. 8, William Leon, L-e-o-n.

16          Juror No. 9, Arte Figueroa, F-i-g-u-e-r-o-a.

17          THE COURT:  Take all your things with you.

18          THE CLERK:  Juror No. 10, Patrick Courchaine,

19 C-o-u-r-c-h-a-i-n-e.

09:15:48 20          Juror No. 11, Edward Hanke, H-a-n-k-e.

21          Juror No. 12, Abigail Maquitico,

22 M-a-q-u-i-t-i-c-o.

23          Juror No. 13, Thomas Lee, L-e-e.

24          Juror No. 14, Trina Palter, P-a-l-t-e-r.

09:16:31 25          Juror No. 15, Domine Solesbee, S-o-l-e-s-b-e-e.

26

| | | |
|---|---|---|
| 09:16:42 | 1 | Juror No. 16, Baha Dean, D-e-a-n. |
| | 2 | Juror No. 17, Susan Spiezia, S-p-i-e-z-i-a. |
| | 3 | Juror No. 18, Robert Huang, H-u-a-n-g. |
| | 4 | Juror No. 19, Sebastian Zapart, Z-a-p-a-r-t. |
| 09:17:25 | 5 | Juror No. 20, Gerardo Rivera, R-i-v-e-r-a. |
| | 6 | Juror No. 21, Elizabeth Corona, C-o-r-o-n-a. |
| | 7 | Juror No. 22, Richard Lagorio, L-a-g-o-r-i-o. |
| | 8 | Juror No. 23, Kylie Filipek, F-i-l-i-p-e-k. |
| | 9 | Juror No. 24, Jasmine Hugo, H-u-g-o. |
| 09:18:10 | 10 | Juror No. 25, Chi Nguyen, N-g-u-y-e-n. |
| | 11 | Juror No. 26, Mariana Tudor, T-u-d-o-r. |
| | 12 | Juror No. 27, Viviana Kim, K-i-m. |
| | 13 | Juror No. 28, Elizabeth Van Hoogmoed, |
| | 14 | V-a-n H-o-o-g-m-o-e-d. |
| 09:18:50 | 15 | Juror No. 29, Tzee Lin, L-i-n. |
| | 16 | Juror No. 30, Carlos Ortigoza, O-r-t-i-g-o-z-a. |
| | 17 | Juror No. 31, Elizabeth Halcomb, H-a-l-c-o-m-b. |
| | 18 | Juror No. 32, Gino Estacio, E-s-t-a-c-i-o. |
| | 19 | Juror No. 33, Elizabeth Kim, K-i-m. |
| 09:19:38 | 20 | Juror No. 34, Julia Silvey, S-i-l-v-e-y. |
| | 21 | Juror No. 35, Jeffrey Cook, C-o-o-k. |
| | 22 | Juror No. 36, Kathryn Yarnal, Y-a-r-n-a-l. |
| | 23 | Juror No. 37, Terry Braley, B-r-a-l-e-y. |
| | 24 | Juror No. 38, Amada Almase, A-l-m-a-s-e. |
| 09:20:27 | 25 | THE COURT:  All right.  Now, I told you it would |

09:20:30   1    feel a little bit like musical chairs, but you're now all

           2    seated where you need to be, and we have you in order.

           3              So let me give you some information about the case

           4    a little bit and about our schedule:  So this is a civil

09:20:52   5    case titled Preslie Hardwick versus County of Orange, et al.

           6    And the case is expected to last, approximately, eight days.

           7    For a federal trial, I know sometimes you've heard of

           8    10-week trials, six-month trials, et cetera.  You don't

           9    have one of those, so that's the good news.  The eight days

09:21:20   10   doesn't include deliberations because we can't estimate how

           11   long you would take to deliberate on a case.

           12             Our schedule is that we -- this week, obviously,

           13   you're starting on Tuesday, and we will go Tuesday,

           14   Wednesday and Thursday.  On Fridays, I have other matters

09:21:38   15   that I hear, so we are dark for purposes of trial on

           16   Fridays, so you won't be here on Friday.  We would start

           17   again the following Monday, and we'll go Monday through

           18   Thursday again, unless you're deliberating on a Friday, we

           19   won't go on Friday.  And since that's seven days, I imagine

09:22:01   20   you would come back on the following Monday for the last day

           21   of trial, if it hasn't concluded yet and then you would

           22   deliberate thereafter.  All right.  So that's our schedule.

           23             We begin at 9:00 each morning and we go until

           24   4:30 in the afternoon.  We have a 15-minute break in the

09:22:21   25   morning usually around 10:45 or so and a 15-minute break in

09:22:25  1    the afternoon, usually around 3:15, 3:00 or 3:15.  And for

2    lunch, we are in break from noon to 1:30.  That way it's a

3    little longer, but we can handle some other matters while

4    you're not here so we're not wasting your time having you

09:22:47  5    sit in a hallway, or something to that effect.  It's

6    important for us to be able to keep this schedule that

7    everybody arrives on time so that we're all ready to go.

8    I -- it seems like that would be a given that you would all

9    need to be here because even if one person is late, then we

09:23:06 10    can't begin, right?

11         However, I say this and I emphasize it, because I

12    had a trial a couple of years ago in which we were waiting

13    for one juror.  We finally found him, called the cell phone

14    number that we got and got an answer.  And he said, *Oh, I'm*

09:23:22 15    *just running late.  Start without me and I'll be there in a*

16    *little while.*

17         *(Laughter.)*

18         THE COURT:  Obviously, we couldn't, right?

19         We had to have everybody here, hearing the same

09:23:33 20    evidence.  So as long as everyone is here, we can keep to

21    your schedule.

22         Now, before I go any further, what I'm going to do

23    is, I'm going to have the attorneys give what I call a

24    mini-opening statement to the entire panel.  And we're going

09:23:50 25    to begin with the plaintiff; that is, the person who's --

09:23:53  1    the attorney for the person who is bringing the lawsuit; and

2    then, we will turn to defense counsel.

3              And this is just, like, five minutes to give you

4    an overview, a quick overview so you understand maybe where

09:24:07  5    some of the later questions are leading.

6              All right.  And so with that, if you would like to

7    begin, Mr. Powell.

8              MR. POWELL:  Good morning, ladies and gentlemen.

9              As the Judge said, it's three to five minutes, so

09:24:27 10    it's a short story, although it's really quite long.  I'm

11    going to start with the end first, the most traumatic event.

12              My client, Preslie Hardwick, when

13    six-and-a-half-years old, found herself under a table at her

14    school clinging to the leg of the table, screaming and

09:24:48 15    wailing as social workers, including Ms. Vreeken, a police

16    officer -- there was a police officer there -- came to

17    remove her, because the court had made an order that she and

18    her sister were going to be removed from their mother.

19    Ms. Vreeken was there, but she's the one who got the order,

09:25:09 20    and here's how she got it.

21              That event I just described was February 17th, the

22    very day the court made the order.

23              On February 15th, Ms. Vreeken supervised a

24    visit -- I'll take that back.  She came at the end of a

09:25:21 25    visit between the father, which were being monitored with

09:25:24 1    the children at that time, essentially, due to a long

2    history of drug addiction.  There was also a sex addiction

3    I'll touch on briefly in a moment.  And they had gone to

4    court.  He was having visits monitored.  Ms. Vreeken came at

09:25:39 5    the end of a visit.  And Preslie came running out of that

6    room and ran to the room where her mother was.  Tears

7    running down her eyes, saying they were going to be taken

8    away that night, that Ms. Vreeken had said that they were

9    going to be going to a foster home.

09:25:58 10   Ms. Vreeken came to the door after Preslie arrived

11   with Kendall, who was also similarly red-eyed, teary-eyed,

12   and she acknowledged that she had made that statement.  She

13   acknowledged that she had made that statement.  The

14   children's mother literally had to vomit and jumped up and

09:26:20 15   ran to the restroom.

16   Two days later in court, Ms. Vreeken and

17   Ms. Wilkins put the story together that Ms. Wilkins heard

18   mom say this to the child or children and that was what all

19   the hubbub was about.  It was an absolute cold-hearted lie

09:26:38 20   and the judge made an order.  He actually had a meeting

21   before their mother got in the courtroom with the county

22   counsel and the attorneys for the social workers and came

23   out of that meeting saying, initially, *I think I'm going to*

24   *remove these children.*  That was the first horrendous act.

09:26:55 25   The second horrendous act:  So now they're

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:26:56  1    removed.  They're in Orangewood.  It's not a campground.

       2    It's not a fun place when you've been removed from your

       3    children -- from your parents.  No place is.  Both Preslie

       4    and her sister were suffering in that facility.  Of course,

09:27:12  5    they were lit up when someone came to visit them.  So any

       6    reports about visits and the kids being excited, that makes

       7    sense.  But they were in touch with their therapist who they

       8    had since the beginnings of divorce proceedings that started

       9    because of the father's drug and alcohol -- and we're

09:27:29 10    talking crystal methamphetamine -- and sex addiction.

      11    That's what started all of that.

      12            So when the children were in Orangewood and not

      13    doing well and their therapist/psychologist knew that and

      14    had left messages for Marcy Vreeken -- now, on March 31st,

09:27:47 15    they lie again.  A letter is literally went [sic] and picked

      16    up from the psychologist and brought back to the courtroom,

      17    okay?  They read it.  They don't let Preslie Hardwick's

      18    mother read it, okay?

      19            And then the judge expressly asked -- this letter

09:28:05 20    from the psychologist says, *They're not going.  They're not

      21    doing good.*  Preslie is acting out.  She's having anger and

      22    acting-out issues.  Kendall, who's on the autism spectrum,

      23    diagnosed early on:  Pervasive deficit.  It's on the autism

      24    spectrum.  They're not doing well.  And when the judge gives

09:28:21 25    them the opportunity -- Ms. Vreeken the opportunity to tell

09:28:25  1   him, you know, if the kids are doing bad, you know, you

2   would let me know that, right?

3            Yes.  Another boldface lie.

4            I'm just going to briefly say that the background

09:28:38  5   of the marriage was typical between the parents in the

6   beginning; happy, great.  They gave birth to -- well, the

7   mother gave birth to Kendall, the child who did have a

8   complicated pregnancy [sic], at least in the essence of a

9   post-birth surgery to remove a large mass from her

09:28:54  10  intestines and then later diagnosed as autistic.  That

11  required the mother to spend significant amounts of time.

12           They also hired a nanny, Rosie Reales.  You may or

13  may not hear from her in the course of this, depending on

14  what people say when they sit on that stand, up there.  And

09:29:10  15  then when the issues of the alcohol and the drug abuse and

16  sex addiction came to light, the divorce had to happen,

17  obviously.  The mother did try to help at first as father

18  went through rehab.  But, eventually, they divorced, and the

19  defense is going to say it was a nasty divorce.  I guess it

09:29:29  20  is nasty when a mother is trying to protect her children.

21           In any event, the crux of this case will be -- and

22  I'll say it now and I will say it at the end -- is whether

23  it's okay to lie to a judge to get orders that rip a child

24  from the child's parents.

09:29:48  25           THE COURT:  All right.  Now, Mr. Watkins.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:29:52    1           MR. WATKINS:  Thank you, Your Honor.

            2           Good morning, ladies and gentlemen.  I'm going to

            3   sort of look that way, but I'm addressing my comments to

            4   everyone back here as well.

09:30:01    5           You've heard the introductions and seen my

            6   clients.  We are here because of what you will learn is a

            7   what's called a "high-conflict divorce."  This is a divorce

            8   that just will not end.  This couple was married for one

            9   half a length of time that it took for the divorce case to

09:30:27   10   be litigated.  It just went on and on.

           11           Now, there was removal.  And what you're going to

           12   learn as the case unfolds is that in 1999 -- the marriage

           13   occurred in 1989.  The divorce occurred in '95 and it was

           14   rocky all the way up through '99.

09:30:53   15           In 1999, Preslie Hardwick's mother leveled charges

           16   of sex abuse against Preslie Hardwick's father claiming that

           17   he had abused in the most horrendous way the eldest

           18   daughter, and that would be Kendall.  Preslie was born in

           19   1993.  Kendall was born in 1990, so we're talking young

09:31:23   20   children at that point.  In fact, Preslie, when she

           21   testifies, she's going to tell you she doesn't really

           22   remember anything.  She doesn't remember any of the facts.

           23   She doesn't know who my clients are.  She doesn't know who

           24   she's suing.  She doesn't know anything about them, and she

09:31:40   25   doesn't recall anything that occurred during the time that

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:31:43  1    the social workers had contact with the family.

2              In 1999, for strategic reasons in the divorce,

3    sexual abuse claims were lodged against Mr. Hardwick.  And

4    they weren't just lodged.  They were publicly announced as

09:32:04  5    well.  It turns out that that automatically moved that

6    divorce case into what's called dependency court.

7    Dependency court -- and you'll learn this -- is there for a

8    reason, and that is to determine what's in the best interest

9    of the children, given these allegations and are the

09:32:25 10    allegations true.

11             And so the case is now being handled by a judge in

12    the juvenile court.  The juvenile court holds hearings and

13    the social workers prepare reports for each one of those

14    hearings.  And his job, the judge's job -- and this is a

09:32:44 15    man -- his job is to determine what's in the best interest

16    of the children for the safety of the children.  And in that

17    connection, the judge has the authority by California law to

18    appoint an expert as the court's expert to do an in-depth

19    study of the family and determine what's going on.  Usually,

09:33:09 20    one of those reports is enough.  In this case, there were

21    four by three different experts over a period of two years.

22    Each one came to the same conclusion:  The sexual abuse

23    allegations are false.  They were heavily influenced, if not

24    coached, by mother and that it was very harmful, very

09:33:36 25    harmful for the children.

09:33:39  1          Now, you're going to hear from those experts and

2    you will hear their reasoning.  And you're going to hear

3    from a Dr. Rogers.  She's so well-esteemed in this field.

4    And she's going to tell you that Kendall Hardwick is

09:33:56  5    particularly vulnerable to manipulation.  She's vulnerable

6    to manipulation, because she has what's known as a -- well,

7    I just call it very high functioning autism.  Very slight.

8    She's a beautiful girl.  She's now grown up, away.  She's

9    pregnant.  And I'm hopeful that she will come here and

09:34:17 10    testify, but she has given us testimony in the form of sworn

11    testimony in depositions.  And she testified originally

12    because she had a lawsuit, identical lawsuit to Preslie's.

13    And she testified that her dad did horrible things.  Now,

14    all this testimony was given while she was living with mom,

09:34:43 15    Deanna Fogarty-Hardwick.

16          Then I took her deposition in Preslie's case.  And

17    in that case, she testified that -- and it was under order

18    of court -- that everything was a lie; that she was told to

19    lie.  She was fed lies by her mother.  That her father never

09:35:08 20    touched her improperly.  That she felt horrible about it and

21    that she was going to fire her attorney and dismiss her

22    lawsuit and she was being pressured by her mother and her

23    attorney to continue with her lawsuit.  She didn't continue

24    with her lawsuit.  She dismissed it.  And thankfully she's

09:35:33 25    gotten out from under all of this.  And as I said, she's

09:35:37  1   doing well, I believe.  She will testify either by video or

       2   by live testimony.  But she testified that on that fateful

       3   night in November of 1999, she was actually sleeping with

       4   her mother.  Her mother was distraught because of a pivotal

09:36:05  5   point in the divorce litigation.  She was worried about the

       6   hearing that was coming up and the talk just kept going and

       7   the next thing you know, this little girl is accusing her

       8   father of the worst kind of abuse.

       9           THE COURT:  You've got one minute.

09:36:25 10           MR. INGOLS:  Thank you, Your Honor.

      11           The worse kind of abuse.  And she will testify

      12   that she wrote a story back then.  And you'll learn that an

      13   11-year-old or a 10-year-old girl unraveled all of this way

      14   back in 2000, 2001.

09:36:49 15           So I thank you for your time and look forward to

      16   putting this case on before you.  But the removal orders

      17   that came, came because of this kind of acrimony.  This is

      18   what happens when children are drawn into divorce and made

      19   tools of the divorce.

09:37:11 20           Thank you, Your Honor.  Thank you, ladies and

      21   gentlemen.

      22           THE COURT:  All right.  We are going to start with

      23   the obvious:  Jury service is a right.  Jury service is an

      24   obligation.  There's one thing that it's not and that's

09:37:31 25   optional.  You don't get to tell me -- raise your hand and

09:37:34  1   tell me that you would rather not be here.  The only reason

2   that you can be excused is for an undue hardship.

3          And I think it's best if I start by telling you

4   what undue hardship is not.  It doesn't mean that it's

09:37:52  5   inconvenient to either you or your employer for you to be

6   here.  I understand that many of you have important jobs,

7   but we have surgeons who come here and sit as jurors.  We

8   have CEOs of companies who come and sit.  We have lawyers

9   who come and sit as jurors.  And there is no one who can

09:38:19 10   tell me, really, that their position is so important that

11   they can't be a juror, because every juror also has sick

12   leave and vacation time.  And there are times when you just

13   have to be absent from work, and this is one of those.  You

14   did have an opportunity to postpone your service if this was

09:38:40 15   a difficult time.  None of you did that.  Sometimes that's

16   for whatever reason.  But once you're here, you would have

17   to show an undue hardship.

18          It also doesn't mean that you can avoid jury duty

19   because your employer doesn't pay for jury service.  I wish

09:38:58 20   every employer paid you while you were here for jury

21   service.  You have to also show that not only do you not get

22   paid, but you won't be able to meet the -- your basic

23   obligations, such as putting food on the table for your

24   dependents, paying the electric bill and the rent or

09:39:18 25   mortgage at the end of the month.

09:39:21  1            Another undue burden or hardship could be a

2  disability.  Again, you've had the opportunity to tell us

3  that in the response to a summons that's issued.  However,

4  some -- sometimes something comes up in the meantime.  You

09:39:37  5  have a bad back, for example, or you have difficulty hearing

6  perhaps.  We don't want to exclude anyone from jury service

7  because of a disability.  And so, we can accommodate most.

8  And again you had an opportunity to tell us; but even if you

9  didn't, but you have a bad back, let us know.  We'll put you

09:39:55  10  in the back row and you can stand periodically if you need

11  to stand.  If you need to take breaks with some frequency

12  because you are taking some medication or something like

13  that, we can accommodate that.  So you just need to let us

14  know.

09:40:10  15            But if you have a disability or a reason why you

16  can't be here during the time period -- sit in the chair you

17  need to sit in and deliberate, listen to the evidence and

18  then deliberate because of a disability -- then you can let

19  me know.

09:40:31  20            Now, having said all of this, is there anyone here

21  who believes they have what I've described as a legal

22  hardship, a reason, an undue hardship that would cause them

23  not to be able to be here for jury service?

24            And if so, raise your hand.

09:40:48  25            Okay.  I don't see -- I see one hand in the back.

09:40:51    1          All right.  What we're going to do is just give

           2    you a form that you'll fill out.  I will review it.  Wait

           3    until a break and fill it out.  I may ask you follow-up

           4    questions.

09:41:03    5          You can go ahead and go on back and provide that

           6    to her.

           7          I may ask you follow-up questions.  And so, when

           8    we do take a break, you'll need to be available.

           9          Did you see who raised their hand?  It was the one

09:41:21   10    person in the back.  And we have one other person up in

          11    front.  We have two people in front.

          12          THE PROSPECTIVE JURORS:  I don't, but I really

          13    need to use the restroom.

          14          THE COURT:  Right now?

09:41:36   15          PROSPECTIVE JUROR:  Yes.

          16          THE COURT:  Okay.

          17          PROSPECTIVE JUROR:  I'm sorry.

          18          THE COURT:  No, no.  We do have to stop whenever

          19    anyone is in that position.

09:41:44   20          Raise your hand high, if you are asking for a form

          21    to fill out.  And keep in mind that simply asking for the

          22    form just gives you an opportunity to tell me.  It doesn't

          23    mean that you're going to be excused, unless there's a very

          24    specific reason that I find constitutes a legal hardship.

09:42:05   25          All right.  We're going to take a break.  Keep

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:42:08   1   this in mind -- I have to give you at least some minimal

2   instructions before you leave the room; and that is, you're

3   not to discuss this case with anyone, each other or anyone

4   else, anything you've heard so far.  You have no evidence

09:42:22   5   yet.  You just have a brief little overview.  Don't discuss

6   it.  Don't talk to each other.  Don't use any search device,

7   such as your phone, to communicate with anyone or to do any

8   kind of research.

9           Then, come back in -- we're going to take a very

09:42:37  10   brief break at this point in time.  We'll take until 10

11   'til, so six or seven minutes, just enough time for you to

12   use the restroom and come back and then we'll resume from

13   there.

14           Everybody who needs to use the restroom, please

09:42:51  15   use it so that we can continue on without breaks for a

16   little while.

17           THE CLERK:  All rise.

18           *(Recess taken from 9:43 a.m. to 9:55 a.m.)*

19           *(The following proceedings were had in open court*

09:55:45  20           *in the presence of the prospective jury:)*

21           THE COURT:  All right.  Welcome back, ladies and

22   gentlemen.

23           We're going to move on to the next phase, and that

24   is where I ask you questions.  I will review the sheets that

09:56:04  25   you've provided to me but, again, I'll do that at some point

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:56:09  1    later in the process.  Right now we're just going to move on
       2    to where we engage in what we call voir dire, which is -- I
       3    think the literal translation of that is "to speak to the
       4    truth."

09:56:23  5         Our goal here is to pick an impartial and unbiased
       6    jury.  That doesn't mean that you come to the courtroom
       7    without your common sense and your experiences.  It may be
       8    experiences that you've gained through life or through your
       9    profession.  None of that is disqualifying.  We are simply
09:56:41 10    looking for a jury that can keep an open mind throughout the
      11    process, can listen to the facts as they come in through the
      12    witnesses on the witness stand and the documents that are
      13    admitted and that in that way arrive at a verdict, find the
      14    facts from that evidence and arrive at a verdict.  And so,
09:57:04 15    as we go through the process of jury selection and asking
      16    questions and having you answer them, if there's any reason
      17    why you believe you might be biased or prejudiced in any
      18    way, it's your duty to disclose that.  Also, even if you
      19    wouldn't be biased or prejudice, but you have some life
09:57:27 20    experience that's asked about, you should let us know that
      21    and then the attorneys can at least evaluate that and make
      22    their decision.

      23         Please understand that we won't be trying to ask
      24    personal questions for the sake of asking personal
09:57:50 25    questions, but you heard what the case is about, and so my

09:57:53   1   questions will focus on some of that.  If at any point in

2   time there is an answer that you believe you need to give

3   but that it's very personal in some way, or you would be --

4   you would just feel very uncomfortable providing it in front

09:58:09   5   of everyone, let me know by raising your hand just telling

6   me, you know, you'd prefer to answer, you can say, in

7   private or something along those lines.  Keep in mind that

8   it can't be entirely private because any answer you give

9   will be in front of the attorneys and their clients, but

09:58:25  10   we'll do it again during a break where I have everybody

11   leave, and it will just be the court staff and the attorneys

12   and myself who are present at that point in time.

13          You know, if it's something like your uncle's

14   friend got a D.U.I. 10 years ago, those things are really

09:58:43  15   not that personal.  We've heard that many times before, and

16   you can certainly answer that from your seat.

17          However, with that, I will simply get started.

18   I'll ask some questions and then I'll give the attorneys an

19   opportunity -- a few minutes to ask questions as well.

09:59:00  20          You heard the attorneys, I believe, identify

21   themselves and their clients and they stood and looked at

22   you.  Is there anyone here who recognizes any of the

23   individuals who introduced themselves?

24          No?  Okay.  And, again, just do this by raising

09:59:22  25   your hand if you have a response, because I won't

09:59:24  1    necessarily see if you shake or nod your head.

2         You have been told that you may hear from certain

3    witnesses.  That was mentioned earlier.  Obviously, you will

4    hear from witnesses.  So what I'm going do is, I'm going to

09:59:43  5    read from the witness list that I have.  Keep in mind that

6    not everybody on this witness list will necessarily testify.

7    And I suppose it's possible that someone not on the list may

8    testify, although that's very unlikely.  But let me list the

9    people here, name them for you, and I will ask you at the

10:00:02 10    end if you recognize any of the names as someone you know:

11         Preslie Hardwick.  Marcia Vreeken.  Helen Dwojak.

12    Patricia Dumas.  Deanna Fogarty.  Marlene Fogarty.  Kevin

13    Hardwick.  Hannah Bell.  Kendall Hardwick.  Cary Hardwick.

14    Marjorie Cain Mitchell.  Mary Shumate.  Peter -- is it

10:00:38 15    "Hermes"?  H-e-r-m-e-s.

16         MR. POWELL:  I think I had one, up in the back one

17    of those names.  I may be mistaken.

18         THE COURT:  I'm waiting until the end.  I'm not

19    going to stop in the middle, because then I'll never know

10:00:50 20    where to start again.  But keep in mind, if you put a hand

21    up, I will come back to you.  So keep in mind what you're

22    thinking.

23         Joyce Riley.  Sharon Grier.  Maria Segovia.  Lisa

24    Celaya, C-e-l-a-y-a.  Rachael Davis.  Joy Hardwick.  Martha

10:01:16 25    Rogers.  Cheryl Gibson.  Russell Johnson.  Thomas Howell.

44

10:01:22  1    Rachel Bavis.

        2          And we come to the end.  All right.  Is there

        3    anyone here who recognizes those names?

        4          All right.  I have a hand in the very back.  And

10:01:35  5    is that Ms. Yarnal?

        6          PROSPECTIVE JUROR:  Yes, ma'am.

        7          THE COURT:  All right.  You recognize names on

        8    there?

        9          PROSPECTIVE JUROR:  Yes.  Three of the names.

10:01:42 10          THE COURT:  Which names?

       11          PROSPECTIVE JUROR:  Thomas Howell.  Dr. Johnson

       12    and Marjorie Mitchell.

       13          THE COURT:  Because those are evaluators and so

       14    you must work in that area?

10:01:51 15          PROSPECTIVE JUROR:  Yes.  I'm a family law

       16    attorney.

       17          THE COURT:  All right.  And you've -- have you

       18    used those individuals before as evaluators in cases?

       19          Your microphone is not working.  I'm not sure if

10:02:06 20    we --

       21          No, we're going to need a new microphone if that's

       22    not working.  We usually try to get -- put new batteries in

       23    before the beginning.

       24          THE CLERK:  I did.

10:02:18 25          THE COURT:  Okay.  Let's give this another -- we

10:02:22  1    always have technical difficulties.  Okay.  Just try

2    speaking up and we'll try to remedy the problem in the

3    meantime.

4            PROSPECTIVE JUROR:  For Dr. Johnson, I've used him

10:02:30  5    at least 20 times.  I probably have five active cases with

6    him currently.

7            Dr. Howell, I've used in one case, and I deposed

8    him in his case.  And Marjorie Mitchell, I know by

9    association but have not used her.

10:02:47 10            THE COURT:  All right.  Based on your familiarity

11    with the individuals who may be witnesses, do you think that

12    you could be an unbiased juror in this case?

13            PROSPECTIVE JUROR:  I do.

14            THE COURT:  Listen to their testimony and decide

10:03:00 15    who you believe, who you don't, who you think is credible or

16    whether the information is accurate or inaccurate?

17            PROSPECTIVE JUROR:  Yes.

18            THE COURT:  All right.  And that's what you do as

19    a lawyer, in any event, often, isn't it?

10:03:14 20            PROSPECTIVE JUROR:  Correct.

21            THE COURT:  Okay.  All right.  But that is the

22    kind of disclosure that we need.  Even if you don't think

23    that you would be biased or prejudice as a result, you still

24    stand up and answer the question.  So thank you very much.

10:03:27 25            PROSPECTIVE JUROR:  You're welcome.

10:03:29  1            THE COURT:  There may be more questions for you

2     later, in light of your profession.

3            Anyone else here who recognizes any of the names

4     that were called?

10:03:39  5            Okay.  Now, as I said, the parties are not

6     required to call all of these witnesses.

7            Does anyone here know anyone else who's here as a

8     prospective juror?  I ask that question because sometimes

9     I've had uncle and nephew, boss and employee, and it is

10:04:01 10    helpful to know just because of a possible jury dynamic that

11    may result from that.  No?

12           Okay.  You have all heard the attorneys describe

13    this case in their mini-opening statement.  Is there anyone

14    who, having heard that, has knowledge of the facts of this

10:04:22 15    case, like, Oh, I know of this case?  Or I know something

16    about this, personally?

17           Okay.  Don't see any hands.  And, again, if the

18    attorneys see hands that I don't see, do exactly what you

19    did, which is alert me to that and then -- and then, I will

10:04:40 20    call on the person.

21           Is there anyone here who either personally, they

22    themselves, or a close friend or family member, anyone like

23    that, has ever been involved in a lawsuit with circumstances

24    similar to this?

10:05:00 25            All right.  We have two sort of hands.  We have --

10:05:04  1  we have a question.  Whenever you would do this in your

2  mind, hmm, I'm not sure, go ahead and raise your hand,

3  because it can't hurt.  So let's start with -- is it

4  Ms. Palter?

10:05:16  5          PROSPECTIVE JUROR:  Yes, ma'am.

6          THE COURT:  All right.  And what circumstance?

7          PROSPECTIVE JUROR:  I actually took

8  guardianship --

9          *(Court Reporter requests clarification for the*

10:05:19 10          *record.)*

11          THE COURT:  We don't have a microphone yet.

12          Are we getting one?

13          PROSPECTIVE JUROR:  I took guardianship of my two

14  younger sisters about 15 years ago who were in a similar

10:05:34 15  situation, sexual assault.  And they were taken away, and I

16  had guardianship of --

17          THE COURT:  And I see that it was 15 years ago

18  that that happened.  But you seem like it's still very

19  emotional for you; is that right?

10:05:48 20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Do you think that you could set aside

22  what you went through?

23          You think it would be very difficult for you to do

24  that.

10:05:56 25          All right.  So you might make decisions in this

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:06:01  1    case, based on your own experience?  Might even be difficult

2    for you to listen during the case; is that right?

3                    PROSPECTIVE JUROR:  Yes.

4                    THE COURT:  Okay.  All right.  Thank you.

10:06:12  5                    And we have Mr. Lagorio.

6            *(Court Reporter requests clarification for the*

7            *record.)*

8                    THE COURT:  I'm sorry.  We'll come back in just a

9    moment to you, sir; and then -- and we'll go here first,

10:06:25 10    because I forgot after your hand went down, but we'll come

11    back.

12                    PROSPECTIVE JUROR:  Yeah, my sister is a victim of

13    domestic violence.

14                    THE COURT:  All right.  And is that domestic --

10:06:38 15    her spouse?

16                    PROSPECTIVE JUROR:  Yes.

17                    THE COURT:  Okay.  And is there a lawsuit going on

18    relating to that?

19                    PROSPECTIVE JUROR:  It's ongoing right now, yes.

10:06:47 20                    THE COURT:  Okay.  And what kind of -- in what

21    context?  What court?

22                    PROSPECTIVE JUROR:  They live in San Joaquin

23    County.

24                    THE COURT:  Okay.  So is there -- is it a divorce

10:07:00 25    proceeding or just a domestic violence proceeding of some

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:07:03  1    sort?

2            PROSPECTIVE JUROR:  Yeah.  Just a domestic

3    violence.  She has been talking to police and --

4            THE COURT:  Okay.  And just so you understand,

10:07:12  5    there won't be any -- and it's important that you identify

6    that.  I don't think -- at least from what I've seen here --

7    that there's allegations that you'll be hearing relevant to

8    this case of domestic violence, right.  There were -- there

9    are allegations and there will be discussion of -- it sounds

10:07:35  10   like -- sexual abuse or allegations of sexual abuse and the

11   investigation of that, but I don't think there's going to be

12   any spousal domestic violence as an issue here.

13           Is that something that -- is there anything -- are

14   there children involved in that with your sister?

10:07:58  15           PROSPECTIVE JUROR:  She has three children, and --

16   yeah.

17           THE COURT:  Okay.  All right.  Do you think that

18   you'd be able to be an unbiased juror in this case, knowing

19   it doesn't involve domestic violence?

10:08:12  20           PROSPECTIVE JUROR:  I'm not sure.

21           THE COURT:  How do you think it might affect you

22   in this case?

23           PROSPECTIVE JUROR:  Without knowing everything, I

24   guess I can't really say.  I just know that going into this,

10:08:23  25   I'm already unbiased -- you know, unbiased.  I feel that if

10:08:31  1    this person has put themselves in this position, that

2    they're most likely guilty.

3              THE COURT:  All right.  I'm not sure which person

4    right now, but let me just ask:  You understand that there's

10:08:45  5    been no findings by anybody about anything that's happened

6    yet.  That would be the job of the jury to sit and listen to

7    the facts in the case and to make a determination, right?

8    And you would understand, for example, each of you, if you

9    had allegations that you were either making or on the other

10:09:04 10   side of, you would want a full -- full investigation, right?

11   And so that's really the jury's job here.

12             Do you think you could listen to the testimony in

13   this case and then make a decision about what you believed

14   the facts are?

10:09:22 15             PROSPECTIVE JUROR:  Well, at this point, I don't

16   think I have a choice, right?

17             THE COURT:  Well, I'm asking.  You know, I want --

18   I want --

19             PROSPECTIVE JUROR:  I'm answering.

10:09:29 20             THE COURT:  Because a lot of times people will

21   say, *Well, I'll try,* or *I think I will,* or *I don't know.*

22   And I just want to -- I just probe a little bit so that I

23   understand, because a lot of times people just say, *Well,*

24   *how do I know what I'm going to do, because that's not in*

10:09:44 25   *front of me right now.  I can't predict of the future.*  And

10:09:48   1    that's true.  That's true.  You don't know what's going to

       2    come in.

       3              But the question is:  Will you wait and see what

       4    comes in before you make a decision?  You base it on what

10:09:57   5    you see here in the --

       6              PROSPECTIVE JUROR:  Like I've said, I -- at this

       7    point, I really cannot give this case a fair shake.

       8              THE COURT:  Okay.  All right.  Thank you.

       9              If you can hand the microphone back.  And I'm

10:10:11  10    first going to go to Mr. -- is it? -- Abbott.

      11              All right.  He had his hand raised earlier.  And

      12    then, we'll go to you, Mr. Zola.

      13              PROSPECTIVE JUROR:  When -- when my older

      14    stepbrother was a younger child, he endured a custody battle

10:10:29  15    as part of divorce proceedings between my mother and her

      16    first husband.

      17              THE COURT:  Okay.  So you heard about that, or

      18    were you --

      19              PROSPECTIVE JUROR:  I've heard about it.  I'm not

10:10:37  20    aware of too many particulars --

      21              THE COURT:  All right.

      22              PROSPECTIVE JUROR:  -- pertaining to the case.

      23              THE COURT:  And you would understand that if you

      24    were selected as a juror in this case, it would be your duty

10:10:47  25    while you're here not to start talking to your family about,

*DEBORAH D. PARKER, U.S. COURT REPORTER*

52

*Well, what happened there?  And how does that compare to*
*what's happening -- what I'm hearing in court here?*

PROSPECTIVE JUROR:  Right.

THE COURT:  That you would be obligated to just
focus on the evidence, not discuss it with anyone until
you'd been discharged as a juror after having reached a
verdict.

PROSPECTIVE JUROR:  Right.

THE COURT:  And you would be able to do that?

PROSPECTIVE JUROR:  I do believe so, yes.

THE COURT:  Okay.  And do you think that you could
be a fair and unbiased juror using the definition I've used,
which is, keeping an open mind and listening the evidence?

PROSPECTIVE JUROR:  I do.

THE COURT:  Okay.  All right.  Thank you.

And then, if you can pass that down to Mr. -- is
it Zola?

PROSPECTIVE JUROR:  Yes.  Yes.  You can hear me?

THE COURT:  Yes, I can.

PROSPECTIVE JUROR:  Forty years ago, I was
involved in a child custody dispute.  And it was very
painful and very dramatic.  And I was accused of sexual
abuse which was -- didn't happen.  But as I was listening to
the attorneys present their summaries of the case, it was
very disturbing to me.  I feel like I was treated unfairly,

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:12:01  1   and I probably have -- I'm confident I have a bias that I

2   would be -- take the male's side.  And I understand there

3   may not be a male involved in the decisions in the

4   deliberations, but I really have this concern that it

10:12:24  5   wouldn't -- I would be difficult -- it would be very

6   difficult for me to make a fair decision.

7            THE COURT:  All right.  So you think that your

8   determination of the facts would be colored by your own

9   experience?

10:12:38  10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  And that you would favor the side that

12  you were -- where you felt you were treated unfairly.  You

13  would perhaps weigh the evidence in favor of the -- of

14  finding that the allegations are false, or something to that

10:12:53  15  effect?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  All right.  Thank you for that.

18           And I wanted to make sure that everyone

19  understands here and -- just, as in any case I have --

10:13:10  20  oftentimes, I have criminal cases.  This is a civil case.

21  It's not a criminal case.  I have criminal cases.  And it

22  may be a bank robbery case, for example.  And a juror will

23  raise their hand and say, *Well, you know, I'm really against*

24  *bank robberies.  Or I was robbed once, so I can't be fair.*

10:13:30  25           I don't mean this as to you, Mr. Zola, but you

*DEBORAH D. PARKER, U.S. COURT REPORTER*

54

10:13:34    1    just caused me to think of something.  *So I can't be fair.*

2    And to be honest, there's no one who thinks bank

3    robbery is good, who thinks it's appropriate, who thinks

4    that -- there's really no side necessarily on that.  It's

10:13:48    5    just what are the facts.  Did it occur?  Did it not occur?

6    Were the elements of the crime met or were they not met, so

7    you're making a factual determination.  You're not deciding

8    whether the underlying act is good or bad.  You're deciding

9    whether or not it's been proven or not true.

10:14:06   10    And, here, this is just one element of the case.

11    It's not a -- or one aspect, an allegation in the case.  It

12    may or may not end up being central to the case.  But you

13    understand we're just asking if you can keep an open mind

14    and make a determination based on what you hear here in the

10:14:24   15    courtroom, all right?  That's what we're looking for.  And

16    we've had several people who've had very specific

17    experiences who say that will be difficult for them.

18    All right.  Anyone else who had an answer to that

19    question?

10:14:41   20    Yes.

21    PROSPECTIVE JUROR:  Well, I have an open mind and

22    I can set aside, but I'm not sure if it pertains.  I did

23    foster a child that was pulled from the home for -- two

24    years ago and my sister took over.  And she just finished

10:14:56   25    adopting the child.  I don't know if it pertains.  He was

55

10:15:00  1    taken away for neglect.  Mom does have some mental health

2    issues, so I'm not sure if it will pertain.

3              THE COURT:  It's an experience that you've had,

4    and thank you for sharing that.  It's probably going to come

10:15:17  5    up in questions that I ask later.  And so, you've already

6    shared it, so you won't need to let us know again.

7              Is there anything about that experience, though,

8    that you think means you can't listen to the evidence here

9    and make a determination on what the facts are here in this

10:15:33 10    case?

11              PROSPECTIVE JUROR:  No.

12              THE COURT:  Okay.  All right.  So any other -- any

13    other responses?

14              The question was whether or not there was anyone

10:15:44 15    who was involved in any kind of claim or lawsuit proceeding

16    similar to the one that -- or may involve some of the same

17    issues that are being involved in this case.

18              And, again, I think for this -- at this point, I'm

19    excluding anything that's just sort of a simple divorce

10:16:07 20    proceeding, although I may get to that at some point.

21              PROSPECTIVE JUROR:  I'm a child/adolescent

22    psychiatrist, and I deal with a lot of these issues.

23              THE COURT:  Would you mind standing up so I can

24    see you and the attorneys can.

10:16:17 25              Thank you.

10:16:18  1          PROSPECTIVE JUROR:  I'm a child/adolescent

2     psychiatrist and I deal with this [sic] issues a lot.  And I

3     know when I'm dealing with this issues, I err on the side of

4     caution.  So I'm likely to side with the people who took the

10:16:29  5     children away, only because that's the safest way and then

6     everything else is ironed out afterwards.  And it's always a

7     difficult case and everyone can make a case as to how

8     horrendous it was or how much better the children are.  So

9     it's very difficult for me to be objective, because I know

10:16:49  10    what side I'm coming from.  And I know what the systems

11    [sic] are in place to ensure safety more than anything.

12          THE COURT:  So you think that you would have

13    trouble basing your decision on the evidence that's

14    presented in this case?

10:17:03  15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  That you may harbor a particular basis

17    based on your experience, as you said, a child and

18    adolescent psychologist?

19          PROSPECTIVE JUROR:  Psychiatrist, yes.

10:17:15  20          THE COURT:  Psychiatrist.

21          All right.  And have you been involved in

22    proceedings where there have been accusations by one parent

23    against another --

24          PROSPECTIVE JUROR:  Not in proceedings.  Because

10:17:25  25    what I tend to do is I encourage the parents to see a

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:17:29  1   mediator.  Because once I've treated the child, I tend to

2   side on the child.  That's my responsibility.  And I know

3   that both parents will have their own agendas and it's hard

4   to iron that out.

10:17:44  5            THE COURT:  All right.  Thank you.

6            And, again, the attorneys may have additional

7   questions for any of you.  I may not have asked all of the

8   questions.  One moment.

9        (Pause.)

10:18:03  10           THE COURT:  Okay.  Let me just ask some more

11  specific questions.  If you've already answered these

12  questions, you don't have to repeat; but if there's new

13  information, please do let me know.

14           Have any of you or any members of your family or

10:18:18  15  anyone close to you ever had any training or work experience

16  as a social worker or in social work?

17           Okay.  We have a couple of hands here.  We'll

18  start in the front row and then move to the back row.

19           And that is, is it Ms. --

10:18:37  20           PROSPECTIVE JUROR:  Maquitico.

21           THE COURT:  -- Maquitico?

22           PROSPECTIVE JUROR:  Yeah, Maquitico.

23           THE COURT:  Oh, I got it.  Okay.  A lot of

24  syllables.

10:18:44  25           PROSPECTIVE JUROR:  I hold a bachelor's in human

10:18:46  1   services.  So a lot of my coursework was child -- I took

2   courses in child abuse, crisis intervention, case

3   management, stuff like that.

4           THE COURT:  Okay.  So that's been your class work

10:18:57  5   and your coursework?

6           PROSPECTIVE JUROR:  Yeah.

7           THE COURT:  So you may have some knowledge in that

8   area?

9           PROSPECTIVE JUROR:  Right.

10:19:02 10           THE COURT:  Would you be able to listen to

11   witnesses and experts and keep an open mind while you're

12   listening?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Do you think there's anything about

10:19:12 15   your coursework or class work or any other experience that

16   might bias you in a way that would be unfair to one side or

17   the other?

18           PROSPECTIVE JUROR:  No.

19           THE COURT:  All right.  Thank you.

10:19:23 20           And then in the back row, we have Mr. -- is it

21   Mr. Tapia?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  All right.

24           PROSPECTIVE JUROR:  I, too, took coursework in

10:19:32 25   college, in sociology, relating to social work type of

10:19:37  1   classes.  And, currently, I -- I'm employed with a social

2   services agency as an eligibility technician.

3         THE COURT:  All right.  And what does an

4   eligibility technician do?

10:19:47  5         PROSPECTIVE JUROR:  My particular duties involve

6   just evaluating cases for food stamps.  I do come across

7   clients from time to time that express concern about

8   potential child abuse, sexual abuse, stuff like that.

9         THE COURT:  All right.  It's not your area to

10:20:07 10   investigate that or make determinations about child abuse or

11   sexual abuse?

12         PROSPECTIVE JUROR:  No.  Just report as needed.

13         THE COURT:  All right.  And have you ever had

14   occasion where you've had to report?

10:20:19 15         PROSPECTIVE JUROR:  I did about probably under a

16   month ago.

17         THE COURT:  Okay.  Other than that, have you had

18   any other experiences?

19         PROSPECTIVE JUROR:  No.

10:20:26 20         THE COURT:  Okay.  Do you think you would be able

21   to keep an open mind and listen to the testimony and decide

22   the facts of the case here based on the testimony you hear

23   in court?

24         PROSPECTIVE JUROR:  I think so, yes.

10:20:37 25         THE COURT:  All right.  Thank you.

10:20:38  1              And then we have Ms. Nguyen.

2              PROSPECTIVE JUROR:  Yes.  Yes.  I am in the same

3    situation that he is.  I am not a social worker, but I'm

4    eligibility technician and working for social services also

10:20:52  5    for Cal-Fresh program.

6              THE COURT:  For the Cal-Fresh program.

7              PROSPECTIVE JUROR:  I don't have any experience

8    related about that case or any kind like that with my

9    client.

10:21:05  10             THE COURT:  Okay.  No cases of child abuse or

11   sexual abuse, or anything like that?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Okay.  Thank you.

14             Two eligibility technicians sitting two seats

10:21:17  15   apart from each other.  We always have such coincidences

16   here.

17             All right.  Any other hands raised relating to

18   someone who has been a social worker or has experience in

19   social work other than what we've already heard?

10:21:35  20             PROSPECTIVE JUROR:  I do -- I do have a sister

21   that is a school counselor.  You were asking family members

22   as well, correct?

23             THE COURT:  That's correct.  That's correct.

24             Is she like a psychological counselor, or a

10:21:46  25   typical, like, high school counselor?

61

10:21:50  1            PROSPECTIVE JUROR:  High school counselor.

          2   Probably like curriculum-associated.

          3            THE COURT:  Okay.  All right.  Thank you.  I don't

          4   think that's necessarily going to be -- come into play.

10:21:59  5   But, again, whenever you're wondering, go ahead and answer.

          6            All right.  Has anyone here, other than what

          7   you've already told us about, ever had any specific

          8   experiences with social services or a social services

          9   agency, such as child protective services?

10:22:23 10            We have one hand in the back.  Mr. Tapia.

         11            PROSPECTIVE JUROR:  Yes.  When I was younger, I

         12   was visited by a social worker in regards to suspected child

         13   abuse that was going on in the home.

         14            THE COURT:  In your home?

10:22:41 15            PROSPECTIVE JUROR:  Yes.

         16            THE COURT:  When you were a child?

         17            PROSPECTIVE JUROR:  Yes.

         18            THE COURT:  Was there just one visit, or was there

         19   any further --

10:22:48 20            PROSPECTIVE JUROR:  From what I recall, there was

         21   just one visit.

         22            THE COURT:  All right.  Anything about that

         23   circumstance -- how old were you at the time?

         24            PROSPECTIVE JUROR:  I want to say I was around

10:22:56 25   seven, maybe eight.

62

10:22:58   1          THE COURT:  Okay.  Do you have much of a

2     recollection of it?

3          PROSPECTIVE JUROR:  No.  Just a vague remembrance

4     of it, of the questions that they were asking me.

10:23:07   5          THE COURT:  Okay.  Anything about that experience

6     that you think would cause you not to be able to be fair

7     here or would color your views here?

8          PROSPECTIVE JUROR:  I don't think so.

9          THE COURT:  Okay.  All right.  Thank you.

10:23:18  10     Anyone else?  Yes, Ms. -- is it McCann?

11          PROSPECTIVE JUROR:  Yes.  I was the assistant

12     superintendent of business for Garden Grove Unified School

13     District in charge of all operations, including risk

14     management.  And many times I was the one to help school

10:23:38  15     principals interpret whether or not -- when they received

16     family law orders whether or not they had to release the

17     child to one parent or the other.

18          THE COURT:  Okay.  All right.  So you would help

19     them look at the orders and decide -- make a decision about

10:23:54  20     what the school's responsibility was in that context.

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Okay.  Is there anything about that

23     role that you played that you think will impact your ability

24     to be a fair juror here?

10:24:05  25          PROSPECTIVE JUROR:  I think I can be a fair juror,

10:24:06  1    except for we always followed the order.

2              THE COURT:  Right.  Okay.  And I don't know that

3    that's going to be anything that is relevant here in that

4    sense.  But, again, that's important that you share that so

10:24:23  5    that the attorneys can follow up with any questions they may

6    have.

7              All right.  Anyone else?

8              Yes.  Mr. Zola.

9              PROSPECTIVE JUROR:  During my second marriage, my

10:24:37  10    wife and I were foster parents for five years.  Quite a few

11    of the children that we had were removed from their families

12    because of sexual abuse.  And that doesn't -- it doesn't

13    adversely affect my abilities to make a judgment as much as

14    the previous discussion that I presented to you.

10:25:03  15              THE COURT:  All right.  Thank you.

16              Anyone else?  All right.  I don't see any further

17    hands on that.

18              Is there anyone here who has had any particularly

19    positive or negative experiences in family law court?

10:25:27  20              I don't see any -- I'm not sure of anyone who has

21    had a particularly positive experience in family law court.

22    I don't even know that that was an appropriate question to

23    ask, but maybe.

24              Yes.

10:25:38  25              PROSPECTIVE JUROR:  Can you reliterate [sic] the

10:25:39  1    question?

2              THE COURT:  Sort of rephrase it to make it

3    clearer?

4              PROSPECTIVE JUROR:  Yes.

10:25:44  5    THE COURT:  Yes.  I'm happy to do that.

6              You're going to be hearing, based on what I just

7    heard in the mini-opening statement, about family law

8    proceedings and what happened there and what the parties

9    went through.  And, again, we just want to make sure that

10:26:02  10   jurors can decide cases based on what comes in here.  So if

11   you've had a particularly negative experience in family

12   court -- you thought you were treated completely unfairly,

13   you thought that -- you were dragged through a proceeding

14   for years and years with your ex, all of those sorts of

10:26:20  15   things, those might be relevant because those are

16   experiences that you may be hearing about in the context of

17   this case, right?  And I don't know which side that may

18   favor or not favor, but at least it's something that the

19   attorneys may want to know about.

10:26:40  20   PROSPECTIVE JUROR:  Okay.  Well, I had a family --

21   we went to court with my ex.  It was a little rough just

22   with the mediator, because I always felt that the mediator

23   was taking dad's side of just the evidence that they

24   provided.  But in all end [sic], it turned out fine.  We

10:26:57  25   just had to share custody and stuff.

```
10:27:00   1            THE COURT:  So in the end, you feel like the -- it
           2   worked out?
           3            PROSPECTIVE JUROR:  Yeah.
           4            THE COURT:  All right.  Is there anything about
10:27:06   5   that experience that you think might cause you to favor one
           6   side or the other in this particular case?
           7            PROSPECTIVE JUROR:  I believe not.
           8            THE COURT:  All right.  Thank you.
           9            Anyone else?
10:27:17  10            All right.  Ms. Palter.
          11            PROSPECTIVE JUROR:  I just got done with court
          12   with my ex.  I have full custody of my kids.  And it dragged
          13   on for years.  And I just felt like it wasn't fair.  They
          14   didn't want to hear anyone's side.  It was more -- I'm glad
10:27:34  15   they finally got the kids involved, but I didn't -- the kids
          16   didn't want to get involved.  I'm sorry they had to do that,
          17   but I didn't think it was fair.
          18            THE COURT:  And so it was just not a fair
          19   proceeding?
10:27:44  20            PROSPECTIVE JUROR:  It's wasn't a fair proceeding.
          21            THE COURT:  Not a fair process.
          22            PROSPECTIVE JUROR:  Not at all.
          23            THE COURT:  Well, that's what we want to cure
          24   here.  We want to make sure that both sides have a fair
10:27:53  25   process and have a jury that will listen and make a decision
```

10:27:54  1   based on the facts, which is what everybody would want if

2   they were in a proceeding, right?

3           So, is there anyone else here who's had any other

4   experiences like that that they need to tell us about?

10:28:09  5           No.

6           Okay.  All right.  Is there anyone who's just been

7   a party to a lawsuit before, regardless of whether it's like

8   this one or not?  You know, you've been either a plaintiff

9   or a defendant in a civil lawsuit.

10:28:32 10          Okay.  We have three hands.  And the question that

11  I'm going to ask you -- you can go ahead and go back -- keep

12  your hand raised, please.

13          All right.  In the corner.  Mr. Cook.

14          PROSPECTIVE JUROR:  Yes.

10:28:48 15          THE COURT:  I'm not going to ask you the details

16  of it.  I just wanted to find out, was there anything about

17  that experience that was -- that you think might impact your

18  ability to be a fair juror here?

19          PROSPECTIVE JUROR:  No.  It's ongoing right now,

10:29:05 20  but no.

21          THE COURT:  Okay.  And is it a process that you

22  think is a fair process?

23          PROSPECTIVE JUROR:  I'm --

24          THE COURT:  You'll know when the results come in,

10:29:14 25  right?

10:29:14  1          PROSPECTIVE JUROR:  Yeah, exactly.  I'm a

          2  defendant in a civil matter, a named defendant in a real

          3  estate transaction.

          4          THE COURT:  All right.  Do you think that you

10:29:24  5  could be fair to both the plaintiff and a defendant in a

          6  civil lawsuit, if it doesn't necessarily relate to a

          7  real estate transaction?

          8          PROSPECTIVE JUROR:  Yes.

          9          THE COURT:  All right.  Thank you.

10:29:37 10          And we had other hands.  So before we come up

         11  here, we have -- is it Ms. Spiezia?

         12          PROSPECTIVE JUROR:  Yeah.  My husband's

         13  real estate company was also sued in a lawsuit, and I was

         14  named.  I was sued also.

10:29:54 15          THE COURT:  Okay.  Yes.

         16          PROSPECTIVE JUROR:  But it was a couple of years

         17  ago.  I thought the proceedings were fair, and I don't see

         18  how it would affect anything.

         19          THE COURT:  Okay.  Thank you.

10:30:03 20          But it is important that you respond when I ask

         21  the questions, right, because you all raised your hand and

         22  said you would respond, even if you think it might not be

         23  relevant.

         24          In the front row, I think -- oh, the front row,

10:30:14 25  starting with -- is it --

10:30:16   1          PROSPECTIVE JUROR:  Courchaine.

           2          THE COURT:  All right.  Mr. Courchaine.

           3          PROSPECTIVE JUROR:  Yeah, I was named in a

           4   lawsuit.  My wife was in a car accident.  So, just -- I

10:30:23   5   thought it was fair.  No big deal.  I just wanted to make

           6   sure that you were aware of it.

           7          THE COURT:  All right.  So it was just a car

           8   accident and there's -- sometimes there are lawsuits coming

           9   from those.

10:30:32  10          PROSPECTIVE JUROR:  Never actually got into a

          11   courtroom.  It just was handled.  I just wanted you to know.

          12          THE COURT:  All right.  Thank you.

          13          And then there were hands I saw in the back.

          14   Ms. McCann.

10:30:44  15          PROSPECTIVE JUROR:  Yes.  I've been named in the

          16   course and scope of my employment with the school

          17   district -- civil and contractual matters -- but eventually

          18   dismissed or they named the agency only.

          19          THE COURT:  All right.

10:30:58  20          PROSPECTIVE JUROR:  For -- after I was dismissed.

          21          THE COURT:  All right.  Understood.

          22          And anything -- well, anything about that

          23   experience that you think would cause you not to be able to

          24   be fair in this case?

10:31:10  25          PROSPECTIVE JUROR:  Well, I think I can be fair.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:31:14  1  But, you know, a lot of our matters were very frivolous.

2          THE COURT:  All right.  So you would -- and I

3  think everybody here probably understands that there are

4  lawsuits -- there are lawsuits that are frivolous and

10:31:29  5  lawsuits that are not.  And "frivolous" is in the eye of the

6  beholder.  Here the beholder is the jury, right?

7          So do you think you would be able -- someone has

8  to decide what the facts are.  Do you think that in the back

9  of your mind a thought that lawsuits may be frivolous would

10:31:45 10  prevent you from deciding, oh, this lawsuit has merit; or,

11  oh, this is what these facts are here in this case.  I'm

12  just going to focus on this and not the McDonald's hot

13  coffee lawsuit, right, which everybody seems to raise as

14  their -- the epitome of what they think was a frivolous

10:32:05 15  lawsuit or an inappropriate jury award?

16          Do you think you could be fair and listen to the

17  facts and then decide?

18          PROSPECTIVE JUROR:  Yes, I believe so.

19          THE COURT:  Okay.  Anyone else who has been

10:32:20 20  involved in a lawsuit of any sort as a party?

21          Okay.  Let me take a look.  Is there anyone here

22  who has any -- other than what I've already learned, has any

23  special training in the law, for example?  We have one

24  person who raised her hand as an attorney, a family law

10:32:51 25  attorney.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:32:52    1          Is there anyone else who has any particular

2     training?  And I think we've gone through social work

3     already, so I won't burden you with that question again.

4          All right.  Now, in a civil lawsuit, plaintiff --

10:33:06    5     and you'll hear this in the instructions later -- plaintiff

6     has a burden of proving their case by preponderance of the

7     evidence.  Now, some of you may have served as jurors in

8     criminal trials before where you've heard different

9     instructions about evidence beyond a reasonable doubt.

10:33:25   10          Does anyone think that you can set aside whatever

11    it was you heard in another case and follow my instructions

12    in this case, whether it's on the burden of proof or any

13    other legal instructions that I provide?

14          And I guess another way of saying it is that when

10:33:42   15    it comes to the facts in this case, if you're selected as a

16    juror, you will be the judge of the facts, so you think of

17    yourselves of wearing a black robe when it comes to the

18    facts of the case.  You are the judge.  I don't have enough

19    to go around, but figuratively you're wearing a black robe.

10:33:58   20    But when it comes to the law of the case, I keep my black

21    robe.  I decide what the law is and I let you know what that

22    is.

23          Is there anyone here who thinks if they disagreed

24    with my instructions on the law they wouldn't be able to

10:34:10   25    follow them?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:34:12  1          All right.  So I have your commitment that if

2   you're selected as a juror, you would follow the

3   instructions on the law?  Yes?

4          Okay.  All right.  I don't see -- I don't hear any

10:34:24  5   objections.

6          All right.  So now what I'm going to do is turn to

7   the questionnaire that you have.  You should have somewhere

8   around your seat or your neighbor may have a copy, if you

9   don't, of the -- of a questionnaire.  It looks something

10:34:44 10   like this (indicating) where you're going to tell us your

11   name, where you live -- just the city or town -- what you do

12   for a living -- what your occupation is and who your

13   employer is.  If you're retired or you're not working, for

14   whatever reason, but you have an occupation, or -- tell us

10:35:04 15   what your most recent employment was.

16          If you have a spouse or someone with whom you have

17   a significant relationship, then tell us what that person

18   does, who their employer is.  And your children, if you have

19   children, tell us how many, how old they are.  If they are

10:35:27 20   adults, tell us what they do for a living.  If your son or

21   daughter is in high school and, you know, working at a

22   Jamba Juice, you don't have to necessarily let us know that,

23   but I just mean as a career, something along those lines.

24          Let us know whether you've ever served on a jury.

10:35:48 25   And in that regard, just tell us was it civil or criminal

10:35:52  1   and briefly what it was, you know, like I said, bank

2   robbery, D.U.I., contract dispute, personal injury,

3   something like that.

4           And were you able to reach a verdict?  Don't tell

10:36:02  5   us what the verdict was.  Just say, *Yes, we reached a*

6   *verdict* or, *No, we weren't able to.*  I won't be

7   interrupting, really, with any questions, because we're

8   going to go through everybody here.  And only if I don't

9   understand or can't hear something that you say, I might

10:36:18 10  interrupt with a question.  And we will begin with -- we'll

11  just pass the microphone down.

12          We'll begin with "Ms. Creel," is it?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  All right.

10:36:30 15  PROSPECTIVE JUROR:  My name is Judith Creel.  I

16  live in Irvine.  I'm retired.  I was in advertising.  I

17  worked in an advertising agency that happened to be owned by

18  my husband.  He's retired as well.

19          I have no children.  I served on a jury.  It was a

10:36:50 20  criminal case.  It was assault.  And, yes, we reached a

21  verdict.

22          THE COURT:  Thank you.

23          And you can just hand the microphone.  Yes.

24  Perfect.

10:37:00 25  PROSPECTIVE JUROR:  Okay.  My name is Jordana

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:37:01  1    Gergis.  I live in Mission Viejo.

2                    I am an ABA therapist for Easter Seals.

3                    And no to the rest of the questions.

4                    THE COURT:  All right.  And when you said an "ABA

10:37:16  5    therapist" --

6                    PROSPECTIVE JUROR:  Yes.

7                    THE COURT:  -- can you just tell us what that is?

8                    PROSPECTIVE JUROR:  I work with kids with autism.

9                    THE COURT:  All right.  Thank you.

10:37:25 10          PROSPECTIVE JUROR:  My name is Sue McCann.  I live

11    in the City of Orange.  I was the -- I'm retired four years

12    from the Garden Grove Unified School District.  I was the

13    assistant superintendent of business and operations.

14                   My husband is retired, and he was -- worked for

10:37:44 15    Kaiser Permanente in business operations in -- I'm not sure

16    what he did -- project management.

17                   I have two children.  They are young men now, ages

18    32 and 34.  One of them is a pharmacist for Kaiser

19    Permanente and the other is a software engineer for Boeing.

10:38:09 20          And I have served on a jury before only as an

21    alternate.  And I can't remember if it was a criminal or

22    civil case, but it involved indecent exposure.  And the jury

23    was able to reach a verdict.

24                   THE COURT:  All right.  Thank you.

10:38:24 25          PROSPECTIVE JUROR:  My name is Jeff Abbott.  I

*DEBORAH D. PARKER, U.S. COURT REPORTER*

74

10:38:26 1   live in Lake Forest, California.  I'm a student at the

2   University of Redlands.  I'm not employed; never have been.

3            I'm single.  I don't have any children.  And I've

4   never served on a jury.

10:38:38 5            THE COURT:  Thank you.

6            PROSPECTIVE JUROR:  My name is Jesse Tapia.

7            I live in the City of Orange.  I'm a Cal-Fresh

8   eligibility technician.  I'm not married or have any

9   children.

10:38:54 10           I have served on a jury before.  I believe it was

11   civil.  It involved a female that was accused of vandalizing

12   a Buddhist temple.  We were not able to reach a verdict.

13           THE COURT:  Thank you.

14           PROSPECTIVE JUROR:  My name is Martin Zola.  I

10:39:12 15   live in Laguna Beach.  I'm retired.  And I was a business

16   owner and a consultant.

17           THE COURT:  What kind of business?

18           PROSPECTIVE JUROR:  IT and consulting.

19           Five children.  Two adopted.  Two have passed

10:39:31 20   away.  The children's ages ranged from 33 to 50.

21           I did serve on a jury.  It was a civil case, and

22   the -- the jury reached a verdict, and it was reached very

23   quickly.

24           THE COURT:  Thank you.

10:39:55 25           PROSPECTIVE JUROR:  My name is Phuong-Chi Nguyen.

10:39:57  1    I live in Santa Ana, Orange County.  I am employed with

2    social services agency as an eligibility technician for

3    Cal-Fresh.

4              My spouse is working with Meggitt, M-e-g-g-i-t.

10:40:21  5              I have two adult children:  One is a salesmen

6    [sic] with AAA.  And my daughter is Interventional

7    Cardiology, in Dallas.

8              And I have never served on a jury.

9              THE COURT:  Thank you.

10:40:41  10             PROSPECTIVE JUROR:  My name is William Leon.  I

11   live in La Habra, and I am driver for MB Transportation for

12   senior and disabled.

13             I've been separated from my spouse for the past

14   two years.  I have three children.  They're 24, 21 and 17.

10:41:03  15   The 24-year-old works at Sam's Club.  The 21 is unemployed.

16   And the 17-year-old is in high school, not working.

17             And I never served on a jury.

18             THE COURT:  Thank you.

19             We'll send that all the way down to the other end,

10:41:20  20   because you're Juror No. 16, and we have to go to Juror No.

21   9, first.

22             PROSPECTIVE JUROR:  Is it okay if I stay sitting?

23   My back kind of hurts.

24             THE COURT:  Yes, you may.

10:41:31  25             PROSPECTIVE JUROR:  Hello, my name is

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:41:31  1    Arte Figueora.  I'm from Anaheim.  My current employer is

2    the Pizza Press.  And I do not have any children or a

3    spouse.

4              And yes, I have served on a jury.  It was a

10:41:48  5    criminal case, and we did reach a verdict.

6              THE COURT:  Thank you.

7              PROSPECTIVE JUROR:  My name is Patrick Courchaine.

8    I live in the City of Orange.  I am an advanced technology

9    technician with Orange County Transportation Authority.

10:42:05 10              My wife is an IT director for Fairmont Private

11   Schools.

12              We have no children.  And I've been on five cases;

13   three criminal, two civil.  We reached verdicts in all of

14   them.

10:42:20 15              Do you want me to go through them in a little more

16   detail?

17              THE COURT:  You said three criminal and two civil.

18              What were the two civil ones?

19              PROSPECTIVE JUROR:  One was a homeowners'

10:42:32 20   association suing a developer and the other one was a client

21   suing her attorney for misrepresentation.

22              THE COURT:  Malpractice?

23              PROSPECTIVE JUROR:  Yeah, like divorce.  She was

24   going through a divorce and she claimed that that attorney

10:42:51 25   botched her divorce, so she hired another attorney to sue

10:42:55  1    that attorney.

2              THE COURT:  Okay.

3              PROSPECTIVE JUROR:  And her attorney was her

4    husband who was also an attorney, so it was interesting.

10:43:02  5              THE COURT:  All right.  Thank you.

6              PROSPECTIVE JUROR:  Hello.  My name is

7    Edward Hanke.  I live in Aliso Viejo.  I'm retired.  I used

8    to be a millwright for Aluminum Company of America and

9    Bill Bos Bay Bloats.

10:43:20 10              My wife is a nurse at Hoag Hospital.  I have two

11   children:  One, 33 and one, 29.  My eldest was a Marine and

12   now works at the Montage Hotel.  My youngest is a patient

13   companion for Hoag Hospital.

14              I have served on a jury.  It was a criminal case,

10:43:43 15   and I was an alternate.  The case was about a robbery, and

16   they did reach a verdict.

17              THE COURT:  Thank you.

18              PROSPECTIVE JUROR:  Hi.  My name is Abigail

19   Maquitico.  I live in the City of Anaheim.  I'm an after

10:44:01 20   school instructor for Santa Ana Unified School District.

21              My fiancé's occupation is a design developer for

22   Oakley.  We don't have any children.  And I have never

23   served in a jury [sic].

24              THE COURT:  Thank you.

10:44:16 25              PROSPECTIVE JUROR:  Hi.  My name is Thomas Lee.

10:44:18  1              I live in the [sic] Fullerton.

          2         (Court Reporter requests clarification for the

          3         record.)

          4              PROSPECTIVE JUROR:  I'm a salesman.  And I live

10:44:47  5    with my wife.  She's a housekeeper.  And then two children:

          6    One of them is 20.  One of them is 19.  Twenty is oldest.

          7    He's -- he junior at the Art Center, and one of them is --

          8    younger is Cal-State Fullerton.  He's a freshman.  And

          9    that's it.

10:45:14 10              THE COURT:  And you haven't served on a jury

         11    before?

         12              PROSPECTIVE JUROR:  No.

         13              THE COURT:  All right.  Thank you.

         14              PROSPECTIVE JUROR:  Hi.  My name is Trina Palter.

10:45:22 15    I live in Anaheim.  I am a VP of finance and operations for

         16    Cantor Fitzgerald.

         17              I'm single.  I have four kids, ages 17, 14, 11 and

         18    nine.  And they are all in school.

         19              And I've never served on a jury.

10:45:40 20              THE COURT:  Thank you.

         21              PROSPECTIVE JUROR:  Domine Solesbee.

         22    Anaheim Hills.  I work for a family auto shop.  I do HR and

         23    finance.  My husband does the same.  He works for the same

         24    company with his family.

10:45:54 25              I have five children:  23, unemployed; 25, works

*DEBORAH D. PARKER, U.S. COURT REPORTER*

79

| | | |
|---|---|---|
| 10:46:00 | 1 | in a paving company; 27, homemaker; 29 -- I'm trying to |
| | 2 | think -- homemaker and 32, homemaker.  I'm sorry.  Is that |
| | 3 | five kids? |
| | 4 | *(Laughter.)* |
| 10:46:22 | 5 | PROSPECTIVE JUROR:  I also lost my mind. |
| | 6 | I have served on a jury.  I cannot recall whether |
| | 7 | it was civil or criminal, and it was dismissed during |
| | 8 | deliberation. |
| | 9 | THE COURT:  All right.  Thank you. |
| 10:46:32 | 10 | PROSPECTIVE JUROR:  My name is Baha Dean.  I live |
| | 11 | in Anaheim.  I'm a psychology student at Cal-State |
| | 12 | Fullerton. |
| | 13 | I'm not employed.  I don't have any children.  Not |
| | 14 | married.  And I've never served on a jury. |
| 10:46:45 | 15 | THE COURT:  Thank you. |
| | 16 | And we'll take that down to Ms. Spiezia. |
| | 17 | PROSPECTIVE JUROR:  Hi.  My name is Susan Spiezia. |
| | 18 | I live in Irvine. |
| | 19 | I was a flight attendant many years ago.  That's |
| 10:47:01 | 20 | why I'm so nervous, talking to all these people.  I stayed |
| | 21 | home -- |
| | 22 | THE COURT:  It's like a public speaking |
| | 23 | engagement. |
| | 24 | PROSPECTIVE JUROR:  That's why I never liked it. |
| 10:47:07 | 25 | I stayed home and raised three children. |

10:47:09    1          My husband is an attorney and we own a real estate
            2   company.  My daughter is 29.  She lives in Chicago.  She's
            3   an attorney with Gordon and Rees.  I have a 28-year-old son
            4   who's in private equity and a 26-year-old son who works for
10:47:21    5   CBRE Commercial Real Estate in Newport Beach.
            6          And I never served on a jury.  I made it up to the
            7   box a few times, but I never got further than that.
            8          THE COURT:  Thank you.
            9          PROSPECTIVE JUROR:  Hi.  My name is Robert Huang.
10:47:33   10   I live in Irvine.  I'm a freelance software developer.
           11          My wife was a mortgage loan processor for
           12   Wind Point, but she recently quit.
           13          We have one child.  She's six months old.
           14          And I've never served.
10:47:53   15          THE COURT:  Thank you.
           16          PROSPECTIVE JUROR:  My name is Sebastian Zapart. I
           17   live in Mission Viejo.  I'm a pharmacist, and I work for
           18   Laguna Drug.
           19          My wife is also a pharmacist.  She works for
10:48:04   20   Albertsons inside the Sav-on.
           21          I have two children:  Six and two.  They don't
           22   work, obviously.
           23          I have served on a jury.  It was for a criminal
           24   case.  A verdict was reached.  And the case was about a
10:48:19   25   gentleman who was abusing his girlfriend -- allegedly

10:48:26  1  abusing his girlfriend, but a verdict was reached.

2              THE COURT:  All right.  Thank you.

3              PROSPECTIVE JUROR:  My name is Gerardo Rivera.  I

4  live in Brea.  I work at a call center in Santa Ana, and I

10:48:38  5  also work at 24 Hour Fitness.

6              I'm not married.  No children and never served.

7              THE COURT:  All right.  Thank you.

8              PROSPECTIVE JUROR:  Hi.  My name is Elizabeth

9  Corona, and I live in the City of Anaheim.

10:48:52  10             My occupation is the County of Orange with

11  nutrition services, WIC.  I'm a store clerk.

12             I have two children.  He's 19, almost 20, and my

13  daughter is 18.  And my daughter is up in UC Santa Barbara

14  and my son is -- tire service occupation.

10:49:20  15             And, no, I never served on a jury.

16             THE COURT:  Thank you.

17             PROSPECTIVE JUROR:  Hi.  My name is Richard

18  Lagorio.  I live in Fullerton.  I work as a graphic

19  designer.

10:49:31  20             I am single.  I have no children.  And I've never

21  been on a jury before.

22             THE COURT:  Thank you.

23             PROSPECTIVE JUROR:  My name is Kylie Filipek.  I

24  live in Tustin.  I'm currently unoccupied.  I'm a student.

10:49:51  25  I have no children.  Single.  And I've never served on a

10:49:54 1    jury.

2              THE COURT:  Thank you.

3              PROSPECTIVE JUROR:  Hi.  My name is Jasmine.  I

4    currently live in Irvine.  I'm currently an intern

10:50:02 5    pharmacist as Kaiser Permanente and an incoming third-year

6    doctor pharmacy student at USC.

7              My fiancé, he's a Ph.D. student at the

8    Beckman Laser Institute of UC Irvine.

9              I have no children.  And I've never served on a

10:50:25 10    jury.

11             THE COURT:  Thank you.

12             PROSPECTIVE JUROR:  Hi.  My name is Jean Nguyen.

13    I living in Santa Ana.  I work for South Coast Nail Supply.

14             My husband work for the National Oilwell Varco.

10:50:43 15             And I have one daughter, 17 years old.  And I have

16    never served on a jury.

17             THE COURT:  Thank you.

18             PROSPECTIVE JUROR:  My name is Mariana Tudor.

19             I'm living in Garden Grove.  I'm working at UCI

10:50:59 20    Medical Center.

21             My husband is doing construction.  We have no

22    children.  And I've never served on a jury.

23             THE COURT:  Thank you.

24             PROSPECTIVE JUROR:  My name is Viviana Kim.  I

10:51:17 25    live in Buena Park.  I'm primarily a stay-at-home mom, but I

83

1  used to work in visual effects.

2           My husband is a math professor at Mount San

3  Antonio College.

4           We have one son who is five years old.

5           I served on two criminal cases:  One was for

6  sexual assault and one's for domestic violence.  And we

7  returned verdicts on both.

8           THE COURT:  Thank you.

9           PROSPECTIVE JUROR:  My name is Elizabeth Van

10  Hoogmoed, and I live in Yorba Linda.  I consider myself

11  retired after 30 years of raising children.

12           My husband just recently retired from the beverage

13  industry.

14           I have two children.  The oldest is 27, and she is

15  a resource specialist in special education.  My son is 24.

16  He lives in Colorado and works at a brewery and a

17  restaurant.

18           I was on a jury many years ago.  It was a criminal

19  case -- shoplifting -- and we found a verdict.

20           THE COURT:  Thank you.

21           PROSPECTIVE JUROR:  Hi.  My name is Tzee Lin.

22           Just recently retired.  Used to work in the IT

23  industry.  I'm divorced.

24           One daughter, 27 years old.  She's a new

25  mother/housewife.  And never been a juror.

84

10:52:44  1          THE COURT:  All right.  Thank you.

        2          PROSPECTIVE JUROR:  Hello.  My name is Carlos

        3  Ortigoza.  I live in Yorba Linda, California.  I'm a

        4  business owner.

10:52:54  5          My wife works alongside me.  I do the operations.

        6  She does all the payments and payroll stuff.

        7          We have three beautiful kids:  One is 32.  She's a

        8  mother.  My son is 30.  He works for a real estate company

        9  out of Pasadena called Lands Advisor.  My daughter works for

10:53:11 10  the Forest Service as an environmentalist.

       11          I served in two criminal juries before, and both

       12  times we reached a verdict.

       13          THE COURT:  Thank you.

       14          PROSPECTIVE JUROR:  Hello.  My name is Elizabeth

10:53:23 15  Halcomb.  I live in Laguna Hills, and I am a self-employed

       16  private piano instructor.  And I work for my dad, who owns

       17  his own carpet and upholstery cleaning business.  I'm an

       18  office administrator for him.

       19          And I'm also employed by Red Hill Lutheran Church

10:53:44 20  as an assistant choral director for their children's choir.

       21  And my fiancé works for his family's business at Pinpoint

       22  Pest Control, in Oceanside.

       23          I do not have any children.  And I have never

       24  served on a jury.

10:54:00 25          THE COURT:  Thank you.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

85

10:54:02   1              PROSPECTIVE JUROR:  My name is Gino Estacio.  I
           2   live in Irvine.  I work as a project manager.  My wife works
           3   as a loan processor.  We have no children.
           4              And I have served in a civil case.  It was about
10:54:17   5   personal injury, and the jury was able to reach a verdict.
           6              THE COURT:  Thank you.
           7              PROSPECTIVE JUROR:  My name is Elizabeth Kim.  I
           8   live in Irvine.  I was a manager of a computer store.  My
           9   husband is business owner.  I have two children, 19 and 16,
10:54:36  10   and one of them is in college.  And I never served as jury
          11   [sic].
          12              THE COURT:  Thank you.
          13              PROSPECTIVE JUROR:  My name is Julia Silvey.  I'm
          14   from Aliso Viejo.  I work as a writing tutor at Loyola
10:54:49  15   Marymount University, and I'm also a performer at
          16   Disneyland.
          17              I'm not married, and I don't have any children,
          18   and I've never been on a jury before.
          19              THE COURT:  Thank you.
10:55:01  20              PROSPECTIVE JUROR:  My name is Jeff Cook.  I live
          21   in San Clemente.  I own a real estate consulting company,
          22   and my wife owns a digital marketing company.
          23              We have five children:  Seventeen, 15, 10, nine
          24   and six.  And I have never served on a jury.
10:55:23  25              THE COURT:  Thank you.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:55:24  1          PROSPECTIVE JUROR:  Hello.  My name is

2   Kathryn Yarnal.  I live in Costa Mesa, California.  I'm a

3   family law attorney employed by Hughes & Hughes.

4          My husband is a computer consultant for McAfee

10:55:39  5   Security.

6          I have two children.  They are ages three and one.

7   I have never served on a jury.

8          THE COURT:  Thank you.

9          PROSPECTIVE JUROR:  Hi.  My name is Teri Roach

10:55:52 10   Braley, and I live in Dana Point, California.  My occupation

11   is, I'm self-employed.  I'm a pet sitter and a nanny for a

12   three-and-a-half-year old.

13          Let's see.  I am divorced.  I have two children:

14   One is 28 and the other one is 24.  The 28-year-old is

10:56:12 15   self-employed.  24-year-old is a bookkeeping [sic] for a

16   construction company.

17          Let's see.  And I've never served on a jury.

18          PROSPECTIVE JUROR:  My name is Amada Almase.  I

19   live in the City of Orange.  I'm a physician in private

10:56:31 20   practice.  My significant other is a contractor.

21          I have a 39-year-old daughter.  She is -- she

22   works as -- she's a poet.  And I have never served on a

23   jury.

24          THE COURT:  Thank you.

10:56:48 25          All right.  We've gone through everyone.  Now,

10:56:52  1  what we're going to do is, I'm going to allow the attorneys

2  to ask some follow-up questions, based on what we've already

3  discussed and any others that they might have to ask, giving

4  each side no more than 15 minutes.

10:57:08  5         When that is done, we will at that point take a

6  break and, hopefully, we'll be able to come back before

7  lunch and have a jury, so -- but no guarantees.  It may take

8  us going through lunch, but we will give that a try.

9         So let's begin, Mr. Powell.

10:57:34  10         MR. POWELL:  Your Honor, I'm not confined to the

11  podium, am I?

12         THE COURT:  Yes, you are.

13         MR. POWELL:  Hello, again.

14         You may see me wince from time to time.  I got a

10:57:50  15  little back thing going on myself, but I'm fine.

16         I wanted to start with asking Mr. Zola -- it

17  sounds like that was a pretty emotional time having charges

18  leveled against you.  And the Court has inquired, but it's

19  kind of part of our job to follow up and ask a few things

10:58:11  20  that -- the mere fact that there are possibly facts in this

21  case related to that makes you incapable of seeing what is

22  the real question before you.  In other words, are you so

23  clouded by that experience that you're not going to be

24  able -- I know your background.  It sounds like you're a

10:58:33  25  terribly smart man -- to differentiate what you went through

10:58:37  1    from what is really -- what you're being asked to rule about

2    in this case?

3              PROSPECTIVE JUROR:  One of the facts that was

4    presented in the summary was that one side felt that the

10:58:51  5    mother was influencing the children to say things that made

6    the case stronger for that side.

7              I had a similar situation where my ex was making,

8    kind of -- quite frankly, I felt, manipulating the children

9    to do things and to say things.  That was very, very

10:59:18 10    painful.  And, generally, I'm a very calm and objective

11    person, but I know when I -- that really raised in me an

12    emotional response.  And I was shaken by that.  And I

13    think -- I have to be candid.  I think that will affect my

14    judgment.

10:59:43 15              MR. POWELL:  Is that one the reasons early on when

16    the Court was asking about people who felt that there was a

17    hardship, is that one of the reasons that you were --

18              PROSPECTIVE JUROR:  Yes.  I was going to put that

19    down on the hardship, that particular issue.  And when the

11:00:00 20    Judge asked these questions, I felt -- it would be covered

21    that way better.

22              MR. POWELL:  Okay.  Thank you, sir.

23              Next, to Mr. Tapia.  I wanted to see if I

24    understood.  Is it okay to ask how old are you?

11:00:16 25              PROSPECTIVE JUROR:  25.

11:00:17    1              MR. POWELL:  And you said that you were -- you

           2    actually were just talked with [sic] the social worker

           3    because of some kind of claim when you were like eight?

           4              PROSPECTIVE JUROR:  Yeah.  Basically, they got

11:00:28    5    sent to our place, because my brother had bruises on his

           6    arm.

           7              MR. POWELL:  And you remember that to this day?

           8              PROSPECTIVE JUROR:  Yes.

           9              MR. POWELL:  Okay.  Do you think that that will

11:00:39   10    affect in any way your ability to hear this case?  It has

          11    aspects of that whole CPS system in it.

          12              PROSPECTIVE JUROR:  I mean -- it's really tough to

          13    say.  I mean -- I can kind of relate, I guess, to possibly

          14    some of the circumstances relating to this case.

11:00:59   15              MR. POWELL:  Can I ask you this, sir?  You weren't

          16    taken from your parents, right?

          17              PROSPECTIVE JUROR:  My parents I guess, sort of,

          18    told me what to say.  So in a way, they kind of manipulated

          19    me a bit.

11:01:14   20              MR. POWELL:  Did you end up staying in your own

          21    home?

          22              PROSPECTIVE JUROR:  Yes.

          23              MR. POWELL:  So do you think -- it's kind of the

          24    same question I was asking Mr. Zola.  And I'm hoping that

11:01:23   25    I'm pronouncing it correctly.

11:01:23  1          Do you think that that's going to affect your

        2  ability to, you know, sort out what's relevant here, what's

        3  not relevant here because of this experience that you've

        4  had?

11:01:32  5          PROSPECTIVE JUROR:  I'd like to think it probably

        6  wouldn't have any bearing.

        7          MR. POWELL:  Okay.  Good.  Mr. Courchaine has

        8  been --

        9          Am I pronouncing that correctly?

11:01:49 10          PROSPECTIVE JUROR:  "Cro-chaine."

       11          MR. POWELL:  You've been on five juries.  I would

       12  almost feel bad asking you to stay, because this doesn't

       13  seem fair and all these people haven't been on any juries.

       14  You sound like my father.  He's been on a bazillion.

11:02:04 15          Honestly, does that make you -- you're a big guy.

       16  Talk out loud.  Is that going to create any problem for you

       17  in terms of, you know, being able to sit through number six?

       18  And it might be -- I think the judge said up to two weeks,

       19  eight days.

11:02:17 20          PROSPECTIVE JUROR:  I want to say it was actually

       21  six, but I can't seem to remember the sixth one, so I only

       22  said five.

       23          MR. POWELL:  That's how bad it's gotten.  Okay.

       24  All right.  Well, I thank you for your service.  Everything

11:02:28 25  the judge says about the importance of jurors is quite

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:02:32  1    accurate.  People, they need to solve things in less than

2    fistfights.

3              Ms. Palter, I also wanted to talk to you, because

4    I saw a couple of emotional responses along the way there.

11:02:45  5    And, again, I'm really just getting for my own, wanting to

6    ask you myself:  Do you think after these experiences you've

7    been through, taking on two children and a guardianship,

8    going through the lovely field of flowers that analogizes

9    family law court, that you're going to be able to sit here?

11:03:04 10   And mostly what I want to know is not whether you can get

11   through it.  What you've done already shows you're a strong

12   woman, but is that going to cause you any problem

13   differentiating what matters from what doesn't matter

14   because of your own personal experience?

11:03:20 15             PROSPECTIVE JUROR:  Yes -- I mean, I know what

16   matters.  I can get through it.  It's the difficulty of

17   getting through it.  I mean, I can do that.  I would lean

18   towards the side of the children.

19             MR. POWELL:  You were leaning towards?

11:03:33 20             PROSPECTIVE JUROR:  The side of the children,

21   because I do know what happens.  I do know the Orangewood

22   situation, going through the courts, getting them -- them

23   being taken away, myself having four kids of my own going

24   through the court system, the hardship of the divorce, all

11:03:49 25   that stuff.  I've been in that situation, so I know.  And

92

11:03:52  1  that's why I kind of lean towards a little bit of the -- I

2  mean, I can also set aside my emotions, but at the same time

3  I still feel like I would still lean towards the children.

4           MR. POWELL:  Okay.  So what you've said,

11:04:03  5  Ms. Palter, is -- what I want to reiterate in terms of my

6  question to any and all of you, because this is the most

7  important thing of everything that's been said.  The judge

8  asked, you know, can you follow the legal instructions that

9  she's going to give you?

11:04:18 10           Like she said, she's going to continue to wear the

11  robe.  At some point, maybe more than once, she's going to

12  talk about law.  You are the fact people.  That's the law

13  person.  And she's going to convey that to you.  And one of

14  the most important things is, can you honestly say I'm going

11:04:37 15  to do what you ask me to do, Judge?  I'm going to be able to

16  put out of my mind my personal experience with the

17  guardianship, my personal experience with having allegations

18  made against me, social worker coming to talk to me, my

19  personal experience working with children with autism.

11:04:54 20           Am I going to be able to do all those things?

21           PROSPECTIVE JUROR:  I don't think so.

22           THE COURT:  And you don't think you can?

23           PROSPECTIVE JUROR:  I --

24           MR. POWELL:  You think you're going to be --

11:05:00 25           PROSPECTIVE JUROR:  I think that I --

11:05:02   1          MR. POWELL:  So we've learned something there.

           2          And Ms. -- is it "Gergis" --

           3          PROSPECTIVE JUROR:  Gergis.

           4          MR. POWELL:  Gergis.  How long have you worked

11:05:11   5    with autistic children?

           6          PROSPECTIVE JUROR:  About four months.

           7          MR. POWELL:  Four months.  Oh!  Did you have

           8    education in that field before that?

           9          PROSPECTIVE JUROR:  No.  Speech therapy.

11:05:21  10          MR. POWELL:  Okay.  So this is kind of a new job

          11    for you?

          12          PROSPECTIVE JUROR:  Yes.

          13          SPEAKER2:  Okay.  Do you think that your brief,

          14    albeit, experience working with autistic children will cause

11:05:34  15    you any sympathies or biases that you can't see through to

          16    get to the heart of the matter?

          17          PROSPECTIVE JUROR:  No.

          18          MR. POWELL:  And, Mr. Abbott, you related not even

          19    your own -- not even your own custody battle, if you will.

11:05:59  20    You related, I believe, a stepbrother?

          21          PROSPECTIVE JUROR:  Correct.

          22          MR. POWELL:  Is that right?

          23          PROSPECTIVE JUROR:  Yes.

          24          MR. POWELL:  Even being like not in the center of

11:06:10  25    whatever that storm was, however bad that storm was, was

11:06:14  1   just the experience of hearing your stepbrother's side of it

2   or what you witnessed, something that's going to affect your

3   ability to sort out again what matters in this case from

4   what doesn't matter?

11:06:27  5          PROSPECTIVE JUROR:  I don't believe so.

6          MR. POWELL:  Okay.  Just like nobody else

7   indicated, *Hey, I can't follow the Judge's instructions,* you

8   can do that as well.

9          PROSPECTIVE JUROR:  I can.

11:06:37 10          MR. POWELL:  All right.  Other than that I just

11   wanted to thank Mr. Hanke's son service as a Marine, and

12   thank you all.

13          THE COURT:  All right.  Let me turn to the

14   defendant, Mr. Watkins.

11:06:53 15          MR. WATKINS:  Thank you, Your Honor.

16          Good morning, folks.  Are we having fun yet?

17          This is an awkward time in the trial.  This is the

18   only time that counsel will get to talk directly with you

19   from, say, let's say, this afternoon on.  We're not going to

11:07:11 20   talk to you.  It would be improper to do so.  Even to the

21   extent of, if I see you in the elevator, I may not speak,

22   because that could be misconstrued by somebody down the

23   hall.

24          Do you all understand that?  This is not the way

11:07:25 25   we live our lives, normally.  You're not -- you're going to

11:07:28  1   be asked to defer judging anything until all the evidence is

2   in.  That means sitting here day in and day out.  Do you

3   think you'll be able to do that, all of you?

4         Now, my wife sat on a jury.  And when she walked

11:07:43  5   in the house, the first question that I asked her was -- and

6   I started, but I know better and I caught myself.  You go

7   home tonight, you're going to be asked what kind of case

8   you're on.

9         You're going to be told by Her Honor that you

11:07:56 10   cannot discuss the case at all.  In some homes that's going

11   to be more difficult than others.  Does anybody really have

12   a serious reservation whether they're going to be able to go

13   the next two weeks without letting their family know what

14   they're doing all day long?  Anybody?

11:08:13 15         I know it's tough.  In my house, I don't know if I

16   can make it or not.  Same goes with jumping on line and

17   looking up terms, anything like -- you're not allowed to do

18   that.  And the reason for that is -- so that everybody knows

19   that this case is decided, based upon the evidence presented

11:08:33 20   in this courtroom and that all of the jurors, whoever it may

21   be, all of the jurors hear and see the same evidence.

22         Anybody going to have difficulty with that

23   instruction?  Because now is the time to speak -- this is

24   the only time we get a chance -- both Mr. Powell and I and

11:08:53 25   our clients, all we want is a fair-minded jury that will be

*DEBORAH D. PARKER, U.S. COURT REPORTER*

96

11:08:58  1  able to follow the law and apply the law to the facts as you

2  find them.  Everybody understand that?

3           Mr. Zola, let me ask you -- this situation that

4  you had, how long ago was it?

11:09:17  5           PROSPECTIVE JUROR:  It was about 40 years ago --

6  45 years ago.

7           MR. WATKINS:  All right.  And it's still fresh in

8  your mind?

9           PROSPECTIVE JUROR:  Yes.

11:09:25 10           MR. WATKINS:  Painful, I take it.

11           PROSPECTIVE JUROR:  Yes.

12           MR. WATKINS:  Is it still painful for you to think

13  back on those accusations?

14           When you think back on the dispute, it was a

11:09:36 15  dispute, correct?

16           PROSPECTIVE JUROR:  Today, I have excellent

17  rapport with all my children.  It's -- and there was no

18  lasting damage done to me; however, as I explained to the

19  other questions, it does bring -- I tend to lean -- I

11:09:54 20  understand how a father in a situation could be -- could be

21  accused and victimized by -- by the wife -- the mother,

22  because she wanted to have a stronger case.

23           MR. WATKINS:  Let me ask you this:  As you sit --

24  you're a bright man.  You're an articulate man.  As you sit

11:10:19 25  here, you know both sides are asking you, Mr. Zola, to look

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:10:23  1    inside your heart.  You know -- I couldn't stand here and

2    ask you enough questions to know you as well as you do.

3    That's not -- I'm not smart enough and Her Honor wouldn't

4    give me enough time.  So you know how you feel.  And you're

11:10:39  5    going to be asked to put any of that aside, because that has

6    nothing to do with this case, and then decide who has been

7    able to prove what to you.

8           Do you think you'd be able to do that?

9           PROSPECTIVE JUROR:  I don't know.

11:10:56  10          MR. WATKINS:  Well -- and you don't know in part

11    because you haven't heard any of the evidence.  Is that fair

12    to say?

13          PROSPECTIVE JUROR:  Yes.

14          MR. WATKINS:  Would you give it your best shot?

11:11:05  15          PROSPECTIVE JUROR:  If I were selected and asked,

16    I would give it my best shot.

17          MR. WATKINS:  All right.  And you would bring all

18    your intelligence to bear on trying to be fair and impartial

19    to these folks in this courtroom, right?

11:11:21  20          PROSPECTIVE JUROR:  Yes.  Yes.

21          MR. WATKINS:  All right.  Miss -- Mr. Tapia.  This

22    contact -- I take it you had some contact with social

23    workers when you were younger?

24          PROSPECTIVE JUROR:  Yes.

11:11:37  25          MR. WATKINS:  And how long ago was that?

98

11:11:40  1          PROSPECTIVE JUROR:  I was about seven or eight at
        2   the time.
        3          MR. WATKINS:  So that would be -- you're not too
        4   old.  How old are you now?
11:11:47  5          PROSPECTIVE JUROR:  25.
        6          MR. WATKINS:  Okay.  I'm going to ask you the same
        7   kinds of questions I asked your neighbor there, Mr. Zola:
        8   Knowing you as you know you, do you think that you will be
        9   able to follow the Court's instructions and put those
11:12:06 10   emotions, painful as they may be, aside and decide this case
       11   based upon what you hear in this courtroom?
       12          PROSPECTIVE JUROR:  I think I could, yes.
       13          MR. WATKINS:  Is there anybody in the panel,
       14   anyone, based on what they've heard, wants to serve on this
11:12:24 15   jury?
       16          That's the right answer.  This is an intrusion on
       17   your time.  It's an intrusion on your schedules.  We know
       18   that.  We thank you for that.  Both sides do.  The Court
       19   does.  But if anyone has an abiding interest in sitting on
11:12:44 20   this jury, I'd like to talk to them just to find out how we
       21   could spread the word.  Anybody at all?
       22          Okay.  Mr. Tapia -- I'm sorry.
       23          Mr. Tapia, one other question:  I wasn't quite
       24   clear on what you're doing.  Your employment.
11:13:09 25          PROSPECTIVE JUROR:  Food stamp eligibility

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:13:12  1   technician.

2                MR. WATKINS:  In that connection, do you ever

3   review log sheets for social workers or anything -- you know

4   what I'm talking about?

11:13:23  5                PROSPECTIVE JUROR:  No.

6                MR. WATKINS:  No, okay.  Then, it's probably --

7   it's probable that you haven't reviewed them.

8                Okay.  That's all I have for you.  Thank you very

9   much.

11:13:33 10                Ms. Palter.  You knew I was going to come back to

11   you, didn't you?

12                PROSPECTIVE JUROR:  I was hoping you wouldn't.

13                MR. WATKINS:  You made a comment to Mr. Powell

14   that you think you're leaning towards the kids.

11:13:46 15                PROSPECTIVE JUROR:  Yes.

16                MR. WATKINS:  Is that because you -- that's your

17   predisposition.  When you wake up in the morning that you're

18   kind of -- what's it's based on?

19                PROSPECTIVE JUROR:  The experience that I had with

11:13:59 20   the social worker that came and pulled my sisters away.  It

21   wasn't for the right reasons.  But I'm glad they ended up

22   with me, but I don't think it was fair.

23                MR. WATKINS:  This is a question for all of you,

24   but hang on to your mike, Ms. Palter.  How many of you have

11:14:19 25   strong feelings, one way or the other, about social workers

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:14:23  1    and the work they do?

2              No one.  How many of you have strong feelings

3    about the notion that the Government at times has to intrude

4    on a family for the protection of children?

11:14:42  5             Ms. Palter.

6              Yes, ma'am.  Ms. McCann, is it?

7              PROSPECTIVE JUROR:  Only in my role with my former

8    employer where we had to follow any of the court orders and,

9    of course, the safety of the children are our responsibility

11:15:05 10   while they are in school and sometimes out of school.

11             MR. WATKINS:  Now, were there times when the Court

12   made orders that you disagreed with, but you felt you had to

13   go forward with anyway?

14             PROSPECTIVE JUROR:  No, I wasn't that personally

11:15:22 15   involved.  Just what the order said.  Whether or not you

16   released the child or not.

17             MR. WATKINS:  So your job -- did I hear you

18   mention that you're also partly in risk management?

19             PROSPECTIVE JUROR:  I oversaw that department.

11:15:36 20             MR. WATKINS:  Your job, was it partly to make sure

21   that the court orders were followed?

22             PROSPECTIVE JUROR:  Yes.

23             MR. WATKINS:  And that's what you instructed

24   people who reported to you, that they must follow the court

11:15:47 25   order?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:15:48    1          PROSPECTIVE JUROR:  Most of the school principals,

2    I helped them interpret the order when there was a question

3    as to whether or not they were to release that child during

4    schooltime.

11:15:58    5          MR. WATKINS:  Is there anyone in the panel that

6    has been negatively impacted by a court order that they

7    thought was very unfair or wrong?  Anybody?

8          Ms. Palter?

9          PROSPECTIVE JUROR:  No, it's actually different.

11:16:19   10    When I was younger.

11          MR. WATKINS:  Coming back.

12          PROSPECTIVE JUROR:  I did -- my dad had full

13    custody of us later on.  But before this, the judge actually

14    gave us [sic] full custody to my mother, which was an

11:16:31   15    abusive household, and never followed up on it.  CPS came

16    often, but it was never looked into.  We had to lie.  And,

17    finally, it came to where she didn't care and gave us to our

18    father.  So it would have been negative, if she just didn't

19    give up, but the Court didn't look into it.

11:16:51   20          MR. WATKINS:  The situation was remedied by your

21    mother actually just voluntarily sending you and your

22    siblings to your father?

23          PROSPECTIVE JUROR:  Yes.

24          MR. WATKINS:  Okay.  Now that's a complicated

11:17:00   25    thing that you've gone through, and I can understand your

11:17:07   1   feelings about that.  But let me ask you:  Having been

2   through all that you've been through and come out the other

3   end, do you think that you'd be able to sit and give these

4   folks -- both sides -- a fair shake on the evidence and the

11:17:29   5   law as Her Honor gives it to you?

6          PROSPECTIVE JUROR:  I could try.  It would be

7   hard, but I can try.

8          MR. WATKINS:  Being a juror is hard.  At the end

9   of the day, it is.  Trust me, it is.  If you're selected to

11:17:44   10  be on this jury -- all of you -- it's hard work, and it's

11  difficult, because you don't know how important it is to

12  these people.

13          You're going to give it your best shot?

14          PROSPECTIVE JUROR:  I can try.

11:17:57   15  MR. WATKINS:  All right.  Or as you sit here, do

16  you think, if I or the parties in this case -- if I was

17  Mr. Watkins' client, I don't think I would want Ms. Palter

18  sitting in judgment of me.

19          Do you know what I'm asking you?

11:18:13   20  PROSPECTIVE JUROR:  No, I don't think I would want

21  me in here.

22          MR. WATKINS:  Well, you know, I appreciate your

23  honesty, and everyone does.  That's what we're here trying

24  to do.

11:18:23   25  Okay.  Let me ask you a few other questions for

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:18:29   1   the group.  I think once, somebody has been a foster parent.

2            Okay.  Mr. Zola.  Anything about that experience

3       dealing with a bureaucracy that you have to deal with?

4       Anything like that that has caused you heartache?  Distress?

11:18:53   5   Anger?

6            PROSPECTIVE JUROR:  I don't believe so.  We

7       interacted with social -- at social services and social

8       workers on a regular basis.  And it went very, very well, I

9       felt.

11:19:11  10            MR. WATKINS:  And is this -- Orange County social

11      workers that you dealt --

12            PROSPECTIVE JUROR:  No.  It was Howard County,

13      Maryland.

14            MR. WATKINS:  So that experience, you don't think

11:19:22  15   is going to color your work in this case if you're selected?

16            PROSPECTIVE JUROR:  No.  No, it wouldn't.

17            MR. WATKINS:  All right.  Has anyone else been a

18      foster parent?

19            Ma'am, tell us about that.

11:19:40  20            PROSPECTIVE JUROR:  I was foster parent to my

21      cousin's child for a year.

22            MR. WATKINS:  For how long?

23            PROSPECTIVE JUROR:  A year.  One year.  A whole

24      year.

11:19:48  25            MR. WATKINS:  Are you licensed?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:19:51   1                PROSPECTIVE JUROR:  No, I was a relative.  Given

2    relative.  I was called in.

3                MR. INGOLS:  So you don't have any connection to

4    the social services agency, or anything like?

11:20:01   5                PROSPECTIVE JUROR:  No.

6                MR. WATKINS:  How is it going for you?

7                PROSPECTIVE JUROR:  Well, my sister took him over.

8    It was too rough for me, because I was single parent with

9    two older kids.  And he had a -- the little boy has a lot

11:20:14  10    of -- a lot of history.  A lot of psychology, psychiatric.

11    I was just taken away from work too much, so I wasn't able

12    to handle his behavior.

13                MR. WATKINS:  Anything about that experience

14    knowing what little you know about this case that it's going

11:20:29  15    to stand in the way of you being a fair and impartial here?

16                PROSPECTIVE JUROR:  No.

17                THE COURT:  You have about another minute or so.

18                MR. WATKINS:  I'm sorry?

19                THE COURT:  No, I said you have about another

11:20:43  20    minute or so.

21                MR. WATKINS:  Oh, okay, Your Honor.  I'm sorry.  I

22    lost track of time.

23                How many of you have ever had to judge credibility

24    of another person?  Not in the day-to-day business, but

11:20:58  25    something where you had to make a call?  Is this person

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:21:01  1   telling the truth or not?

2            Okay.  Let me see Mr. Zola, Ms. McCann.  Anybody

3   else?

4            THE COURT:  You have hands in the back.

11:21:17  5            MR. WATKINS:  All right.  For your folks, you're

6   going to be asked to do that here in this case.  Is that

7   going to cause you difficulty in being fair and impartial in

8   this case, your prior experience in that regard?

9            Mr. Zola.

11:21:42 10            PROSPECTIVE JUROR:  I have to say that in my

11  answers to the other questions, there is one particular

12  situation that will affect my ability to make a credible --

13            MR. WATKINS:  And that's the one you've already

14  discussed.

11:21:58 15            Do you believe that you'll be able to bring your

16  skills in this case and judge the evidence fairly?

17            THE COURT:  I think he has been asked that

18  question enough now.

19            MR. WATKINS:  Okay.  Thank you very much,

11:22:09 20  Your Honor.  Thanks, ladies and gentlemen.

21            THE COURT:  All right.  So now, ladies and

22  gentlemen, what we're going to do is give you a break.  And

23  then, after the -- and I have all the hardship papers.

24  We're going to address some issues outside the presence of

11:22:28 25  the jury.  If you've given me a hardship paper, you may want

11:22:32  1    to remain outside the door so that if we need to reach you,

2    if I have any questions, I can pull you in to ask you those

3    questions about your hardship request.

4              Keep in mind the admonition that I give you

11:22:47  5    earlier that you're not to discuss this case with each

6    other, or anyone else, or allow anyone to discuss it with

7    you while you're out there.

8              You're not to do any research, use your phone or

9    any other device to learn anything about the case or

11:23:01 10    communicate about the case in any way.

11             We're going to take a break until 11:45 and then,

12    we're going to come back.  We'll be working during the

13    break, so we hope to accomplish some things.

14             Is there anyone who has a form that has not given

11:23:18 15    it to me?

16             All right.  We do have one -- oh, we have two.

17    Okay.

18             All right.  And I'm going to stay on the bench.

19             Please keep in mind -- well, I'm not sure you'll

11:23:33 20    be seated where you are seated now when you come back.

21    We'll let you know.

22             We'll be in recess.

23         (Pause.)

24             THE CLERK:  He has not filled out his form, yet.

11:24:53 25             Go ahead and step outside into the hallway, sir,

11:24:57  1    and I'll come and get your form from you.

2                (Pause.)

3                (The following proceedings were had outside the

4                presence of the jury:)

11:25:15  5              THE COURT:  Okay.  Now, what we'll begin with is

6    challenges for cause.  I do have hardship forms up here.  I

7    will give them to you to review.  It's my determination on a

8    hardship, but you can let me know.  So --

9                Well, let me at least tell you who they are first

11:25:37 10   and the nature of them and my tentative ruling.  There's one

11   person outside, Juror No. -- I believe it's -- 13, Mr. Lee,

12   who has a form and didn't fill it out.  I believe he told my

13   CRD that he's also having trouble hearing, but he's sitting

14   right in the front, right here.  So we'll see what his form

11:26:03 15   says.

16               The first one is from Juror No. 8.  I'm just going

17   to briefly go over these with you instead of handing them

18   out.  He says he has a financial hardship.  Lives paycheck

19   to paycheck.  He has -- he's not going to be able to pay the

11:26:20 20   rent.  He has a 17-year-old he's solely responsible for, and

21   he's asking to have service deferred.

22               My inclination is to grant that.

23               The same is true with Juror No. 20, Mr. Gerardo

24   Rivera.  He's the one who says he has two jobs, and he

11:26:39 25   doesn't have -- he says even the two jobs don't pay enough

| | |
|---|---|
| 11:26:43 | 1 |

11:26:43   1    to make his rent, if he loses eight days of work, so I'm

2    inclined to grant that as well.

3        The next one I have is from -- oh, Juror No. 7

4    just wrote, *I have a back problem.*  And so I would need to

11:27:02   5    bring her in to see whether she's just telling me she has a

6    back problem or whether there's something more than that.

7    That is Ms. Nguyen who's in the back row here.  Juror No.

8    22, Mr. Lagorio, in addition to the statements he made when

9    he was being questioned, he said that he's the sole provider

11:27:36  10    of his household.  He's in extreme financial burden and

11    lives paycheck to paycheck.  I think his household is just

12    him, though.  I don't think he indicated having any

13    dependents or anyone else.  I may be wrong on that.  And

14    then, number two, he reiterated what he said when asked,

11:27:52  15    which is, *I'm under the assumption that this person has been*

16    *put in this position for a reason and is guilty of the*

17    *offense.*  I don't think he even necessarily knows who.  *I*

18    *will not be able to provide a fair shake in the outcome of*

19    *this case.*

11:28:09  20        So I think the not getting paid and the not being

21    able to provide a fair shake may be somewhat related, but

22    it's not something that we can always ferret out.  So on

23    that one, I'll leave it to the parties to see if they

24    have -- I may be inclined to dismiss him, but I will give

11:28:31  25    you an opportunity to be heard, if you have any objections

11:28:34  1    to that.

2         The next one I have -- these are jurors that are a

3    little bit further back.

4         *(Pause.)*

11:28:51  5    THE COURT:  There are -- okay.  So I just received

6    from Juror No. 13, Mr. Lee.  He says, *Hearing around*

7    *60 percent good for me.  I am sorry.*

8         And there may be a language issue as well?

9         THE CLERK:  He says that he is not understanding

11:29:06 10    100 percent.

11         THE COURT:  I had a feeling that might be the

12    case, but he was answering all of our questions.  They were

13    somewhat fundamental, but oftentimes that is the best

14    indicator.  But he didn't fill out his form when everybody

11:29:23 15    else filled it out.  It's either a lack of hearing and a

16    lack of a understanding.  And it may be difficult for us to

17    tell which is which, really, at this point or maybe even for

18    him to tell which is which, so I would be inclined to grant

19    that request, or that excuse.

11:29:39 20         Then we have Juror No. 25, Ms. Chi T. Nguyen.  *I*

21    *work* -- I'm just reading:  *I work for the small company from*

22    *now to the end of this year.  I have only three vacation*

23    *days and no pay for jury duty.  Beside I have to drop off*

24    *and pick up my kid every -- my kid.*  I can't read the next

11:30:03 25    word.  *I have to pay some --* something.  *If I ask someone to*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:30:09  1   *help me with this.*  Obviously, she has to pay someone to do

2   that.  *Without working my --*

3            She has a serious financial problem.  I'm

4   paraphrasing it.  It's not quite exactly there.  I'm

11:30:22  5   inclined to grant that as well.  On an eight-day trial, I'm

6   a little more lenient than I am on a three- or four-day

7   trial, because it's more significant.

8            Ms. Elizabeth Kim says, *I give a ride to school*

9   *and back for my son and his friends.  Eight days is too much*

11:30:39 10  *to find rides for both to them.*

11           I'm not inclined to grant that, but she's Juror

12  No. 33.  So I'm not sure we'll get there, but I'm not

13  inclined to grant that one.

14           This one I may have to have this person answer

11:30:51 15  questions, because this is -- I think it's Mr. Lin,

16  Juror No. 29.  He seemed completely fluent, as far as I

17  could tell, but he wrote:  *I seem to have difficulty*

18  *understand the case.*

19           When he stood up and spoke, he was -- I didn't

11:31:09 20  hear any problems at all, so I don't know if he means he has

21  an issue with the substance of the case, or he has an issue

22  with language, so I would bring him in.  Again, I'm not sure

23  it will matter.

24           But then No. 37, which again is awfully far in the

11:31:28 25  back of the -- at the end of the list, but it's Ms. Braley

11:31:32  1  who says she has a learning disability, ADHD, *a hard time*
       2  *remembering things, a hard time staying still.  It hurts to*
       3  *sit for a long period of time.*

       4        Yet, with all that, she takes care of a
11:31:47  5  three-and-a-half-year old whose mother is disabled and has
       6  to have her help daily.  So go figure.  I don't know whether
       7  she -- I wonder if the mother knows that if she has a hard
       8  time remembering things.

       9        THE CLERK:  I'm sorry, Your Honor.  What number
11:32:03 10  was that?

      11        THE COURT:  This is No. 37, Ms. Braley.  I don't
      12  have any strong -- I mean, what -- I don't think we're going
      13  to get to 37, so I think I'm going to set this aside.  If we
      14  for some reason get there, then we will address it.  We'll
11:32:20 15  do the same with 29.

      16        And the others, I am granting, with the exception
      17  that I don't know about the back problem, which is Juror
      18  No. 7.  I think I'm going to actually have her come in so
      19  that we know whether she's saying she can't sit or what that
11:32:41 20  means.

      21        So if you can ask Juror No. 7, Ms. Phuong-Chi
      22  Nguyen, to come in.

      23        MR. POWELL:  She, of course, has my upmost
      24  sympathies.  Mr. Watkins has a preference, but I've got some
11:33:07 25  Advil.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

112

11:33:09  1          Can I ask Your Honor, since no one else is here,

2     when you exclude witnesses, that doesn't mean you exclude

3     actor witnesses, right?  Actor witnesses?

4               THE COURT:  No.

11:33:17  5          MR. POWELL:  Thank you.

6               THE COURT:  They have to say what is on the paper.

7               MR. POWELL:  I only one or two anyway.

8          *(Ms. Phuong-Chi Nguyen enters courtroom.)*

9               THE COURT:  All right.  And you can just go to the

11:34:22 10   lectern, ma'am.  Just to the lectern.

11               Right here.  Yes.  So we can hear you.  You wrote

12    on your questionnaire that you have a back problem.

13               PROSPECTIVE JUROR:  Yes, My [sic] Honor.

14               THE COURT:  All right.  Would you be able to -- do

11:34:38 15   you stand periodically?  Or what would help, if you were a

16    juror?

17               PROSPECTIVE JUROR:  The chair this morning, I have

18    no problem in this chair, and standing up is fine.  Because

19    when you asked the question, I just wanted you to be aware

11:34:54 20   of that.

21               THE COURT:  Okay.  I just wanted to make sure that

22    if we could accommodate you by having, you know, this chair

23    which is -- usually, it's pretty comfortable, or allowing

24    you to stand.  As long as we know why you're standing, that

11:35:08 25   it's your back, then it's not a problem.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:35:10  1          So you would be able sit during a jury trial or

2     participate by sitting and standing?

3               PROSPECTIVE JUROR:  Yes, My [sic] Honor.

4               THE COURT:  Okay.  All right.  Thank you.  You can

11:35:20  5     go back out into the hallway.  I just wanted to make sure

6     that I understood the nature of the back problem.

7               PROSPECTIVE JUROR:  Yes.  Thank you.

8               THE COURT:  All right.  Thank you.

9          All right.  So to the extent that it matters,

11:35:41 10     those people that I have granted the hardship excuse to are

11     Juror No. 8, No. 13, No. 20, 22 and 25.  And I've not gotten

12     to anyone past that at this point, because I don't know that

13     we will get there.

14          So now I will hear hard -- challenges for cause.

11:36:14 15          And so, we can begin with the plaintiff.  Are

16     there any challenges for cause by the plaintiff?

17               MR. POWELL:  I think that Juror No. 6, Mr. Zola, I

18     think his statements alone provide cause.

19               THE COURT:  All right.  Anything from the defense

11:36:36 20     on Mr. Zola?

21               MR. WATKINS:  Both questions are at length -- I

22     questioned him at length.  And I think at the end of his

23     questioning, it was pretty clear that, yeah, he has had some

24     experiences, but he's going to try to be fair and impartial

11:36:52 25     in this case.  And that's really all we can ask him.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

114

```
11:36:55   1            THE COURT:  No, I think that he made it clear that
           2   he's not going to be able to be fair and impartial.  Only
           3   when left with a choice of you're going to be -- if you're
           4   going to be sitting on this jury will you try, he answered
11:37:08   5   "Yes."  That's not sufficient to find that he would be
           6   unbiased.  And everything he said up until then made it
           7   clear that he did not think he could be.  And so, the
           8   challenge of cause is sustained.
           9            And any other challenges for cause from the
11:37:31  10   plaintiff?
          11            MR. POWELL:  No, Your Honor.
          12            THE COURT:  Any from the defendant?
          13            MR. POWELL:  Yes, Your Honor.  Ms. Palter.
          14            THE COURT:  Anything from the defense -- from the
11:37:41  15   plaintiff on that?
          16            MR. POWELL:  I think she's a strong woman and she
          17   indicated she could do this.  I could understand if the
          18   Court felt that cause was appropriate as well.  I wouldn't
          19   say it's clear-cut.
11:37:55  20            THE COURT:  Oh, I would say it is.  For both of
          21   these, it is.  For Ms. Palter, she would be stricken.  I
          22   will sustain the challenge for cause.
          23            All right.  And any others?
          24            MR. POWELL:  No.  Did you -- you let Mr. Rivera
11:38:13  25   out on hardship, correct?
```

11:38:14  1          THE COURT:  I did.  And also Mr. Lagorio.

        2          If there is nothing else, then we're going to turn

        3    to the peremptories.  And you do those as blind challenges,

        4    so each of you get three peremptories.

11:38:37  5          Was there anything else, Mr. Watkins?

        6          MR. WATKINS:  I just want to make sure that I am

        7    on the same -- I got Post-its all over the place.

        8          THE COURT:  Yes, I will tell you that in the box

        9    right now, looking at the 16 who are there, the ones who

11:38:51 10    have been stricken already, either based on cause challenges

       11    or hardship, are:  No. 6, No. 8, No. 13 and No. 14.

       12          And in the first row outside of the box, No. 20

       13    and No. 22 have been relieved, based on hardship and No. 25

       14    in the second row.

11:39:22 15          All right.  So the first eight unstruck jurors

       16    will be the jurors in your case.  So you should exercise

       17    your three peremptories, accordingly.  You do that

       18    separately.  I'm going to step off the bench.  I'm going to

       19    give you five minutes to go over that.  And then, we will --

11:39:43 20    once that's done, we'll have our -- the composition of our

       21    jury.  We'll bring everyone in, swear in the jurors and let

       22    the rest of the folks go before lunch.

       23          MR. POWELL:  Can we agree on what the first eight

       24    are?

11:39:56 25          THE COURT:  Who they are right now before any

116

11:39:58 1  peremptories?

2          Well, that was what I was just doing.  I just told

3  you who was struck from those.

4          So it would be Jurors No. 1 through 5, Juror No.

11:40:07 5  7, Juror No. 9 and 10.

6          MR. POWELL:  Thank you.  I wanted to, I guess,

7  hear it from your voice as well.

8          THE COURT:  All right.  There you go.  Like I

9  said, I'll step off the bench.  I'll give you about five

11:40:28 10  minutes and then you-all can let me know when you're ready.

11          THE CLERK:  All rise.

12      *(Recess taken from 11:40 a.m. to 11:45 a.m.)*

13      *(The following proceedings were had outside the*

14      *presence of the jury:)*

11:45:57 15          THE COURT:  All right.  My understanding is that

16  we may have an issue with one of the prospective jurors.

17          MR. WATKINS:  Yes, Your Honor.

18          I was informed that Marcia Veeken recognized

19  Mr. Tapia's name as being, I guess, employed in her

11:46:20 20  department.  I don't know if there's any personal contact.

21  She's not sure there is.

22          THE COURT:  When you say "she's not sure," let me

23  just ask.

24          Ms. Vreeken, is it?

11:46:40 25          MS. VREEKEN:  Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:46:41  1            THE COURT:  Have you ever met Mr. Tapia before?

2            MS. VREEKEN:  I don't recall.

3            THE COURT:  So you don't work with him on any kind

4       of regular basis or daily basis, or anything like that?

11:46:52  5            MS. VREEKEN:  No.

6            THE COURT:  And do you work, like, in the same

7       location, or anything along those lines?

8            MS. VREEKEN:  I've been in all four regions, and

9       his -- familiar with his job as eligibility technician.  If

11:47:08 10     he has a client who says that they are involved in domestic

11      abuse, they are required to make a referral to our

12      department.

13            THE COURT:  Right.  And I think that was what he

14      was saying earlier when he was sitting up there, that he --

11:47:20 15     he's made a referral before.

16            Okay.  One moment.  Wait.  We have somebody coming

17      in.

18            I'm sorry.  We're not ready yet.  We'll come out

19      and get you.

11:47:32 20       (Pause.)

21            THE COURT:  All right.  Just a couple minutes

22      then.

23            Okay.  Is there any issues by the attorneys?

24            MR. WATKINS:  No, Your Honor.  I have one other --

11:47:50 25     I don't think it's going to be a problem.

11:47:53  1          THE COURT:  And then, let me turn to the

2    plaintiff.

3          MR. POWELL:  With regards to the Tapia situation?

4          THE COURT:  Yes.

11:47:58  5          MR. POWELL:  That seems a little close to home for

6    a case that is going to run for eight days or more.

7          THE COURT:  Well, I'm not sure that there's any --

8    I mean, I wanted to hear from you.  But having considered

9    it, she doesn't know him.  She recognizes the department he

11:48:17 10    works at.  They have -- I'm not sure that this creates

11    any -- any issue or that it makes him unqualified as a

12    juror, so I think I'm going to allow him to stay based on

13    what I've heard so far.

14          Is there anything else?  You said you had

11:48:40 15    something else, Mr. Watkins.

16          MR. WATKINS:  Yes.  Juror No. 36, I believe her

17    employer is Hughes & Hughes.  I don't think we're going to

18    get that far, but Hughes & Hughes was -- represented

19    Ms. Fogarty-Hardwick in this case.

11:48:57 20          THE COURT:  All right.  Well, I don't think we're

21    going to get there.  I can -- I can -- unlike Mr. Tapia, who

22    is part of our eight, so I don't think we're going to get

23    there.  I think I would -- I mean, I think that -- I'm not

24    sure if that's enough.  I would question her on it, but

11:49:16 25    let's first see what your challenges are and see if it even

11:49:20   1   makes it an issue for us.

2          All right.  So we promised the jury that they

3   would come in about quarter 'til.  It's 10 'til.  And I

4   think I've given you enough time, so I'm going to collect

11:49:34   5   your three peremptory challenges.

6          (Pause.)

7          THE COURT:  Okay.  We're collecting your three

8   now.

9          (Pause.)

11:51:43   10         THE COURT:  All right.  So based on the

11   challenges, our first eight jurors are the jurors in this

12   case; that is, Jurors 1 through 5, Juror No. 7 and Juror No.

13   9 and Juror No. 10.

14         (Pause.)

11:52:30   15         THE COURT:  At this point -- actually, I don't

16   think it's necessary, since none of them came into play.

17         (Pause.)

18         THE COURT:  All right.  We're going to bring in

19   the jury.  We'll tell all of the jurors they can sit

11:53:13   20   anywhere right now behind the railing and they'll bring up

21   those eight.

22         MR. POWELL:  Lucky souls.

23         THE COURT:  Exactly.  They just don't know it.

24         (Pause.)

11:53:24   25   (The following proceedings were had in open court

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11:53:24   1        *in the presence of the prospective jury:)*

2              THE COURT:  Please go ahead and have a seat

3       anywhere behind the railing.  You don't need to be where you

4       were before, but do stay on that side of the courtroom.

11:53:48   5   That's best.

6              And as I just indicated, everybody can have a seat

7       behind the railing.  You don't need to go back up into the

8       box now.  Again, just find a place behind the railing.

9       Anywhere will do.  Anywhere behind the railing is fine.

11:54:42  10   Just go ahead and have a seat on the same side as the other

11      jurors, please.  All on this side over here *(indicating)*.  I

12      shouldn't say "anywhere" I guess, should I?

13             All right.  And you may all be seated.

14             All right.  Ladies and gentlemen, as I indicated

11:55:01  15   earlier, the manner in which we select a jury may be

16      somewhat different than what you have experienced before.

17      There was a method to the madness when we had you play the

18      game of musical chairs.  We –– as I promised, I thought we

19      might be able to resolve this before noon.  We have selected

11:55:19  20   a jury.  And so, if your name is called, it means that you

21      have been selected as a juror in the case.  We are selecting

22      eight jurors in this case.  And if you are called, then

23      you'll be seated in the back row and the front row.  Four in

24      the back and four in the front.  We're going to skip those

11:55:43  25   two chairs on the end.  I like to seat the eight jurors sort

11:55:47  1    of in the middle, so we'll skip the two chairs on the end in

2    the back, and you'll start with the third chair.  We'll go

3    four people over, and then the fifth person will be in the

4    third chair in the front row.

11:55:59  5            And if my CRD could call the names, please.

6            THE CLERK:  Juror No. 1, Judith Creel.

7            Juror No. 2, Jourdana Gergis.

8            Juror No. 3, Sue McCann.

9            Juror No. 4, Jeffrey Abbott.

11:56:46  10           Juror No. 5, Jesse Tapia.

11           Juror No. 6, Phuong-Chi Nguyen.

12           Juror No. 7, Arte Figueroa, and

13           Juror No. 8, Patrick Courchaine.

14           THE COURT:  No. 7, Mr. Courchaine.

11:57:35  15           And now that you've been seated, we are going to

16   ask that you stand to be sworn in as jurors in the case.

17           THE CLERK:  Please raise your right hand.

18           *(Jury sworn.)*

19           THE JURY:  I do.

11:57:59  20           THE CLERK:  Thank you.

21           You may be seated.

22           THE COURT:  All right.  Ladies and gentlemen, I

23   don't want those of you who were in the very back to think

24   that you were unnecessary, because oftentimes we do end up

11:58:08  25   all the way back there in terms of our jury selection.  It

122

11:58:12    1    just depends on each case.  But I do want to thank you for

2    responding to the summons when you received it in the mail.

3    It requires us to have a pool of ready, willing and able

4    potential jurors.  And, again, on behalf of the Central

11:58:32    5    District and the Federal District Court, I want to thank

6    you.  You are now excused from service.  And if you need

7    anything from Jury Services, you may go back down there to

8    receive that.  Otherwise, you are free to leave at this

9    time.

11:58:47   10          Thank you.

11          (*Prospective jury pool excused.*)

12          (*The following proceedings were had in open court*

13          *in the presence of the jury:*)

14          THE COURT:  All right.  And you may be seated.

11:59:34   15          And I must say we couldn't have planned that

16    better if we had tried, because look at the time on the

17    wall.  It is the time for you to take the noon recess.

18          So let me just tell you a few things before you

19    come back; and then, we'll let you go.  We're going to take

11:59:49   20    you back to where the jury room is so that you can see where

21    you're going to be, and you can take the notebook that is

22    sitting on your chair, and you can put it back there so you

23    have it to go when you come back.

24          When you do come back, the first thing I'm going

12:00:04   25    to do is give you some preliminary instructions.  You'll be

*DEBORAH D. PARKER, U.S. COURT REPORTER*

12:00:07  1   getting instructions throughout the case -- a lot of them at

2   the end, but you will be given some at the beginning, so I

3   do that next.  After that, you'll hear the opening

4   statements from each side.  And then, we'll begin with the

12:00:23  5   testimony of the witnesses.

6        I want to make sure that now that you've been

7   selected as jurors that you're also very comfortable.  So I

8   know that we have at least two people on our jury who have

9   bad backs, and so -- and they both happen to be seated in

12:00:41 10   the front.  Maybe more than two.  So if, at any point, you

11   need to stand, maybe -- and I'm not sure.  Maybe we should

12   switch you right away so that you can be in the back so that

13   when you stand you're not in front of someone, or you can

14   just step over to the side.  As long as we know what you're

12:01:00 15   doing, no one is going to panic.  Every once in a while,

16   it's surprising when somebody just stands up in the middle

17   of a trial.  But feel free to let us know, and you can move

18   over to the side, that sort of thing.

19        The temperature in here varies, you'll find,

12:01:13 20   throughout the day and throughout the week, so you may want

21   to have a little something to wear over and then to take off

22   when it gets hot in here.  Also, if, at any point, you can't

23   see what's being projected up on one of the screens -- and

24   we'll have a screen here and then that screen that's in the

12:01:30 25   corner now will be moved out at some point.  You'll probably

12:01:32  1   be either viewing documents or video on screen as well.  If
2   you can't see it, let us know; if you can't hear, let us
3   know.  If you would like to bring in something to drink
4   after lunch or again tomorrow morning, feel free to do that.
12:01:50  5   Again, I know it's difficult to just sit there all day and
6   not have access to that.  So all we ask is that you have a
7   lid on whatever you bring so that if it tips, it's covered
8   and we don't have to, you know, clean the carpet afterwards.
9        All right.  So that's it for now.  We're going to
12:02:07 10  be in recess until 1:30.  I do ask that you try to get back
11  here by 1:20 so you can be gathered up, brought back into
12  the jury room and then brought back out here by 1:30 so that
13  we can be ready to go, because we're going to keep this
14  thing rolling and keep ourselves on track.
12:02:27 15       Okay.  And we'll be in recess.
16       THE CLERK:  All rise.
17   *(Recess taken from 12:02 p.m. to 1:30 p.m.)*
18   *(The following proceedings were had outside the*
19   *presence of the jury:)*
01:25:10 20       THE COURT:  All right.  You can bring the jury in.
21   *(The following proceedings were had in open court*
22   *in the presence of the jury:)*
23       THE CLERK:  You may be seated.
24       Good afternoon, ladies and gentlemen.  Welcome
01:32:47 25  back from lunch.  As I indicated before you left, I'm going

01:32:50  1   to be giving you some instructions now, and then you will

2   hear from the attorneys for opening statements.  At the

3   conclusion of the case when you go back to deliberate, you

4   will receive these instructions in written form, so I just

01:33:05  5   tell you that in advance so that you're not worried about

6   whether you have to memorize all of this or write it down.

7          Members of the jury, you are now the jury in this

8   case.  It is my duty to instruct you on the law.  It is your

9   duty to find the facts from all the evidence in the case.

01:33:25 10  To those facts, you will apply the law as I give it to you.

11  You must follow the law as give it to you whether you agree

12  with it or not.  And you must not be influenced by any

13  personal likes or dislikes, opinions, prejudices or

14  sympathy.  That means that you must decide the case solely

01:33:43 15  on the evidence before you.  You will recall that you took

16  an oath to do so.  At the end of the trial I will give you

17  final instructions, and it is the final instructions that

18  will govern your duties.  Please do not read into these

19  instructions or anything I may say or do that I have an

01:34:01 20  opinion regarding the evidence or what your verdict should

21  be.

22          To help you follow the evidence, I will give you a

23  brief summary of the positions of the parties.  Plaintiff

24  asserts that her removal from her mother's custody on

01:34:15 25  February 17th, 2000 and continued separation of the

126

01:34:19   1   plaintiff from her mother on March 31st, 2000 were each

2   unconstitutional actions because each was caused by

3   defendants' presenting false statements and evidence and/or

4   suppressing or omitting exculpatory evidence in a proceeding

01:34:36   5   involving plaintiff in the juvenile dependency court of the

6   County of Orange.  The plaintiff has the burden of proving

7   these claims.  Defendants deny those claims and also contend

8   that plaintiff was removed due to her mother's wrongful

9   conduct.  Defendants further contend that any damages

01:34:56   10   plaintiff seeks for being separated from her mother should

11   be limited because for the majority of time they were

12   separated, it was because plaintiff wanted to be in her

13   father's custody.  The defendants have the burden of proof

14   on this affirmative defense that plaintiff's damages should

01:35:12   15   be limited.  The plaintiff denies defendants' affirmative

16   defenses.

17          When a party has the burden of proving any claim

18   or affirmative defense by a preponderance of the evidence,

19   it means you must be persuaded by the evidence that the

01:35:28   20   claim or affirmative defense is more probably true than not

21   true.  You should base your decision on all of the evidence

22   regardless of which party presented it.  And you should

23   decide the case as to each defendant separately unless

24   otherwise stated in the instructions to all parties.

01:35:49   25          The evidence you are to consider in deciding what

*DEBORAH D. PARKER, U.S. COURT REPORTER*

01:35:52   1   the facts are consists of:  One, the sworn testimony of any

2   witness;

3            Two, the exhibits that are admitted into evidence;

4            Three, any facts to which lawyers have agreed; and

01:36:07   5            Four, any facts that may instruct you to accept as

6   proved.

7            In reaching your verdict, you may consider only

8   the testimony and exhibits received into evidence.  Certain

9   things are not evidence and you may not consider them in

01:36:23  10   deciding what the facts are.  I will list them for you:

11            One, arguments and statements by lawyers are not

12   evidence.  The lawyers are not witnesses.  What they may say

13   in their opening statements, closing arguments and at other

14   times is intended to help you interpret the evidence, but it

01:36:43  15   is not evidence.  If the facts as you remember them differ

16   from the way the lawyers have stated them, your memory of

17   them controls;

18            Two, questions and objections by lawyers are not

19   evidence.  Attorneys have a duty to their clients to object

01:37:00  20   when they believe a question is improper under the rules of

21   evidence.  You should not be influenced by the objection or

22   by the Court's ruling on it;

23            Three, testimony that is excluded, or stricken, or

24   that you are instructed to disregard is not evidence and

01:37:19  25   must not be considered.  In addition, some evidence may be

128

01:37:23  1   received only for a limited purpose.  When I instruct you to

2   consider certain evidence only for a limited purpose, you

3   must do so and may not consider that received for any other

4   purpose;

01:37:34  5           Four, anything you may see or hear when the court

6   is not in session is not evidence.  You are to decide the

7   case solely on the evidence received at the trial.

8           Again, some evidence may be admitted only for a

9   limited purpose and when I instruct you that an item of

01:37:55 10  evidence has been admitted only for a limited purpose, you

11  must consider it only for that limited purpose and not for

12  any other purpose.

13          Evidence may be direct or circumstantial.  Direct

14  evidence is direct proof of a fact such as testimony by a

01:38:10 15  witness about what that witness personally saw, or heard, or

16  did.  Circumstantial evidence is proof of one of more facts

17  from which you could find another fact.  You should consider

18  both kinds of evidence.  The law makes no distinction

19  between the weight to be given to either direct or

01:38:29 20  circumstantial evidence.  It is for you to decide how much

21  weight to give to any evidence.  By way of an example, if

22  you wake up in the morning and see that the sidewalk is wet,

23  you may find from that fact that it rained during the night.

24  However, other evidence such as a turned-on garden hose may

01:38:50 25  provide a different explanation for the presence of water on

*DEBORAH D. PARKER, U.S. COURT REPORTER*

129

01:38:52    1    the sidewalk.   Therefore, before you decide that a fact has

2    been proved by circumstantial evidence, you must consider

3    all the evidence in the light of reason, experience, and

4    common sense.

01:39:06    5            There are rules of evidence that control what can

6    be received into evidence.   When a lawyer asks a question or

7    offers an exhibit into evidence and a lawyer on the other

8    side thinks that it is not permitted by the rules of

9    evidence, that lawyer may object.   If I overrule the

01:39:23   10    objection, then the question may be answered or the exhibit

11    received.   If I sustain the objection, the question cannot

12    be answered and the exhibit cannot be received.   Whenever I

13    sustain an objection to a question, you must ignore the

14    question and must not guess what the answer might have been.

01:39:43   15    Sometimes I may order that evidence be stricken from the

16    record and that you disregard or ignore that evidence.   That

17    means that when you are deciding the case, you must not

18    consider the stricken evidence for any purpose.

19            In deciding the facts in this case, you may have

01:39:59   20    to decide which testimony to believe and which testimony not

21    to believe.   You may believe everything a witness says, or

22    part of it, or none of it.   In considering the testimony of

23    any witness, you may take into account:

24            One, the opportunity and ability of the witness to

01:40:19   25    see, or hear, or know the things testified to;

*DEBORAH D. PARKER, U.S. COURT REPORTER*

130

01:40:21  1              Two, the witness' memory;

2              Three, the witness' manner while testifying;

3              Four, the witness' interest in the outcome of the

4      case, if any;

01:40:32  5              Five, the witness' bias or prejudice, if any;

6              Six, whether other evidence contradicted the

7      witness' testimony;

8              Seven, the reasonableness of the witness'

9      testimony in light of all the evidence; and

01:40:46 10              Eight, any other factors that bear on

11      believability.

12              Sometimes a witness may say something that is not

13      consistent with something else he or she said.  Sometimes

14      different witnesses will give different versions of what

01:41:00 15      happened.  People often forget things or make mistakes in

16      what they remember.  Also, two people may see the same event

17      but remember it differently.  You may consider these

18      differences but do not decide that testimony is untrue just

19      because it differs from other evidence.  However, if you

01:41:18 20      decide that a witness has deliberately testified

21      untruthfully about something important, you may choose not

22      to believe anything that witness said.  On the other hand,

23      if you think the witness testified untruthfully about some

24      things but told the truth about others, you may accept the

01:41:36 25      part you think is true and ignore the rest.  The weight of

*DEBORAH D. PARKER, U.S. COURT REPORTER*

01:41:38   1   the evidence as to a fact does not necessarily depend on the

2   number of witnesses who testify.  What is important is how

3   believable the witnesses were and how much weight you think

4   their testimony deserves.

01:41:52   5        I will now say a few words about your conduct as

6   jurors:  First, keep an open mind throughout the trial and

7   do not decide what the verdict should be until you and your

8   follow jurors have completed your deliberations at the end

9   of the case.  Second, because you must decide this case

01:42:09 10   based only on the evidence received in the case and on my

11   instructions as to the law that applies, you must not be

12   exposed to any other information about the case or to the

13   issues it involves during the course of your jury duty.

14   Thus, until the end of the case or unless I tell you

01:42:25 15   otherwise, do not communicate with anyone in any way and do

16   not let anyone else communicate with you in any way about

17   the merits of the case or with anything to do with it.  This

18   includes discussing the case in person, in writing, by phone

19   or electronic means via e-mail, text messaging, or any

01:42:46 20   Internet chat room, blog, website, or application, including

21   but not limited to Facebook, YouTube, Twitter, Instagram,

22   Linked-In, Snapchat, or any other form of social media.

23   This applies to communicating with your fellow jurors until

24   I give you the case for deliberation and it applies to

01:43:06 25   communicating with everyone else, including your family

01:43:09   1   members, your employer, the media or press and the people

2   involved in the trial, although you may notify your family

3   and your employer that you have been seated as a juror in

4   this case and how long you expect the trial to last.  But if

01:43:23   5   you are asked or approached in any way about your jury

6   service or anything about this case, you must respond that

7   you've been ordered not to discuss the matter and report the

8   contact to the Court.

9            Because you will receive all the evidence and

01:43:39   10   legal instruction you properly may consider to return a

11   verdict, do not read, watch, or listen to any news or media

12   accounts or commentary about the case or anything to do with

13   it, although I have no information that there will be news

14   reports about this case.  Do not do research such as

01:43:55   15   consulting dictionaries, searching the Internet or using

16   other reference materials and do not make any investigation

17   or in any other way try to learn about the case on your own.

18   Do not visit or view anyplace discussed in this case and do

19   not use Internet programs or other devices to search for or

01:44:13   20   view any place discussed during the trial.  Also, do not do

21   any research about the case, the law or the people involved,

22   including the parties, the witnesses, or the lawyers, until

23   you've been excused as jurors.  If you happen to read or

24   hear anything touching on this case in the media, turn away

01:44:31   25   and report it to me as soon as possible.  These rules

133

01:44:34   1   protect each party's right to have this case decided only on

2   evidence that has been presented here in court.

3            Witnesses here in court take an oath to tell the

4   truth, and the accuracy of their testimony is tested through

01:44:49   5   the trial process.  If you do any research or investigation

6   outside the courtroom or gain any information through

7   improper communications, then your verdict may be influenced

8   by inaccurate, incomplete, or misleading information that

9   has been not been tested by the trial process.

01:45:05  10            Each of the parties is entitled to a fair trial by

11   an impartial jury.  And if you decide the case based on

12   information not presented in court, you will have denied the

13   parties a fair trial.

14            Remember you've taken an oath to follow the rules

01:45:19  15   and it is very important that you follow these rules.  A

16   juror who violates these restrictions jeopardizes the

17   fairness of the proceeding and a mistrial could result that

18   would require the entire trial process to start over.  If

19   any juror is exposed to any outside information, please

01:45:36  20   notify the Court immediately.

21            I urge you to pay close attention to the trial

22   testimony as it is given.  During deliberations, you will

23   not have a transcript of the trial testimony.  If you wish,

24   you may take notes to help you remember the evidence.  If

01:45:55  25   you do take notes, please keep them to yourself until you go

*DEBORAH D. PARKER, U.S. COURT REPORTER*

01:45:59  1  to the jury room to decide the case.  Do not let note-taking

2  distract you.  When you leave, your notes should be left in

3  the jury room.  No one will read your notes.  Whether or not

4  you take notes, you should rely on your own memory of the

01:46:12  5  evidence.  Notes are only to assist your memory.  You should

6  not be overly influenced by your notes or those of other

7  jurors.

8          From time to time during the trial, it may become

9  necessary for me to talk with the attorneys out of the

01:46:27 10  hearing of the jury either by having a conference at the

11  bench when the jury is present in the courtroom or by

12  calling a recess.  Please understand that while you are

13  waiting, we are working.  The purpose of these conferences

14  is not to keep relevant information from you but to decide

01:46:42 15  how certain evidence is to be treated under the rules of

16  evidence and to avoid confusion and error.  Of course, we

17  will do what we can to keep the number and length of these

18  conferences to a minimum.  I may not always grant an

19  attorney's request for a conference.  Do not consider my

01:47:00 20  granting or denying a request for a conference as any

21  indication of my opinion of the case or of what your verdict

22  should be.

23          Trials proceed in the following way:  First, each

24  side may make an opening statement.  An opening statement is

01:47:14 25  not evidence.  It is simply an outline to help you

01:47:17  1  understand what the party expects the evidence will show.  A

2  party is not required to make an opening statement.

3          The plaintiff will then present evidence and

4  counsel for the defendant may cross-examine.  Then, the

01:47:30  5  defendant may present evidence and counsel for the plaintiff

6  may cross-examine.  After the evidence has been presented, I

7  will instruct you on the law that applies to the case and

8  the attorneys will make closing arguments.  Now, after that,

9  you will go to the jury room to deliberate on your verdict.

01:47:49  10          Those are the preliminary instructions.  We will

11  now turn to opening statements and we will begin with the

12  plaintiff, Mr. Powell.

13          Would you like to stand at this time.

14          I'm just going to let you know that, typically,

01:48:07  15  attorneys will stand at the lectern whenever they speak,

16  either opening statement, closing argument, or examination

17  of a witness.

18          Mr. Powell has indicated that he's having some

19  problems with his back and in acknowledgment of that, I have

01:48:20  20  allowed him at times to remain seated in his chair.  So at

21  times, he will be, perhaps, either speaking or questioning

22  from his chair as opposed to from the lectern, but those are

23  the only two places.  And other than -- other than that,

24  they will be all from the -- all the attorneys will be from

01:48:41  25  the lectern.

136

01:48:42   1          Mr. Powell.

2          MR. POWELL:  I may switch back and forth because

3    neither one of them is great.

4          Okay.  Every story has a beginning.  You heard the

01:48:56   5    beginning a moment ago when the Court told you what the

6    claims were that my client is making.  As I described

7    briefly in the mini-opening, she's telling you that as a

8    result of lies made to the juvenile court by defendants

9    Vreeken and Wilkins, she was removed from her mother's care.

01:49:18  10          The evidence will show, which is kind of what

11   we're supposed to be telling you now, what we think the

12   evidence is going to show, the evidence will show that from

13   there she went to a facility known as Orangewood here in

14   Orange County.  She experienced being held down and

01:49:36  15   inoculated, injected with a needle against her will.

16   Probably always the case with a six-year-old but without the

17   comfort for her mother or father, for that matter.

18          But I want to -- and then, again, as I said

19   earlier -- and I'll go through this in a moment again --

01:49:53  20   come March -- February 17th, the lies told at that court

21   proceeding which ends up in the removal.  But on March 31st

22   when there's an opportunity to be truthful with the Court

23   again and if not return the child to her mother and her

24   sister, Kendall -- Kendall is along for the ride this whole

01:50:14  25   time -- then given to the father, if you think that the

*DEBORAH D. PARKER, U.S. COURT REPORTER*

01:50:17  1   mother has just made up all of this stuff about sexual abuse

2   and it's all a big manipulation, but that didn't happen

3   either.  They went into foster care.  So -- or they were in

4   foster care, I think, by that time.

01:50:31  5          But let me point out some very important things.

6   I want you to hold me to what I tell you the evidence is

7   going to show.  I want you to hold Mr. Watkins to the things

8   he tells you.  And at the end, I want you to measure those

9   things.  See who kept their word.  I'm going to recap some

01:50:59 10   statements from the mini-opening and about what the evidence

11   will show:

12          You were told mother leveled charges of horrific

13   abuse, quote, end quote.  Publicly announced the abuse

14   claims.  You were told these things.  You were told about,

01:51:22 15   There are reports to the juvenile judge.  The evidence will

16   show that there are reports to the juvenile judge.  And the

17   evidence will show that on February 17th, after whoever's

18   version you believe of what occurred on February 15th, makes

19   no sense.  Because if Ms. Vreeken claimed that my client

01:51:50 20   said to the child -- children, *Your father is gonna -- she's*

21   *trying to take you from your father and put you in foster*

22   *care,* or *if you don't visit with your father, you're going*

23   *to go to a foster home.*

24          If my client -- my client's mother said those

01:52:04 25   things, you think you'd see that in there pretty bold, the

01:52:09  1   big complaint, but the evidence will show that that's not

2   the case.

3            You were told in the mini-opening that Kendall

4   Hardwick was prone to manipulation and that she filed a

01:52:23  5   lawsuit herself.  Those are both true.  You won't hear any

6   dispute there.  You were told at the time when she filed the

7   lawsuit, she was living at her mother's.  Other than the

8   time period that CPS and the acts of Ms. Vreeken and

9   Ms. Wilkins separated these children from their mother, that

01:52:49  10  was where they were living, was with their mother.  But the

11  evidence will also show that the things that Kendall

12  Hardwick said when she was a child to psychologists -- to

13  her own therapist and to others -- were exactly the things

14  that she was saying when she ended up in her own lawsuit.

01:53:19  15           In the middle still while in the CPS system

16  Kendall Hardwick tells her therapist after all this blew up,

17  she has been moved from her mom, I wish I hadn't said

18  anything.  She took the weight of the world upon herself for

19  divulging sexual molestation and abuse.  But let me stop

01:53:46  20  myself right there.  You heard the claims.  Did you hear any

21  claim that I'm supposed to prove about whether Cary

22  Hardwick --

23           MR. WATKINS:  Objection, Your Honor.  Argument.

24           THE COURT:  Sustained.

01:53:58  25           Just what the evidence will show, as you've been

*DEBORAH D. PARKER, U.S. COURT REPORTER*

01:54:03  1  doing.

2          MR. POWELL:  The evidence will show that no one

3  knows whether that occurred -- any type of molestation

4  abuse.  But the evidence will show that this statement was

01:54:22  5  absolutely false that you were told in mini-opening:  That

6  Kendall's mother and attorney pressured her to lie.  You'll

7  hear conflicting evidence on that.

8          So now let me take you back through what went on

9  with this family.  Deanna Hardwick, a hardworking woman,

01:54:48 10  successfully captured Miss California, in late 1970s.

11  Later, 1989, she marries Mr. Hardwick.  And the evidence

12  will show, he's a handsome devil and their life was good.

13  It started out good.  He was a partner in a restaurant.

14  Evidence will show he's still a restaurateur to this day.

01:55:15 15  In fact, he does very well.

16          Let me say this as well:  The evidence will show

17  that my client and her father love each other.

18          But going back to the marriage.  When Kendall was

19  born, she had some type of digestive tract problem and it

01:55:40 20  led to a large mass being removed from her.  I believe her

21  mother described it as the biggest thing she had ever seen.

22  Couldn't imagine it came out of a baby that size.  And that,

23  of course, as you can imagine, whether you have children or

24  not, caused tremendous stress and concern when your child is

01:56:01 25  ill like that.  At that time, as I said, Mr. Hardwick was

*DEBORAH D. PARKER, U.S. COURT REPORTER*

140

01:56:05  1    working with the restaurant.  Mother Deanna had a meat

2    route.  It doesn't seem like, maybe, a logical thing, but

3    that's what she had, a wholesale meat route.  And she also

4    would assist her mother in a dress shop and had dreams at

01:56:22  5    times there of kind of going into business with her mom and

6    going into some dressmaking-type activities, but she did

7    work there.  And that was fine.  They could handle that

8    while Kendall was young and before the signs of autism

9    started to show up, but they did show up.  And the evidence

01:56:43  10   will show you that one of the most poignant moments was when

11   something fell crashing to the ground and Kendall didn't

12   flinch.  And so when that puzzled the mom, of course,

13   thinking, hearing must be bad and the test results were, no,

14   her hearing was fine, she went further and then they found

01:57:02  15   out that she had the -- basically, it's a form of autism.

16        And as Mr. Watkins said, the evidence is going to

17   show you -- she's going to come here.  She's going -- I

18   guess.  I don't know -- and possibly testify.  So the

19   evidence will show that she's not debilitated in any real

01:57:22  20   form.  When Preslie came along, the birth went fine.  But

21   now between all the work of running a restaurant, the meat

22   route, the dress shop, some of the work Mrs. Fogarty --

23   Fogarty-Hardwick now was able to handle with Preslie

24   strapped on her chest, you know, doing that kind of work.

01:57:43  25   But they ended up getting a nanny, and her name was Rosy

01:57:47  1   Reales.  It still is.  And she, you know, started out kind

2   of as you might expect.  She worked a little bit and then

3   moved up into full time as life got more and more hectic and

4   as Kendall's condition became more apparent.  And it became

01:58:04  5   more apparent that children on that autism spectrum need

6   consistency.

7          The evidence will show that the mother essentially

8   devoted her time to both the girls and, admittedly, it was

9   for the reason that Kendall needed the structure.  Her days

01:58:23  10  needed to be structured.  Her time needed to be structured.

11  Deviations from structure would cause anxieties, okay?

12  Preslie got the benefit of mom being around all the time.

13  The evidence is going to show you that they had a wonderful

14  bond, an excellent bond and Kendall, too, until some point

01:58:44  15  after CPS got involved.

16          In any event, back at a time when Kendall was

17  four, maybe three and Preslie was like one, the dad started

18  disappearing.  There started being problems.  And the

19  evidence will show that he, kind of, like just stepped away

01:59:07  20  from the family.  At least in the mother's eyes, he didn't

21  seem to want to participate in those kinds of things.  And

22  she was trying very hard to keep a cohesive family unit even

23  though there was the stress of running a restaurant, her

24  working, dealing with the child.  What she came to find out

01:59:23  25  was that he was -- had an alcohol problem and substance

142

01:59:33 1  abuse problem.  She didn't run.  She didn't abandon the man.

2  She helped him go through rehab.  He still visited with the

3  kids while in rehab.  It's about a three-week rehab.

4          Other things came to light, though.  The addiction

01:59:55 5  to methamphetamine came up.  A sexual addiction that isn't

6  pretty, that came up.  The evidence will show none of those

7  things mattered to the lies that were told on February 17th

8  and on March 31st.  It doesn't matter.  At four in one

9  (verbatim), there's some inappropriate behaviors that mom

02:00:21 10  witnesses between the two girls and it causes her concerns.

11  She knows she has a husband who she separated from who has

12  these issues.  Evidence will show that heightens one's

13  concerns but no one, including Ms. Fogarty-Hardwick, wants

14  to make a claim that's false that she doesn't know.  She

02:00:44 15  does talk to doctors about it.  And the first time that

16  happens, they say, *Well, you know, it's a little strange*

17  *behavior, but just keep an eye on him*, okay?  And that's

18  what she does.

19          She files for divorce eventually, and that has to

02:00:59 20  do with the second time after being declared clean and sober

21  being found to have drugs in his system.  And he gets put on

22  monitored visitation.  Divorce proceedings are going.  And

23  there are these evaluations that go on -- the evaluations

24  about the parents.  He's seeing the children at times, every

02:01:22 25  three weekends a month -- the first, third and fifth, I

02:01:25   1    believe that's what they call it in family court.  In fact,

2    I know that's what they call it:  The first, third and

3    fifth.  So he is seeing the children.  He's seeing them

4    regularly.

02:01:33   5          Is there tension between the parents?  Yes.  The

6    evidence will show, again, it's of no consequence to the

7    dates in question here.  So along about November, Kendall,

8    as you were told in mini-opening, is when she –– that

9    Mrs. Hardwick was pending a family court proceeding and

02:02:08  10    laying in –– or with her little girl, Kendall, and Kendall

11    started telling her mother of just horrible abuse.  Horrible

12    abuse.  That's what you were told.  The evidence is going to

13    show you that all that Kendall did at that point was to say

14    that daddy was touching her down there.  That's it.  But she

02:02:29  15    already had a therapist as a result of the family law

16    proceedings.  And mother contacted the therapist.  And, of

17    course, she said, *Bring her in.*  So of course she did.

18          And the evidence will show that Kendall reported

19    inappropriate touching in bed, digital penetration, *things

02:02:54  20    like that,* okay?  Nothing in the way of outright rape or

21    things like that.  Nothing like that.  Supposedly at night,

22    sneaking in the room.  Again, the evidence is going to show

23    you that none of that matters to the claims, but I know what

24    you're going to hear.

02:03:10  25          There is a back story, but it isn't the story.  So

02:03:15  1    the therapist, not Ms. Fogarty-Hardwick, contacts CPS.  That

       2    brings us here today.  And they come out -- and, by the way,

       3    the evidence will show, never a claim that Preslie was

       4    abused by anyone, other than maybe the system.  It's what

02:03:41  5    she's here telling you.  She was abused by the system but

       6    not that she was abused by her father, or anyone else.

       7         And, originally, an agreement is signed that

       8    basically makes the mother not allow Kendall to be dropped

       9    off with anyone and if they want Kendall down at their

02:03:58 10    offices there at the CPS -- Child Protective Services --

      11    then that's all they need to do is tell them to come down

      12    here.  So then starts a series of -- a document called a

      13    "petition" gets filed in juvenile court.  Interestingly, it

      14    talks about, you know, the child's -- meaning, Kendall's

02:04:23 15    statements about molestation, and it throws in that mother

      16    fails to protect.  I guess, it's -- according to the

      17    evidence -- what they do.  If a child is ever sexually

      18    abused, then the mother fails to protect if it happens

      19    inter-family, but that's just the way things go.

02:04:40 20         So a series of visitations start with the father

      21    that are all monitored and mother is doing her level best to

      22    make all of those happen.  But as you might imagine,

      23    Kendall, who the psychologist said was very creditable, she

      24    didn't make that call to CPS on a whim.  She said Kendall

02:05:04 25    seems credible.  Her story is consistent.  So Kendall is

02:05:08  1   reluctant to go on the visits -- and not every one.  Some

2   visits she was fine; other visits she wasn't.

3         Now the evidence will show some would chalk that

4   up when she wouldn't go to some level.  Some intelligent

02:05:24  5   people who deal with evaluations of children would say,

6   *That's kids.  Sometimes they don't go.  Sometimes they don't*

7   *want to go.  Sometimes you can't get them away from the*

8   *PlayStation to go visit their father.*

9         MR. WATKINS:  Your Honor, argument.

02:05:38 10        THE COURT:  You can move on.

11        MR. POWELL:  Thank you.

12         Now, her first social worker in the case, first

13   real one, if you skip the one who came out and signed the

14   agreement and all that, Ms. Fogarty-Hardwick's social worker

02:05:48 15   was Rachael Davis.  Rachael Davis will tell you

16   Ms. Fogarty-Hardwick was great.  She seemed to care.  If

17   Ms. Fogarty-Hardwick had a question, she would answer it.

18   When these problems developed with the children not going on

19   the visit -- again, not so much Preslie.  Preslie is pretty

02:06:10 20   much seen as a -- the evidence would show kind of a

21   consistent kid throughout until she goes to Orangewood,

22   but -- so Kendall was having problems and Ms. Davis said --

23   Ms. Fogarty-Hardwick said, *What do I do so that I'm not the*

24   *bad guy when the kids won't go on a visit?*

02:06:31 25         Ms. Davis was very clear.  You take them to the

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:06:34    1    monitor person –– and there were two or three:

2    Hector Delgadio and Ms. Wilkins over there.  She was a

3    monitor, too.  And then if –– you know, if the kids still

4    have a problem, let that person be the neutral.  It was

02:06:50    5    perfect.  The evidence will show that's exactly what you

6    should do so that the parent isn't put in that middle of

7    their own child pleading not to go and having to make that

8    decision, especially when they are being watched by the

9    Court, watched by CPS.

02:07:04   10          So Rachael Davis and the relationship there was

11   great.  The evidence will show Ms. Fogarty-Hardwick followed

12   her directions to the tee, right up until she was taken off

13   the case for no particular nefarious reason, but the

14   evidence will show that she was.  She was switched with

02:07:25   15   Marcie Vreeken.  And the evidence will show that was a

16   fateful day for the Hardwick family.  Ms. Vreeken's first

17   time actually seeing Ms. Hardwick and her children and Cary

18   Hardwick, for all that's worth, was when she attended a

19   visit that Mr. Hardwick went to at the Social Security

02:07:50   20   offices –– not Social Security –– at the CPS offices.  So he

21   had come for a visit.  And the evidence will show he was

22   there for a typical hour-long visit.  They ran 4:00 to 5:00.

23          The mother would bring them.  And when she did,

24   she brought Rosie –– Rosie, who is now like the full-time

02:08:12   25   nanny.  This mom, you know, separated household, she doesn't

02:08:14   1  have a man about the house.  She's got Rosie.  Rosie is

           2  really good with the kids, really close with the kids.  The

           3  evidence will show she had her own little boy, Carlitos, and

           4  they were all there.  They had come.  They had dropped off

02:08:26   5  the girls:  Preslie and Kendall.  They went and visited with

           6  dad, and they went into a room, okay?  Down the hall, a

           7  little bit -- ways away.

           8          Ms. Vreeken comes in there the end of the meeting.

           9  Then, you're going to hear conflicting evidence.  You'll

02:08:43  10  decide what it shows.  She's going to give you evidence

          11  about how it wasn't that long.  She thinks the visit ran

          12  late.  That's why she was late.  Ms. Hardwick is going to

          13  tell you that, you know, the place was shutting down.  It

          14  was getting to be around 6:00 o'clock by the time they

02:08:59  15  come -- any activity returns to her room, and she's starting

          16  to get worried.  So she's in a room with Rosie, Carlitos and

          17  herself:  Ms. Fogarty-Hardwick and those two.

          18          And here comes Preslie, flying in the room crying,

          19  saying that they're going to take her away, that the lady is

02:09:19  20  telling them that they are going to be taken away and they

          21  are going to have to go into a foster home.  And, of course,

          22  Ms. Fogarty-Hardwick is going to be saying, *Who?  Who?*

          23          She's saying, *Marcie.*  Six and a half, articulate,

          24  telling her, *Marcie is doing it.*

02:09:35  25          Ms. Fogarty-Hardwick reacts as anyone might when

02:09:38   1   they believe their children are going to be taken away, she

           2   immediately becomes anxious and starts crying.  She's

           3   comforting her child.  She's crying.  Ms. Reales is crying a

           4   little bit, because she is so close with both Preslie and

02:09:55   5   Kendall.  This is an ugly scene.  But Preslie came in there

           6   by herself.  Shortly after that comes Ms. Wilkins.  And very

           7   shortly after that, here comes Ms. Vreeken, who's now got

           8   Kendall.  And the evidence will show Ms. Fogarty looks at

           9   Kendall's face and she's all puffy and swollen, and she's

02:10:16  10   got tears, okay?

          11          Ms. Fogarty-Hardwick looks up and says, *Is it*

          12   *true?* when she sees Ms. Vreeken.  *Is it true?*

          13          And she says, *Is what true?*

          14          *Is it true the kids aren't coming home with me*

02:10:31  15   *tonight?*  And she says, *No* -- I'm sorry.

          16          She says that she had told them, she expressly

          17   tells her that she had told them that if the kids don't

          18   visit with their father, the judge is going to put them in a

          19   home.

02:10:44  20          They just completed a visit with their father.  So

          21   you'll determine what the evidence shows as to why anyone

          22   would do that, but that's what happened.  That is what

          23   happened.

          24          MR. WATKINS:  Argument, Your Honor.

02:11:01  25          THE COURT:  Overruled.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:11:03  1      MR. POWELL:  Ms. Hardwick -- I'm sorry.  Did I say

2  February 17th?  That was February 15th, this visit at the

3  CPS office that went horribly awry.  Ms. Hardwick jumps up

4  because she's going to throw up, and she runs into the

02:11:18  5  restroom.

6      Preslie comes toddling along behind her.  After a

7  little bit, Ms. Hardwick goes into the restroom.  She throws

8  up and then she tries to collect herself, figure out, what

9  is going on?  What is happening here, trying to gather her

02:11:33  10  thoughts.  And she -- as she's leaving -- she throws some

11  water on her face.  She goes out the bathroom.  Preslie is

12  trying to come into the bathroom at that time, simply turns

13  her around and walks back.  And she approaches Ms. Vreeken

14  and asks her, you know, *What do I need to do?  You know,*

02:11:53  15  *what do I need to do?  What are your directions?*

16      She's not really sure of the source of this

17  complaint.  *What is it that I need to do for you?*

18      She's gone through an experience with Ms. Davis

19  where if she wanted direction or Ms. Davis wanted her to do

02:12:06  20  something a certain way, Great, she'd do it.  So her thought

21  was somehow our wires got crossed.  I just met this woman,

22  but let me -- even in the panic she was in, let me see if I

23  can't sort this out and see what is going on.  And she says

24  to Ms. Vreeken, you know, *What is expected of me?  What is*

02:12:26  25  *it you expect of me?  What do you want me to do?*

02:12:28  1    And she wouldn't say.  And Hardwick says it again,

2  and she wouldn't say.  And so Ms. Hardwick gives it one last

3  shot.  And Ms. Vreeken's response is, *What's the matter?  Am*

4  *I not warm and fuzzy enough for you?*

02:12:46  5    So the evidence will show that the impact of

6  saying something to both these little children and the

7  mother about how they're going to go to a foster home and

8  the mom is going to go home to an empty home was lost on

9  Ms. Vreeken.

02:13:03 10    Next Mr. Hardwick, of course, gives up trying to

11  get any cooperation and they pack up the girls and they

12  leave.  And I'm truncating it.  It's going to be longer when

13  you hear it starting today.  She goes to court two days

14  later, February 17th and -- Ms. Fogarty-Hardwick.  She's

02:13:27 15  outside the court and here comes her attorney saying --

16  obviously, upset.  Obviously, flustered.  In juvenile court,

17  a lot of times they go in there and this juvenile court

18  system is, you know, to protect the best interest of the

19  children and the family.  And then, they have these meetings

02:13:45 20  where the clients aren't there.  And by "clients," I mean

21  the parents and I mean the children.  They're not there.

22  But in any event, this day, her attorney comes out.  She's

23  upset, and Deanna is like, *What's going on?*

24    And they go into the courtroom and the judge comes

02:13:59 25  out -- I'm sorry.  When she goes into the courtroom, the

02:14:02  1    evidence is, Ms. Vreeken and Ms. Wilkins have been called.

2    So when she goes in, they're not in session, like the judge

3    sitting up there at the moment.  And then Ms. Vreeken comes

4    and Ms. Wilkins.  And the Judge, first words out of his

02:14:19  5    mouth, pretty much is, *Based on the consultation we've had*

6    *off the record, I'm initially inclined to remove the*

7    *children.*

8         So here's another -- second shock wave through

9    Ms. Hardwick.  The evidence will show that they went

02:14:44  10   ahead -- Ms. Wilkins, Ms. Vreeken -- and maintained the lie,

11   maintained the lie, and the evidence will show they are

12   sitting here today prepared to do it again.  But there's

13   more.  So with that, the Judge makes an order to go remove

14   the children forthwith.  Right now.  It doesn't matter where

02:15:09  15   they are.  Get them.  Preslie is at her school, McDonough,

16   something like that.  McGaugh.  Kendall is at a therapy

17   appointment with her grandmother, Marlene Fogarty, who you

18   will also hear from.  And a police officer is called by

19   Ms. Vreeken and they show up at Preslie's school.  And in

02:15:35  20   the meantime, Ms. Fogarty-Hardwick, wanting to make the

21   stress level on her children as little as possible, contacts

22   the grandmother and tells her that she needs to bring

23   Kendall to the school so that they can take both of her

24   children.

02:15:51  25        They get to the school and Preslie learns they're

*DEBORAH D. PARKER, U.S. COURT REPORTER*

152

| | | |
|---|---|---|
| 02:15:54 | 1 | trying to take her and she crawls under a table and she is |
| | 2 | clutching the table leg, screaming, crying, sobbing because |
| | 3 | they are there to take her.  They got the police officer. |
| | 4 | The evidence will show he's a nice officer but still a |
| 02:16:16 | 5 | police officer.  And, of course, Mrs. Fogarty-Hardwick |
| | 6 | wasn't there.  The grandmother was.  And guess who else came |
| | 7 | was -- Marjorie Mitchell, the psychologist, because |
| | 8 | Ms. Fogarty-Hardwick, in an effort to ameliorate the trauma |
| | 9 | that was definitely about to befall her children, contacted |
| 02:16:34 | 10 | her.  And Ms. Mitchell, in the kindness of her heart, |
| | 11 | dropped what she was doing and hustled to that school.  So |
| | 12 | there they all are trying to pull -- not pull -- I always |
| | 13 | try to avoid exaggeration -- trying to get Preslie to come |
| | 14 | out from under the table.  Eventually, after several |
| 02:16:56 | 15 | minutes, they are able to cajole her with the promise of ice |
| | 16 | cream and the promise that when she does leave, she's going |
| | 17 | to leave with her grandma.  And they did at least keep that |
| | 18 | promise.  She did get to leave with her grandma long enough |
| | 19 | to go to Orangewood, where, the evidence will show, she was |
| 02:17:15 | 20 | held down against her will.  The evidence will show they had |
| | 21 | to bring her sister to try and help to get her to hold still |
| | 22 | so they could shoot her with a needle -- give her a shot |
| | 23 | with a needle and not shoot her.  And that was pretty |
| | 24 | traumatic, the evidence will show. |
| 02:17:38 | 25 | So the kids are living in Orangewood.  Big |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:17:44  1    facility.  The evidence will be presented to you that it's

2    an almost idyllic park-like setting, I'm sure.  The evidence

3    will be shown to you by myself and the plaintiff that it

4    wouldn't matter if it was Disneyland.

02:18:02  5            MR. INGOLS:  Your Honor, I'm having difficulty

6    hearing, and it is argument.

7            THE COURT:  Overruled on argument.  Do try to stay

8    near a microphone.

9            MR. POWELL:  I'm sorry.  I don't have much left.

02:18:12 10            As I said, the evidence will show it's no

11    Disneyland.  It was no Disneyland to my client.

12            The evidence will also show an interesting turn of

13    events.  Everything that Ms. Vreeken had her hands in or

14    Ms. Wilkins had her hand in, after they took the kids in

02:18:36 15    terms of reporting about visits with dad, were glowing.

16    They were glowing.  And the psychologist, you know, the one

17    with the license from the State of California, education and

18    all that, Ms. Mitchell, she saw something completely

19    different.  She saw two children who were suffering.

02:19:06 20    Preslie, who as I said before, the evidence will show in

21    terms of up to her six years of life at that point, was a

22    pretty consistent kid, pretty normal, strong-willed,

23    somewhat quiet.  You will hear all that.

24            Now, Preslie Hardwick was acting out in anger.

02:19:27 25    Lashing out.  The evidence will show a six-year-old lash out

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:19:32  1   when they don't understand and that it's very damaging to

2   them.  So Kendall was really, really suffering.  Really

3   decompensating is what the experts call it, what

4   Ms. Mitchell called it, or any other expert who makes it to

02:19:50  5   that stand, I submit to you, the evidence, they will call it

6   that as well.  That means, like, they're falling apart.

7   They're falling apart.

8           And Ms. Mitchell calls Ms. Vreeken, I want to say,

9   two days before -- you can check me on that as the evidence

02:20:05 10   comes in -- two days before the March 31st hearing and

11   leaves her a message and uses these types of words, like

12   decompensating.  She's extremely stressed, okay?

13           Mother -- Ms. Fogarty-Hardwick asks

14   Ms. Mitchell -- Dr. Mitchell, *How are the kids doing*?

02:20:26 15   Around about that time.

16           And she tells her, *They're not doing good.  This

17   isn't good for them.  And the longer they're here*, *the more

18   damaged they'll be.  They are really suffering from the

19   separation* -- caused by the lie in the first place.

02:20:39 20           It's about time for a second lie.  The evidence

21   shows that Ms. Mitchell, at the request of

22   Ms. Fogarty-Hardwick's attorney in the juvenile matter,

23   writes a letter to provide an updated status as to the

24   children.  Now, remember, the evidence is going to show over

02:21:01 25   here all these reports from Wilkins and from Vreeken, from

02:21:05   1   anybody who monitored something for the County of Orange

2   about suitable visits and then there's this letter from

3   Marjorie Mitchell.  And what does it say?

4            It says what I already told you it said.  It says

02:21:15   5   the kids are decompensating -- I'm sorry.  *Kendall is*

6   *decompensating.  Preslie is acting out angrily.  They're not*

7   *doing well.*

8            When the judge hears that from the mother's

9   attorney, Ms. Fogarty-Hardwick, that he believes there's

02:21:30  10   going to be a letter -- because he never got confirmation

11   that the psychologist was ever going to actually write the

12   letter, but she said she would.  And so they stopped the

13   hearing.  And Preslie's grandmother, Ms. Fogarty --

14   Marlene -- goes over to the SSA office -- that's their

02:21:49  15   offices.  It's right across the plaza -- goes in.  And in a

16   mail box, sitting there since 8:00 a.m. -- 8:03, if you

17   believe the document fax tag line, is this letter from

18   Marjorie Mitchell.

19            Now, at this point, Helen Dwojak gets involved.

02:22:07  20   Now -- may I mention about the state issue?

21            THE COURT:  Objection?

22            MR. POWELL:  So the evidence will --

23            THE COURT:  No objection.  Yes, you may.

24            MR. POWELL:  I don't know if it's right to say,

02:22:16  25   the evidence will show, but --

02:22:17  1          MR. WATKINS:  I'm having a hard time hearing.

2          THE COURT:  He's at the microphone and so am I.

3          MR. POWELL:  We have a situation here where one of

4    the defendants is a Helen Dwojak.  She's a supervisor to Ms.

02:22:32  5    Vreeken.  She's passed away.  The judge can clarify if she

6    wishes, but under the law you can pursue against the estate.

7    So if you actually read, like, the paper that we filed about

8    this case, it reads:  *Preslie Hardwick versus Elaine*

9    *Wilkins, Marcie Vreeken and the Estate of Helen Dwojak.*

02:22:50 10          So -- and we have testimony from her in a prior

11    trial, because the evidence will come in that there was --

12    in addition to -- in a trial by Kendall that she later

13    retracted, this got left out in the mini-opening.  She

14    retracted that when she moved in with her father.  That's

02:23:08 15    when she canceled that lawsuit.  But there was also a

16    lawsuit by Ms. Fogarty-Hardwick.  Now, I lost my train of

17    thought.  Forgive me, Your Honor.

18          March 31st.  It's a letter.  Marlene Fogarty goes

19    to get it.  They won't hand it to her, because it's a letter

02:23:27 20    from a doctor to -- you know, about a kid and there's

21    confidentiality laws in juvenile courts that, you know, we

22    don't want the public to know about the privacy of people's

23    affairs in the juvenile court.  So the letter --

24    Helen Dwojak comes down.  She gets the letter, and she goes

02:23:49 25    with Marlene Fogarty back over to the court.  Then the

02:23:53  1    evidence is going to show that there's a little powwow

2    around the letter.  A little powwow with the letter there.

3    But guess who's not in the powwow?  Ms. Fogarty-Hardwick's

4    attorney.  He's not in the powwow.  Ms. Vreeken is there.

02:24:09  5    Again, she's already had the voicemail message from the

6    doctor.

7         So this letter, which I just told you about,

8    Ms. Vreeken on the stand -- he's asked for them to go check

9    on the letter to see if there's some problem with the girls

02:24:26  10   in the home -- in the Orangewood home.  And sure enough,

11   they lie.  Marcie Vreeken is asked to this effect, *If there

12   *was something wrong with the girls, about the status of the*

13   *girls, surely you would let me know.*  I don't think he used

14   "you."  I think he used the "agency."  He's talking to

02:24:52  15   Ms. Vreeken.  Ms. Vreeken says, *Yes.*

16        In other words, I would let you know, but -- and

17   the evidence here is, I'm not letting you know right now.

18   And she didn't.  The letter shows up later.  But there it

19   was in the courtroom.  In the courtroom.  Those are the

02:25:12  20   extent of our claims.  Extent of my client's claims.  She'll

21   put on evidence of all of these things through the

22   witnesses.

23        And I thank you for your time and appreciate your

24   service.

02:25:32  25        THE COURT:  And Mr. Watkins.

02:25:43  1          MR. WATKINS:  Thank you, Your Honor.

2          Good afternoon, ladies and gentlemen.

3          My name, again, is Norm Watkins.  It's my pleasure

4   to represent Elaine Wilkins and Marcie Vreeken in this case.

02:26:01  5   And this is the time permitted under the rules for counsel

6   to give you what is known as an opening statement, and what

7   that is and what it is supposed to be and what it's intended

8   to be is an overview of the evidence as an assist to you so

9   that when it comes in -- and sometimes it doesn't always

02:26:22 10   come in, in order -- you might reflect on what is said and

11   understand how a piece of the puzzle may fit later on.  In

12   fact, if you look over there behind the witness box, there's

13   38 volumes of exhibits.  I'm happy to tell you that you're

14   not going to have to read them.  But there's 38 volumes of

02:26:44 15   exhibits.  And the reason for that is, this story covers 22

16   years of nonstop litigation turmoil and domestic lawsuits in

17   divorce and dependency court.  And what I'm going to do in

18   this time allotted to me, with your patience, is I'm going

19   to try to walk you through this.  And I apologize if it gets

02:27:16 20   a little bit too much in the weeds, but I think you will see

21   as the case unfolds that this may be of an assist to you:  A

22   timeline.  We're going to work you through the courts that

23   got involved and what happened in the proceedings.

24          Now, the overview of this is, this is a sad story

02:27:37 25   of what happens when kids are injected into grown-up adult

02:27:44  1  litigation when they shouldn't be.  The broad timeline is

2  Cary and Deanna Fogarty-Hardwick marry in 1989.  They have

3  Kendall in 1990.  They have Preslie in 1993.  And by 1995,

4  the marriage has grown toxic.  And, yes, there's discussion

02:28:10  5  of drugs and alcohol and issues, frankly, on both sides, but

6  divorce papers are filed.  The separation occurs and that

7  couple will never live again together.  That's 1995.

8      '95 and '96, they are co-parenting more or less

9  successfully.  I would say more on the less side -- pardon

02:28:38 10  me.  And Mr. Hardwick will testify that he began to get

11  threats from Mrs. Hardwick that she was going to accuse him

12  of molesting his kids.  And he was very worried about it.

13  She made good on that in 1996.  And there are two

14  investigations of child abuse in 1996:  First, by the

02:29:13 15  welfare folks.  And what is alleged is that -- and this is

16  coming from Ms. Fogarty-Hardwick -- that the oldest daughter

17  is making reference to a -- to something called "kiss the

18  banana" and you're going to hear that phrase throughout.

19      And, by the way, it gives me no pleasure to go

02:29:37 20  through this family's strife; but, unfortunately, this

21  lawsuit is tied in with it and there's no other way to do it

22  and do justice to my clients.  So there is an allegation

23  of -- that she heard this phrase and there's sexual acting

24  out certainly by Kendall, according to her mother, and she's

02:30:03 25  worried because this seems to happen when she comes back

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:30:05  1   from a visitation with her father.  Now, you may say that's

2   not a direct allegation of sexual abuse.  It is where I come

3   from.  And it was investigated as such.

4        And the social welfare department came and made

02:30:22  5   impromptu home visits, interviewed the kids at length and

6   documented that neither child confirmed any abuse by anyone.

7   And it was deemed unsubstantiated.  The -- the allegation of

8   abuse that ended up in the family law court became the

9   subject of litigation in that court.  And what the courts

02:30:54  10  can do is -- and I mentioned this in my mini-opening -- they

11  order what we refer to as a 730 investigation or evaluation.

12  730 evaluation is for the Court.  The court appoints an

13  expert, usually a psychologist, a clinical psychologist, a

14  neuropsychologist, whatever the Court feels it needs.  And

02:31:21  15  in case, Dr. Thomas Howell was engaged by the Court and the

16  Court, specifically, said look into the allegations that the

17  father is acting out sexually with his oldest daughter, who

18  is now all of six years old and then give me advice on other

19  aspects of parenting in this troubled family.

02:31:51  20       Dr. Howell is very well-known in the field.  He's

21  very accomplished.  And I took his deposition.  And he

22  testified.  And we have him under subpoena to testify in

23  this trial.  And he said, *In my experience* -- which he will

24  tell you is broad.  And he said, *In my experience, whenever*

02:32:21  25  *I do one of these, there's always some indication that could*

02:32:27  1   *be equivalent.  In other words, 90 percent of it says no*

2   *molestation happened here, but there's this 10 percent over*

3   *here that you can look at either way, and I have to make a*

4   *judgment call.  He said, In this case -- and it may be the*

02:32:43  5   *only case I've ever had -- there was nothing that even*

6   *remotely suggested that Cary Hardwick had a sexual interest*

7   *in young girls, much less his daughter.*

8           And so, what did Dr. Howell recommend to the

9   Court?  Dr. Howell said, First of all, there's no abuse.

02:33:05 10   That's ruled out.  Secondly, Mr. Hardwick should have more

11   than standard visitation.  More than standard custody

12   rights.  Because when I say "standard" and when it was said

13   back in those days -- 1996 is where we are now, you

14   remember -- there were formulas and men usually got maybe

02:33:28 15   40 percent of the time with kids and the mother usually got

16   60 and that would be standard.  And I may have that number

17   wrong, but it's something like that.

18           But, anyway, the doctor is saying more.  Well, you

19   could imagine that most people would be very relieved to

02:33:44 20   hear that dad isn't molesting a daughter.  Not here.

21   Deanna Fogarty-Hardwick criticized the doctor.  Was upset.

22   Felt he was unprofessional.  And she went out and found

23   another doctor.

24           Now, we moved up to, like, 1997 and we're crossing

02:34:12 25   into 1998.  She found a Dr. Johnson.  Thomas Johnson.  And

02:34:18 1    she said to Cary, *I want another 730 evaluation.*  And I have

2    to tell you, this is very unusual.  730 evaluations are not

3    done in every case, number one.  They are done in rare cases

4    where they just can't get agreement.  And to do more than

02:34:39 5    one is very rare.  Mr. Hardwick said, *Sure.  If you want*

6    *another one, I'll agree to it.*

7         Remember, this is all going on in divorce -- what

8    I call divorce court.  Family law court.  So they're filing

9    declarations back and forth and stipulations and that kind

02:34:55 10   of thing.  But anyway, the upshot of it is, Mr. Hardwick

11   said, *Sure.  If you want another 730 evaluation, I'm*

12   *agreeable.  The only stipulation would have to be that you*

13   *pay for it, because I paid for the last one, and I'm not*

14   *requesting another one.*

02:35:12 15        So off they go to Dr. Johnson.  Dr. Johnson is

16   described as the premier 730 evaluator.  Now, this is

17   actually a 733 evaluation.  That number surely doesn't mean

18   anything to you and shouldn't.  But what it means is it's a

19   second opinion so the Court knows that this is going to be a

02:35:33 20   second opinion, and it's called a 733 evaluation.

21        So Dr. Johnson does his evaluation.  Now, to give

22   you an idea of what these evaluations entail, it's not just

23   sitting down and reviewing a file.  Dr. Johnson may have had

24   30 hours of interviews.  May have spoken to -- I think he

02:35:55 25   did speak to well over a dozen references that the mother

163

02:36:01  1   gave and the father gave.  Made home visits.  Does

2   psychological testing and very extensive psychological

3   testing and reduces all that to a report.  And in his case I

4   think his report again to the Court -- to the presiding

02:36:20  5   judge of the Court.  Not to the parties.

6           Then it's up to the Court to decide if I'm going

7   to distribute it to the parties.  But he did his report to

8   the Court.  What did he say?

9           Well, first of all, it's important to note now

02:36:35  10   we're in 1997 and 1998 that one of the things that he was

11   specifically told by the Court to investigate was -- you

12   guessed it -- a recurring allegation of sexual abuse against

13   the father; specifically, that he's abusing his oldest

14   daughter.  That's number three by my count.

02:37:02  15           Dr. Thomas Johnson does all that work, all those

16   hours, all those tests, makes all those interviews.  And

17   what does he conclude?

18           There's no abuse.  Dr. Howell is correct.  And I

19   agree with what Dr. Howell recommended about extra

02:37:23  20   visitation, and I think there should be more on top of that

21   for the father.  And he specified what he wanted to happen.

22   What was the reaction to that?

23           Well, most people would be greatly relieved that

24   their daughter was not getting molested by their father.

02:37:54  25   She refused.  Deanna Fogarty-Hardwick refused to make the

*DEBORAH D. PARKER, U.S. COURT REPORTER*

164

02:38:00    1    payment to Dr. Johnson.  She was upset.

            2          Now, we are coming to the effect -- Dr. Johnson's

            3    report comes out in December of 1998, if memory serves.  So

            4    we're crossing into 1999.  Now the pressure in the divorce

02:38:28    5    starts to build, if you can imagine that.  It gets worse.

            6    One of the reasons for that is that Mr. Hardwick is getting

            7    remarried.  A divorce as to the status of being married had

            8    already occurred.  All that remained for litigation was

            9    custody and the money issues and that kind of thing.  But

02:38:47   10    they were no longer -- Deanna Hardwick and Cary Hardwick

           11    were no longer husband and wife.  And he is now in the early

           12    part of 1999 about to get married, and it will be up to you

           13    to decide if these things are related, but most of the

           14    experts feel that they were.

02:39:11   15          There were a series of events now in June and July

           16    of 1999 that frankly were ugly events, public events that

           17    involved Deanna Fogarty-Hardwick making a lot of

           18    inappropriate accusations, inappropriate and profane

           19    name-calling of extended family, grandparents at a public

02:39:45   20    soccer game, things of that nature.  And there will be some

           21    testimony about that.  And for purposes of the opening, you

           22    need to know that these incidents occurred, that they were

           23    documented for the Court in the way of declarations and the

           24    Court had all of those materials and considered all of those

02:40:04   25    materials.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:40:06   1       As those events occurred, Mr. Hardwick decided, I

2    can no longer sit by and do this.  And, in fact, I think he

3    will testify that he was -- he was -- well, he was told,

4    *You've got to do something on this custody arrangement.*  And

02:40:25   5    he did.

6          Well, for the first time, in the fall of 1999, he

7    filed an order to show cause, which is what you file in

8    family law court basically asking the Court to do two

9    things:  One, review custody, because I want it.  Because

02:40:46  10    the "acting out" is getting uncontrollable, and I believe my

11    kids are suffering, because of these events.  And number

12    two:  *Please, Judge, send us back to Dr. Johnson so that we*

13    *can -- that my ex-wife can get counseling going so that we*

14    *can get back on some sane track of co-parenting.*

02:41:09  15          That declaration was set for hearing originally

16    October 25.  That was moved by the Court to November 10.

17    That's an important day.  So on November 10, the Court is

18    going to hear Mr. Hardwick's request for the first time to

19    be considered for custody -- legal custody of these kids and

02:41:38  20    going to hear the request to send them back,

21    Mr. and Mrs. Hardwick, to the 733 evaluator, Dr. Johnson.

22    That's pending.  The pressure is really vague [sic] on

23    Mrs. Hardwick now.  We know that because the notes of

24    Dr. Mitchell reflect that she told Dr. Mitchell, *I am very*

02:42:07  25    *worried.  Cary is going for custody.  Things are really*

02:42:16  1  *tough in the divorce, and I'm highly distressed about it.*

2          That's going to happen on November 10.  They go to

3  court on November 10.  And the Judge says, *Okay.  I'm*

4  *appointing a doctor to do the 733 or the 730 evaluation, but*

02:42:29  5  *it's not going to be Johnson.  It's not going to be Howell.*

6  *It's going to be Dr. Rogers*, who if there's anyone that has

7  a higher reputation than Dr. Johnson, it's probably

8  Dr. Rogers.  And that order is issued.

9          So now Deanna Fogarty-Hardwick knows she's going

02:42:50  10  back in front of yet another qualified professional, on

11  behalf of another judge and their custody matter; that is,

12  Mr. Hardwick's request for custody was set for trial on

13  November 12.  The pressure has absolutely gotten out of

14  control on Ms. Fogarty-Hardwick.

02:43:15  15          As late as August, maybe even September and

16  October, the notes of Dr. Mitchell reflect that although

17  Mrs. Fogarty-Hardwick keeps talking about sexual abuse and

18  molestation and her fears about that -- and she thinks that

19  it's going on -- that's reflected in the notes.

02:43:38  20  Dr. Mitchell will be here.

21          Kendall and Preslie repeatedly deny any abuse.

22  Nothing whatsoever.  That's in the notes.  So there we are

23  in early November of 1999.  The kids have denied any abuse

24  whatsoever.  Got all these big issues hanging in the divorce

02:44:06  25  court.  And what happens?

On November 10, there's the court hearing. Everybody goes to that court hearing and the judge signs his orders.  Then, Cary and Kendall go to Dr. Mitchell's for a joint session with the therapist.  And in that session, Dr. Mitchell -- and she'll testify to it.  Dr. Mitchell says it was a remarkable session.  Kendall got Cary to agree in the most appropriate fashion that he would take steps to make sure that soccer thing never happened again, if there's not a blowup, and he would tell his family to stay away from soccer games, that's fine.  And Kendall was proud of herself for making that request and the doctor described it this way:  They left the session hand in hand and it was a very positive session.

In the words of Cary Hardwick, *What pressure must have been put on that child*.  From approximately 6:00 p.m. on November 10, until the next morning, what we know is that mom, as was her custom -- there's nothing nefarious about this -- Deanna Fogarty-Hardwick -- strike that.

Kendall was dropped off by dad at Deanna's home approximately 6:00 or 6:30 in the evening, on November 10.

On November 11th, Kendall wakes up and discloses, according to her mother, a lifelong pattern of sexual molestation at the hands of her father.  She says she's been molested since she was age one and that the molestation happened at every house they ever lived in and that it

02:46:17  1   happened every time -- every time Cary had visitation, and

2   he used to beat her with a belt.  No one ever saw any marks.

3         Now, what is the mother's reaction to this

4   startling news?  There's two things in her life:  Number

02:46:41  5   one, she takes Kendall out and she says, *Tell this to the*

6   *nanny, because I want a witness.*

7         First thought.  Litigation.  And then -- and then

8   she says, *Get in the car.  We're going to see Dr. Mitchell.*

9   *It's an emergency.*

02:47:08  10        Now, this is Veterans Day, November 11th, 1999.

11   It just so happens that Dr. Mitchell is in her office, but

12   they go in on an emergency basis.  What's the emergency?

13        Cary has no custody of the girl.  The emergency

14   isn't that.  The emergency is the court.  You remember,

02:47:36  15   we're going to start trial on November 12.  Well, Kendall

16   discloses -- tells Dr. Mitchell what she told mom.  And

17   Dr. Mitchell is what's known as a mandated reporter.  Some

18   of you may be mandated reporters.  And if you are, you know

19   what I'm talking about.  And a mandated reporter must report

02:48:02  20   any reasonably suspicious allegation of child abuse, whether

21   they believe it or not.  And Dr. Mitchell will tell you, *Ah,*

22   *I didn't know*, *but I must say the timing was extremely*

23   *suspicious.*  That's Dr. Mitchell.  So Dr. Mitchell does what

24   she's supposed to do.  She makes a report to the Child Abuse

02:48:28  25   Register, C-A-R, saying, *I reasonably suspect, because this*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:48:34   1   *was disclosed to me.  Oh, by the way, the timing is*

2   *suspicious.*  That's all documented.  What's the reaction?

3   Dr. Mitchell testified that in her experience,

4   which again is vast -- you're going to hear from the premier

02:48:53   5   psychologists in this field:  Four of them.  She testified

6   and will testify that the typical reaction of a parent when

7   I tell them that I have to file a child abuse report, the

8   typical reaction of the mother is either trying to convince

9   me not to do it, that it can be fixed, or great relief

02:49:21   10   because now they can get some help.  But it's very teary,

11   and it's not a pleasant thing.

12   Dr. Mitchell documented -- Mrs. Fogarty-Hardwick

13   seemed excited and happy.  Now, why would that be?

14   That would be because the filing of this child

02:49:54   15   abuse report immediately gets those people from the Orange

16   County Department of Public -- Social Service department.

17   They have to react as an emergency.  And within 24 hours,

18   they are on it.  They have paperwork filed in the juvenile

19   court and a petition is filed to remove the children from

02:50:25   20   both parents until we find out what's going on because of

21   this report.  And what else does it do?

22   It stops in its tracks the divorce litigation.  So

23   that order that the judge set, that trial that the judge

24   set, the appointment of Dr. Rogers to do the 730 evaluation,

02:50:49   25   it's all off.  So mom is back to square one.  Well, wait a

02:50:55  1  minute.  I just said that the petition asked to remove both

2  kids.  It does.  And then immediately those folks decided

3  no, mom is not a threat.  So we're going to take the kids

4  from the parents and then we're going to award the two

02:51:18  5  children to the mother.  Dad's out.  Can't ever see his

6  kids.  The only time he could see his kids is with a

7  monitor.  The only way he can phone his kids is with a

8  monitor on the line.  He's got no notice, no hearing,

9  nothing.  Why?

02:51:36  10  Because of that report.  Now, I apologize.  I know

11  this is in the weeds.  I know this is a long trip, but this

12  is a trip we have to take.  We're going to do justice in

13  this case.  The juvenile court has one mission:  What is

14  best for the kids.  The juvenile court really doesn't see

02:52:13  15  all that's gone on in the family law court.  She's a bit of

16  it:  Whatever is reported by the social workers that comes

17  before the juvenile court.  The juvenile court issues some

18  orders, and you're going to hear these from the witness

19  stand.  The juvenile court tells the parents on the very

02:52:33  20  first hearing -- and I think that's November 17th -- very

21  first hearing:  *Parents, do not discuss this case with your*

22  *kids.  Do not discuss each other with your children.*

23  And the reason for that is self-evident.  It's

24  obvious that two adults in pitch war are hardly the

02:53:05  25  appropriate messengers of things involving the other parent

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:53:10   1   through those kids.  It's just not good.  The judge also

2   ordered Mr. Hardwick, the natural father of these

3   children -- and, by the way, he'll tell you how long he has

4   been clean and sober and without drugs and all of that

02:53:31   5   stuff.  I believe it was in 1996.  But he'll tell you.

6          So Mr. Hardwick is only allowed to have monitored

7   visitation.  And what does that mean?  "Monitored

8   visitation" means just what it sounds like.  That he can't

9   see any one of his kids without someone -- a professional,

02:53:52   10  such as Elaine Wilkins or someone like her, literally

11  sitting in on the visit to make sure he says nothing

12  inappropriate; that he does nothing inappropriate.  And then

13  she documents what her observations were, whether the child

14  was affectionate, whether the child wasn't affectionate,

02:54:13   15  whether it appears the child is afraid of that man, all of

16  that kind of thing.  Those reports are then -- they are put

17  in the reports and they go over to the court.

18         So we have a disclosure of sexual molestation that

19  is sitting in front of that judge, and it has some internal

02:54:38   20  issues that make it a little questionable.  For example,

21  Kendall, when she talked to Dr. Mitchell, she said, *I've*

22  *been molested all the way until I was one year old.*

23         The social worker asked Kendall, *How do you*

24  *remember when you were one year old?*

02:55:01   25         Kendall says, *My mom remembers.*

02:55:06  1          That's documented.  And that goes over to the

2     court.  Of course that's significant.  Does it mean that

3     she's coaching?  Not necessarily.  But it's an issue.  And

4     the social worker said that.  The social worker is also

02:55:27  5     noted and pointed out to the Court that the timing of this

6     disclosure of child molestation is very suspicious for all

7     of the reasons that I discussed with you.

8          Now, on the next three hearings through

9     February 8th, 2000 -- maybe it's four or five hearings

02:55:52  10    actually -- a pattern develops.  Visits are becoming a

11    problem.  Phone calls are becoming a problem.  And when the

12    judge hears about it, he says -- and it's on the record --

13    *I'm not putting up with this.  You're not going* -- he's

14    telling this to Mrs. Fogarty-Hardwick:  *You are not going to*

02:56:15  15    *run this.  If I say the father gets visits, he gets visits.*

16    *And if I say he gets phone calls, he gets phone calls.  No*

17    *excuses.  No cancellations and rescheduling.  That's the*

18    *order of the day.  That's the order of the Court.  And if*

19    *you* -- and he said directly to her: *Ma'am, are you*

02:56:39  20    *listening to me?  If you don't do this, if you don't do*

21    *this, your children will be removed to Orangewood.  I don't*

22    *want to do that, but I will because it's imperative that*

23    *these children see their father.*

24         That was on February 8.  The next scheduled

02:57:11  25    visit -- oh, by the way, all that I just told you, that's

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:57:16   1   February 8th.  Marcie Vreeken isn't even on the case.  She

2   doesn't know any of these issues.  She doesn't have any idea

3   about anything that I've told you now from way too long, and

4   I know that and I appreciate some of you are still awake.

02:57:34   5   But she's not aware of this.  Mom is aware of this.  Mom

6   knows the Judge.  He's at the end the line.  That's

7   February 8th.

8        The next schedule visitation is February 13th.

9   Doesn't happen.  Mom shows up and Kendall reportedly says, *I*

02:58:09   10   *don't want to visit with my dad.*

11        Mom drives off.  So dad and the monitor are there.

12   By the way, dad doesn't know about some of this either, but

13   he knows that he's not getting to see his daughter.  And he

14   knows he's heartbroken because of it.

02:58:30   15       So on February 17, yes, it's true, that Marcie

16   Vreeken and Elaine Wilkins informed the Court of what they

17   heard on the 15th.  By the way, the 15th was a rescheduled

18   visit, the one that was canceled on the 14th.  The

19   15th happened in the offices.  The 14th was off campus --

02:58:59   20   the 13th (sic), and that's important to the father.  But,

21   nonetheless, that visitation occurs.  And then we have

22   this -- according to Mrs. Ms. Fogarty-Hardwick -- that

23   Marcie Vreeken had no idea what any of the controversy was,

24   because she doesn't know about the Judge's orders.  She

02:59:22   25   doesn't know about the Judge saying, *If you miss a visit,*

174

*the kids are going to Orangewood.*

What she does know is that she went in to introduce herself to the kids, because on February 10, she is assigned this case to take it to conclusion.  That's her first involvement in the case.  February 10, she doesn't know anybody.  So she's told that, *Hey, the Hardwick kids will be in here for a visit from their dad, if you want to go introduce yourself.*  And she said, *Sure, I do.*  And she did.

And she went into the visitation room when it was almost over and the girls were in there and she said, *Hi. I'm Marcie Vreeken.*  And I believe she sat down on one of those little -- very little kids' chairs, and she was chatting with Kendall.  Preslie ran out of the room.  She's chatting with Kendall, and -- because she was given specific directions to check on visitation and phone calls.  That was the Court's order.  I want social services to advise me, and she did.  She said to Kendall, *How is the visitation going?*

And Kendall said, according to Marcie Vreeken -- now maybe she's lying.  I don't know why.  I don't know any of the back story here.  Kendall said, *We didn't have a visit.  I hate my dad.*

Well, that's unusual.  That's very unusual.  *Why do you hate your dad?*

*Because he didn't take me to a birthday party.*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:01:00  1    *Sometimes I like my dad.  Everybody likes my dad.*

2              She's a troubled child.  And Marcie just makes

3    note of that.  And she goes and the next thing she's hearing

4    is Mrs. Fogarty-Hardwick reacting volcanically, very upset.

03:01:20  5    Well, why would she be upset?

6              It would make all the sense in the world, if

7    you're Mrs. Fogarty-Hardwick, because Preslie ran over and

8    said, *The lady is talking to Kendall about our visit.*

9    Bingo.  Mrs. Fogarty-Hardwick knows, *Oh, my goodness.  I'm*

03:01:41  10   *in trouble.  She's going to tell them we didn't have that*

11   *visit.  I'm going to lose my kids.*

12             And, yes, she did say, *You're going to take my*

13   *kids away from me, aren't you?*  And ran out of the room.

14   That's an inappropriate comment, but that's what happened.

03:01:57  15            But the story isn't over, and I'm sure you're

16   sorry about that.  The kids ultimately went to a foster

17   home.  They were removed.  They went to Orangewood.

18   Preslie, at least, what she told me under oath is, she

19   doesn't remember anything about Orangewood except, possibly,

03:02:16  20   getting a shot.  And I think she remembered a typewriter or

21   something.  She didn't remember anything else.  She

22   remembered she and her sister stayed in the same cottage,

23   and she might have remembered something about church.  I'm

24   not sure.  But other than that, she didn't remember

03:02:33  25   anything.

03:02:33   1          And then they went from there to the Gibsons'

2    foster home.  And by every measure, by everyone including

3    Preslie and including Kendall, the Gibsons were wonderful

4    people.  Two sisters.  And they were just wonderful.  And

03:02:53   5    their reports to the Court say, These kids are flourishing

6    in that foster care.  And these kids will tell you, they

7    loved the Gibsons.  Two ladies.  And they -- they're in the

8    Gibsons'.  And there's a motion that is made because the

9    dependency court is saying, *Okay.  We're going to have a*

03:03:30  10    *trial on this child abuse.  We're going to find out what's*

11    *going on here, and I want to get it started.*  So they're in

12    trial for, oh, about a month from March until maybe April.

13    And it's off and on.  It's not every day.  And the parties

14    are Mrs. Hardwick, Mr. Hardwick.  The kids, they have their

03:03:53  15    own attorney appointed by the Court, and that's their own

16    attorney.  That's not an attorney that has to march to the

17    drummer of -- what? -- Orange County, or anything else.

18    That's an attorney appointed by the Court to express to the

19    Court what the kids want and what's in their best interest.

03:04:10  20    And the kids had their own attorney.

21          And the parties went to the Judge and said, *You*

22    *know, Judge, we'd like to explore a 301 agreement.*

23          Now, what is a 301 agreement?  A 301 agreement

24    basically, if it's approved by the Court, it basically says,

03:04:30  25    *Okay, we're going to let you have a voluntary case plan that*

03:04:35  1    *does the things that are specified in the agreement*

2    *regarding custody or whatever other issues there are*, *and*

3    *then, I won't continue with this trial in juvenile court.*

4           And so, for the parents, it's a good thing because

03:04:51  5    they don't run the risk of having their kids adjudicated

6    dependent children and literally taken.  And so, the Judge

7    says, *You know, I'm skeptical of this.*  He knew the history

8    of this and he knew how it just was going and going and

9    going and just wouldn't stop.  But he said, *I'll tell you*

03:05:12  10   *what.  I'm going to appoint Dr. Rogers.*

11          Remember, she's the one back on November 10 that

12   was appointed and never got to do the evaluation.  Now, the

13   juvenile court said, *I'm going to appoint her to have her do*

14   *the evaluation she never did, and see what she says.*  And

03:05:34  15   I'm going to ask her a couple of questions:

16          One, is this a case that is appropriate for,

17   basically, informal supervision by social welfare, given its

18   history?  Two, is this child being abused, because these

19   issues -- this allegation keeps surfacing, and I want an

03:05:57  20   answer.

21          Dr. Rogers did a report, and I'm -- she did a huge

22   amount of work in a very short time in one month and she

23   issued a 70-page report detailing all sorts of things.

24   She's going to come in here and testify.  I have her under

03:06:17  25   subpoena.  And she will testify that, again, for the fourth

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:06:23  1    time, there is no abuse of Kendall Hardwick.  But Dr. Rogers

2    also said, *This is not a good case for one of these 301*

3    *agreements, and I'll tell you why, because the mother is so*

4    *hypervigilant and Kendall is so vulnerable to this.*  Why is

03:06:49  5    Kendall so vulnerable to the hypervigilant mood swings of

6    her mother in this divorce mess?

7         Well, Kendall has that -- a light case -- I call

8    it a light case of autism.  I didn't notice it when I first

9    met her, but she does have it.  And one of the things

03:07:12  10   Dr. Rogers will tell you is that that causes -- can cause

11   meta-cognition issues.  What are meta-cognition issues?

12        One is called theory of the mind, and I forget the

13   other one.  But the bottom line is a child like Kendall with

14   that condition can very easily be confused about the sources

03:07:37  15   of memory, and she will think that things she's been told

16   are actually things that happened to her.

17        Okay.  Now, young kids have that, but they grow

18   out of it by age five or six.  Kendall takes much longer.

19   So she's very vulnerable.  Now, it's not to everybody.  I

03:07:57  20   couldn't walk up to her and say, *Do you remember when you*

21   *had this?*

22        But she is unduly vulnerable to suggestions by

23   someone who's closely attached to, and there is no question

24   that Kendall and her mother were closely attached.  So she

03:08:17  25   is vulnerable to manipulation.  And Dr. Rogers says that's

03:08:26  1   just what happened.  This child was given suggestions,

2   questions:  *Were you ever touched?  And did this ever*

3   *happen?  And did that ever happen?*  And before you know it,

4   this is the words of Dr. Rogers.  She said on November --

03:08:45  5   that period, November 10, November 11th, when mom and

6   Kendall were sleeping together and they are having a girls'

7   sleepover, during that night and morning, Dr. Rogers said --

8   she described it as "Kendall threw in the towel."  She knew

9   she could help mom.  She could make mom feel better.  And

03:09:12 10   out comes all this horrific -- and I'll say it again

11   "horrific" and false allegations of abuse.

12        Counsel says, *Well, we don't know and we'll never*

13   *know if there was abuse.*

14        Well, the 301 agreement, we're going to get to

03:09:41 15   that.  The 301 agreement actually did occur.  Now, the

16   interesting thing about that was, number one, the Judge

17   approved it.  And number two, Mrs. Hardwick signed it and

18   had it read to her at counsel (sic) -- I think at that time

19   she was represented by three different lawyers.

03:10:03 20   Mr. Hardwick read it, had his counsel explain it to me.

21   Marcie Vreeken, I don't think she was even there, but she

22   signed it, and it was delivered to her.  And the parties all

23   agreed to a whole number of things.  But the two that caught

24   my eye:  One, Kendall hasn't been molested.  That's a

03:10:25 25   blanket statement.  Kendall recanted.

03:10:29   1          And second thing is:  Mother makes inappropriate

2     statements.  Now, that's listed as something that's a key

3     problem and must be worked on.  So the plan has to involve

4     therapy for that.  And, obviously, the Court never would

03:10:52   5     have approved it, if there hadn't been some resolution to

6     this ongoing and ongoing allegation of sexual abuse by

7     Cary Hardwick.

8          So the question surfaces.  And Dr. Mitchell asked

9     the question of Mrs. Hardwick, *If you believe that your*

03:11:21  10     *child is being molested by Mr. Hardwick, if you really*

11     *believed that, why would you ever sign this agreement*,

12     because it gave custody of the children to Mr. Hardwick.

13     That was Dr. Rogers' recommendation.  Custody goes to dad.

14     Mom gets monitored visitation.  Why?  Because she made

03:11:43  15     inappropriate statements and poisoned the children.

16          Inadvertently.  She can't help herself.  Deanna

17     Fogarty-Hardwick says, *I understand your concern, Doctor.*

18     Why would any mother ever sign a child over to someone she

19     truly believes was molesting her child?

03:12:12  20          It wouldn't happen.  She said, *I relied on*

21     *Dr. Rogers.  She's very well thought of.*  And I said, *Okay.*

22     *If that's what she says, then I'm on board.*

23          What's the next thing that happened?

24          Well, by signing this agreement, that ends the

03:12:36  25     jurisdiction of the juvenile court.  So back they go to

03:12:40  1    family law court where we have that hanging order that says,

2    Appoint Dr. Rogers.  And they get back in the family law

3    court, and what is the first thing?  What is the first thing

4    that Deanna Fogarty-Hardwick does through her lawyers?

03:12:56  5          The first thing:  Throw out the 301 agreement.  *I*

6    *didn't -- I didn't have a fair chance to consider it.  Throw*

7    *it out.  Give me the kids back.*

8          And what else did she do?

9          She said in a sworn declaration that Dr. Rogers,

03:13:20 10    the same one that she said, *I'm going to rely on him or her.*

11    *If she says my child is not being molested, then I'm on*

12    *board with that, because she's so good.*

13          In her declaration in family law court to throw

14    out the 301 agreement, she says, *Dr. Rogers, her report is*

03:13:41 15    *wildly inaccurate.  And she did a terrible job.*

16          I wanted to ask the question, but of course this

17    question didn't quite get asked:  *Well, wait a minute.  You*

18    *can't have it both ways, but that's* -- we'll talk about that

19    later.

03:13:59 20          So what's the next thing that happens?  The

21    Judge -- and I'm going to skip a few things here.  Sorry

22    about that.  The judge has hearings and get papers and all

23    that.  And he says, *I'm not going to throw out this 301*

24    *agreement.  You all signed it.  You all had your lawyers*

03:14:25 25    *read it to you.  You all entered it voluntarily.  You all*

03:14:28    1    *are grown up.  And it was good enough for that Judge; it's*

2    *good enough for this Judge.  And I'm not doing it.*

3              What was Deanna Fogarty-Hardwick's reaction to

4    that?  She moved to disqualify the judge.  Get him off the

03:14:47    5    case.  She went to the Board of Judicial Inquiry, or

6    whatever they call it.  Filed a complaint against him.  And

7    said, *He's biased.*

8              It didn't succeed.  And as the case is winding

9    down -- not really winding down, but I'm going to wind it

03:15:17   10    down for you.  And the judge in family law court said, *I*

11    *want briefs from the parties on the custody issue, who*

12    *should have custody.*

13             You recall Mrs. Fogarty-Hardwick voluntarily gave

14    up custodial rights to the children.  The children through

03:15:44   15    their lawyers argued that they should stay with dad.  The

16    reports from those who are treating with the therapist that

17    the kids are flourishing with dad, academically, socially,

18    in church, every way possible, so it's a good situation.  So

19    anyway, the --

03:16:11   20             Now we're getting up into 2001, and the judge

21    asked for briefs from the parties.  The children, Preslie

22    and Kendall, through their counsel, they file a brief.  And

23    what they say is, among other things, there has been no

24    sexual abuse.  We're flourishing with dad.  The only

03:16:47   25    unhappiness we have is we're not getting visits from mom.

03:16:51  1           After the judge denied mom's attempt to upset that

2    301 agreement, Deanna Fogarty-Hardwick just simply stopped

3    visiting the kids for a period of almost a year.  The judge

4    got on her case about it and said, *How can you not visit*

03:17:22  5   *your children?  Why are you not visiting your children?*

6           Cary Hardwick filed a brief.  He said, *She's not*

7    *visiting her children to punish them for recanting the*

8    *sexual abuse claims and for stating that their -- that dad*

9    *is actually okay.*  I don't know that that's true.  That's an

03:17:40 10   understandable position for a father to think that there is,

11   but that's neither here nor there.

12           What is important is that Preslie, along with her

13   sister said, *Please, keep the status quo.  Keep us with dad.*

14           Dr. Rogers was asked to give the Court another

03:18:05 15   report, and she did.  Nothing had changed.  Literally,

16   nothing had changed.  She said, *I made overtures to*

17   *Mrs. Fogarty-Hardwick to see if we can sit down one-on-one*

18   *and work through some of these things and to see what her*

19   *reaction was.  She never contacted me.  Never happened.  So*

03:18:31 20   *Judge, until I'm satisfied that she can be appropriate*

21   *around these children, I cannot ever recommend lifting the*

22   *monitor requirement for her visitation*, and she didn't.

23           We're almost done.  The Judge issued an opinion --

24   a written opinion.  And in the opinion, he made a number of

03:19:04 25   observations.  One of them was --

184

03:19:08  1              MR. POWELL:  Objection, Your Honor.

          2              THE COURT:  Sustained.

          3              MR. WATKINS:  The record in that proceeding shows

          4    that there was evidence admitted of a story that was written

03:19:25  5    by Kendall.  It's a handwritten story.  And it's called "The

          6    Hardships."  She wrote it when she was 10, maybe 11.  And

          7    it's got misspellings and she used names.  She disguised --

          8    she and her sister called them "Jody" and "Ashley," and she

          9    said that *Jody and Ashley's mother fed Jody or Ashley*,

03:20:00 10    whichever one Kendall was, *with lies and then caused us to*

         11    *be taken away.*

         12              And you read it and you think, that's the wisdom

         13    of an 11-year-old.  The judge quoted that and said, *To me*

         14    *that's autobiographical.*

03:20:20 15              MR. POWELL:  Objection.

         16              THE COURT:  Sustained at this point.

         17              We'll move on.

         18              MR. WATKINS:  The case ended then.  There was a

         19    final order.  And, eventually, Mr. and Mrs. Hardwick were

03:20:47 20    able to co-parent, and I think the divorce case actually

         21    terminated in 2006.  The divorce case lasted twice as long

         22    as the marriage.  Preslie Hardwick, obviously, was caught up

         23    in this.  Her older sister was, frankly, the tip of the

         24    spear, so to speak.  And Preslie -- whatever happened to

03:21:18 25    Kendall happened to Preslie.  They always stayed together,

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:21:23  1    and that's the way it should be.

2              And Kendall was deposed several times.  And on the

3    last occasion, she confirmed that her mother fed her all

4    this information about the molestation.  It's a very

03:21:50  5    emotional videotape, or you may see it, or she may be here

6    alive.  She's from out of state.  And in that videotape,

7    she's very emotional, to say the least, and doesn't have a

8    whole lot of kind words to say about her mother, but she

9    does say something remarkable.  She thanks the social

03:22:12 10   workers for what they did and says they did the right thing

11   and that she'd much rather have had that happen again,

12   because they did the right thing by her.

13             Now, the one that I know that Kendall said on that

14   videotape –– she's in tears and she's loud, and she's

03:22:41 15   profane and she says, *This has to end.*  And you know what?

16   This does have to end.  My opening is going to end.  And

17   this case may bring to an end this nightmare for these kids.

18             Thank you, Your Honor.  Thank you, ladies and

19   gentlemen.

03:22:58 20             THE COURT:  All right.  We're going to take the

21   afternoon recess now.  Normally, we take it at 3:15.  I

22   didn't want to interrupt anyone during opening statement.

23   So we'll take 15 minutes.  Then we'll come back.  We're

24   going to conclude on time at 4:30, as we always will.

03:23:11 25             Keep in mind the Court's admonition that you're

```
03:23:13   1   not to discuss this case with each other, or anyone else, or

           2   allow anyone to discuss it with you.

           3              THE CLERK:  All rise.

           4        (Recess taken from 3:23 p.m. to 3:43 p.m.)

03:43:31   5        (The following proceedings were had in open court

           6         in the presence of the jury:)

           7              THE COURT:  And is the plaintiff prepared to call

           8   her first witness?

           9              MR. POWELL:  Yes, Your Honor.

03:43:44  10              Plaintiff would call Deanna Fogarty-Hardwick.

          11              THE CLERK:  Please raise your right hand.

          12          DEANNA FOGARTY, PLAINTIFF'S WITNESS, SWORN

          13              THE WITNESS:  I do.

          14              THE CLERK:  Step forward.

03:44:07  15        (Pause.)

          16              THE CLERK:  If you can, please, state your full

          17   name, spelling it for the record.

          18              THE WITNESS:  Deanna Fogarty, D-e-a-n-n-a

          19   F-o-g-a-r-t-y.

03:44:32  20              THE CLERK:  Thank you.

          21                      DIRECT EXAMINATION

          22   BY MR. POWELL:

          23   Q    I'll let you get some water, Ms. Fogarty.

          24   A    Thank you.

03:44:47  25   Q    All right.  Ms. Fogarty --
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:44:52  1    A    Yes.

2    Q    -- do you know the lady sitting here at counsel's table

3    with the blond hair?

4    A    I do.

03:44:58  5    Q    Who is that?

6    A    That's my daughter, Preslie.

7    Q    Do you have any other children?

8    A    I do.

9    Q    And who are they?

03:45:04  10   A    That's Kendall.

11   Q    And is Kendall and Preslie the product of a

12   relationship with Cary Hardwick?

13   A    They are.

14   Q    When were you married with Mr. Hardwick?

03:45:16  15   A    We were married in 1989.

16   Q    Okay.  I want to take you a little bit through your

17   background.

18        Where were you born?

19   A    I was born in Lynwood, California.

03:45:28  20   Q    And I'm not going to ask your age, but your date of

21   birth.  And I'm not going to ask your date of birth.  Your

22   year of birth?

23   A    Oh, okay.  My year of birth?  1956.

24   Q    I guess that did give away your age, though.

03:45:45  25   A    It did.

03:45:45  1    Q    Now, did you -- were you raised by an intact set of

2    parents?

3    A    Oh, absolutely, yes.

4    Q    Are they still married?

03:45:53  5    A    My father passed away -- will be just about two years

6    in June, but they were married for about 60 years.

7    Q    Did your -- what did you do for work, say, through your

8    teen years until early college?

9    A    Teen years, my mom had dress shops.  And when I was in

03:46:12  10   high school going forward, I worked in the dress shops with

11   her.

12   Q    Was there any other kind of business, family business

13   that you participated in?

14   A    Well, it's unusual; but for me, it's not.  My

03:46:22  15   grandfather and my father were in the meat business, so as a

16   young child, I worked -- when I was very small -- in a meat

17   business and continued to until I purchased my own business.

18   Q    And what was that business?

19   A    It was a meat route.

03:46:36  20   Q    Delivering of meat goods?

21   A    Delivered meat.  That's right.

22   Q    You were actually the driver?

23   A    I actually drove my own truck.  I did.

24   Q    Okay.  Were you happy when you got married?

03:46:51  25   A    Oh, I was ecstatic.  Absolutely.  I was in my 30s.  And

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:46:56  1   so I was very looking forward to being married and starting

2   a family.

3   Q     And what was Mr. Hardwick doing in terms of employment

4   at that time?

03:47:07  5   A     You know, I was quite proud of him.  He had just opened

6   a new restaurant, so it had been opened about six months.

7   Q     Was this a restaurant he owned on his own?

8   A     Well, it was with a couple of partners and also a

9   limited partnership structure.

03:47:24  10  Q     Okay.  How long from when you began dating until the

11  time you got married?

12  A     It was a whirlwind.  Six months.

13  Q     Did you discuss ahead of time, your intent -- meaning

14  both of you -- intent on having children?

03:47:42  15  A     Oh, we did have that conversation.  And we were looking

16  forward to having -- we were both looking forward to having

17  a family.  Sure.

18  Q     And so about how long after you got married did you

19  have --

03:47:53  20         Well, did you first get pregnant?

21  A     First got pregnant?

22  Q     Yeah.

23  A     Well, we had a pregnancy that subsequently miscarried.

24  That was our first pregnancy, but --

03:48:08  25  Q     All right.  So you had a child.  How far did the child

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:48:12  1    get to term?

2    A    Just about four months.

3    Q    And then, it's pretty clear.  Kendall was the next

4    child, correct?

03:48:19  5    A    That's correct.  Uh-huh.

6    Q    And when was she born?  What year, at least?

7    A    She was born in 1990.

8    Q    Okay.  That would have made you about 32 at the time?

9    A    That's correct.

03:48:31  10   Q    Were there any issues or problems with regards to

11   Kendall's birth or immediately after her birth?

12   A    Well, immediately after her birth, it came to our

13   attention that her tummy was a bit distended when she was

14   born.  And unbeknownst to me, a nurse that really paid close

03:48:53  15   attention, she was measuring her stomach and her stomach was

16   continuing to expand to the point where the nurse came to us

17   and said we need to do an X-ray.

18   Q    And what were the results of the X-ray?

19   A    It showed a large mass in her abdomen.

03:49:07  20   Q    Okay.  How was the large mass dealt with?

21   A    She was immediately transferred to another hospital.

22   Long Beach Memorial in Long Beach.

23   Q    Were there any concerns of losing Kendall at that time?

24   A    Oh, absolutely.  Since we had had a miscarriage

03:49:24  25   already, we were sensitive to that and we weren't sure if

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:49:27  1    this was going to be a malignant type of tumor, if she was

2    capable of surviving any surgeries.

3    Q    Would you agree that you might be more hypersensitive

4    to issues surrounding your children than a parent who hadn't

03:49:44  5    gone through a miscarriage and that medical condition that

6    Kendall suffered?

7              MR. WATKINS:  Objection, Your Honor.

8              Lacks foundation and relevance.

9              THE COURT:  Sustained.

03:49:54 10    BY MR. POWELL:

11    Q    All right.  Now, when Kendall was receiving the

12    surgery, were you able to be there yourself?

13    A    I wasn't.  Her birth was a C-section delivery.  She was

14    breached and, therefore, I was in the other medical center,

03:50:16 15    which was Los Alamitos Medical Center.  She was transferred

16    to Long Beach Memorial, as I said.  So we weren't together.

17    Q    So tell me in the -- let's say the first year after

18    Kendall is born, you got a newborn in the home.  Dad is

19    working at the restaurant.

03:50:34 20              What are you doing?

21    A    Taking care of our baby.  It was decided between the

22    two of us since he had the new business, he was the

23    appropriate one to continue to work and I would be a

24    stay-at-home mom.

03:50:47 25    Q    Did that go on for about a year or more?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

192

03:50:51   1   A     Well, I would say it continued and it was intended to

           2   continue until both our children were -- got out of

           3   elementary school.  That was the intention.  But I

           4   definitely, yeah, did continue for the next year and a half.

03:51:05   5   Q     Okay.  Between the birth of Kendall and later the birth

           6   of Preslie, did you seek out any outside assistance to help

           7   you with raising the kids?

           8   A     There was a point where a friend of mine had this

           9   wonderful nanny that she talked about and raved about and

03:51:23  10   she was a live-in, and she was going to have to let her go.

          11         My daughter, Kendall, had developed some peculiar

          12   behaviors and she was very sensitive to external factors --

          13   sound, light, wind -- and I found that her schedule required

          14   that she be on a regular schedule, and if it was disrupted,

03:51:46  15   she really -- it showed in her behavior greatly.  So I told

          16   this particular nanny that I would be happy to take her on

          17   for a day or two per week.

          18         MR. WATKINS:  Your Honor, move to strike as

          19   nonresponsive.

03:52:04  20         THE COURT:  Yes.  It was a simple "yes" or "no"

          21   answer, so you'll need to listen carefully to the questions.

          22         THE WITNESS:  Okay.

          23         THE COURT:  Did you seek out any outside

          24   assistance to help you with raising --

03:52:18  25         THE WITNESS:  I apologize.  I did.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:52:19  1 BY MR. POWELL:

2 Q Who was that?

3 A Rosie Reales.

4 Q How did you come to hire Ms. Rosie Reales?

03:52:29  5 A Through a friend of mine.  She had fired -- could

6 not -- no longer keep her on.

7 Q Now, you also started talking there about issues with

8 Kendall and sensitivities that she was starting to display.

9 A Correct.

03:52:42 10 Q I'm kind of yelling on behalf of Mr. Watkins, who

11 earlier said he had trouble hearing me.

12   What kinds of things caused you concern in her

13 behaviors?

14 A Well, she walked on her toes.  She hand-flapped.  She

03:52:56 15 responded to the wind.  When she would see the wind when she

16 was inside the house, she would close all the windows and

17 doors.  She would cover her ears.  If I took her out -- I

18 remember in particular, there was a Target that was nearby.

19 The lights, she seemed to respond to even the buzzing in the

03:53:12 20 lights.  And so, it was -- it was -- it was difficult at

21 best.  I wasn't sure what was going on and how to best, you

22 know --

23 Q So did you eventually find out what was going on?

24 A Well, ultimately, I did, yeah.

03:53:28 25 Q And how did you find that out?  Shortly tell us how

*DEBORAH D. PARKER, U.S. COURT REPORTER*

194

03:53:32  1  that process begin and ended to where you got to a

2  diagnosis, if you did.

3  A    Sure.  One of her teachers suggested that there -- she

4  may have a bit of autism and that was there was a specialist

03:53:43  5  that she thought she should see out of U.C.L.A.  So I did

6  take her to that specialist, and she was -- she went through

7  a rigorous process, and the -- that doctor had said she had

8  pervasive developmental disorder, which was on the autism

9  spectrum.

03:54:05  10       MR. WATKINS:  Your Honor, again, nonresponsive.

11  Way beyond the question.

12            THE COURT:  Overruled.

13  BY MR. POWELL:

14  Q    Do you know, as best as you can in time, when that

03:54:15  15  diagnosis was fully known?  '93?  '94?  '95?  Her birthday,

16  whatever?

17  A    Sure.  I can tell you, situationally, it was when she

18  started school.  She was in pre-- like pre-K.

19  Q    Okay.  So Preslie was born by then, correct?

03:54:34  20  A    She was.

21  Q    Okay.  And when was Preslie born?

22  A    Preslie was born in '93.

23  Q    And -- okay.  So these children were three years apart?

24  A    Yes.  Exactly three years apart.  And I'm sorry.  I may

03:54:50  25  need to correct that.  I'm just trying to rethink if Preslie

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:54:53  1    was born already when Kendall was diagnosed.  I can't be

       2    certain of that.

       3    Q    In that close range, though?

       4    A    Correct.

03:54:59  5    Q    And so, did that -- was this nanny, Rosie Reales, was

       6    she already working for you when you found out about this

       7    diagnosis?

       8    A    Again, I'm not sure of the timing on that.  But,

       9    certainly, Kendall was exhibiting these behaviors by the

03:55:15  10   time Ms. Reales came on.  In fact, that's why I was offering

      11    her a day, possibly two a week.

      12    Q    Did she eventually become full time?

      13    A    She did.

      14    Q    Did she bond with your children?

03:55:28  15   A    Oh, immensely.

      16    Q    How would you describe the bond that they shared by the

      17    time CPS became involved in 1999?

      18    A    I would say a strong bond.  Very strong bond.

      19    Q    Now, back to kind of what's going on in the family

03:55:43  20   work-wise.  What's dad doing now that you've determined that

      21    Kendall has got the autism; Preslie is out.  She's toddling.

      22         What's the work situation in the household?

      23    A    Well, if I have this correctly, I think, about when

      24    Preslie was born is -- my husband had suffered a succession

03:56:03  25   of losses -- his grandmother and his father -- so he was

*DEBORAH D. PARKER, U.S. COURT REPORTER*

196

03:56:07   1   appointed special administrator of his father's estate and

           2   we were running that and a second restaurant.

           3   Q    You mean --

           4        (Court Reporter requests clarification for the

03:56:14   5        record.)

           6            THE COURT:  If you can slow down a little bit and

           7   make sure that the question is fully asked before the answer

           8   begins, that would be helpful.

           9            So if you could re-ask that last question that you

03:56:31  10   asked.

          11            You started --

          12            MR. POWELL:  Can I ask for a read-back,

          13   Your Honor?

          14            Well, she answered "... running a second

03:56:34  15   restaurant," and you started a question, "You mean" --

          16   BY MR. POWELL:

          17   Q    You had at least three things going on:  Two

          18   restaurants and a business -- something to do with the

          19   estate of a relative, correct?

03:56:51  20   A    Yes.

          21   Q    Was there any other businesses that your husband was

          22   involved in?

          23   A    Outside of the two restaurants and the medical billing

          24   and collections business, no.

03:57:03  25   Q    Okay.  When you say medical collections and billings,

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:57:05  1    is that what you were talking about he was the special

2    administrator of?

3    A    Correct.  Uh-huh.

4    Q    And were you working at this time when all this was

03:57:13  5    going on for Mr. Hardwick?

6    A    I was pregnant.  I was intermittently working at the

7    first restaurant.  I was waiting tables and helping with the

8    opening of the second restaurant.  And, ultimately, it was a

9    lot going on for my husband.  I ended up taking over

03:57:34  10   managing the medical collections business.

11   Q    So did the medical collections business allow you to

12   work for home more frequently?

13   A    It did not.  Not at that time, no.  I went into the

14   office, and I brought Preslie with me.

03:57:50  15   Q    Okay.  Well, you talked about the structure, the need

16   for structure of Kendall earlier in your testimony.

17         What, if anything, did you do to address that when

18   you said it was pretty much diagnosed by pre-K?  What did

19   you do to address it, if anything?

03:58:03  20   A    In terms of her structure?

21   Q    In terms of whatever it is that the doctor was saying

22   she needed.

23   A    Well, I made sure that I educated myself.  I got

24   involved with a lot of Autism Society programs with other

03:58:18  25   parents.  I made sure that her environment and her schedule

03:58:25   1   was something she could rely on.  I got -- I advocated for

2   her to get the proper support in school in terms of her RSP

3   support, which would have been language support, to be

4   specific.

03:58:41   5   Q    "RSP support" has something to do with language skills?

6   A    In this particular case -- in her case, it was language

7   at that time.

8   Q    So she was having language issues as well?

9   A    Yes.

03:58:54  10   Q    So when the child was between the ages of four and six,

11   how many days a week would you spend working with her on

12   things designed to address her autism issues?

13   A    Well, throughout her life, I worked with her every day.

14   But when -- at this particular time in our lives when I was

03:59:14  15   helping with the businesses and had a second child, that's

16   when Rosie took on more time.  And so, I had less time with

17   her directly.

18   Q    Now, did you raise both of your children telling them

19   the importance of being honest, telling the truth?

03:59:37  20        MR. WATKINS:  Your Honor, I'm going to object.

21   It's argumentative, and it's leading.

22        THE COURT:  Overruled.

23        THE WITNESS:  Absolutely.

24   BY MR. POWELL:

03:59:50  25   Q    Did you explain to them -- let's start with Kendall.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:59:56  1          Was there an age where you started talking to

2    Kendall about the issues of inappropriate touching, things

3    like that?  You know, don't let people touch you here?

4    A    You know, I don't recall specifically, but I'm sure.

04:00:10  5    I'm sure I probably had brought that up at -- at some time.

6    Q    Okay.  And how about Preslie?

7    A    I'm sure the same.

8    Q    You said you got involved in the Autism Society.  What

9    is that?

04:00:23 10    A    Well, organizations where, you know, parents of

11    children with autism congregate and kind of share stories

12    and things that work for them and their family.

13    Q    So in '94, '95, with all of these things going on, did

14    you feel that there was any impact on the marriage occurring

04:00:49 15    or the family, if you want to think of it in the larger

16    sense?

17    A    There seemed to be a drastic impact on the family; in

18    particular, Kendall and my husband.

19    Q    Okay.  And what was -- what is it you were seeing about

04:01:01 20    your husband that makes you think there was an impact?

21    A    Well, I believed at the time that, you know, he just

22    must have been under a great deal of strain, because he was

23    working so much.  Also, I noticed behaviors manifesting

24    where he was coming home less and less.  Excuse me.  He

04:01:19 25    was -- he was becoming very, very short with me, which he

04:01:25  1  hadn't been in the past.  He really didn't seem to want to

2  participate in the family, where he had in the past.  So

3  kind of secretive, I noticed.

4  Q     Okay.  Did you end up filing for divorce from Cary

04:01:43  5  Hardwick?

6  A     I did.

7  Q     When?

8  A     I believe sometime in '95 or '96.

9  Q     Okay.  Was your filing for divorce related at all to

04:01:56  10  anything to do with alcohol or substance abuse?

11  A     It most definitely was.

12  Q     So when is the first time you were concerned?  Other

13  than the signs that you were talking about before, was there

14  something that told you that the problem is severe enough I

04:02:12  15  need to seek an divorce?  Some event?

16  A     Well, the event is would be that my husband finally

17  admitted that he had been having an affair but that he had

18  since ended it.  And he said that he had developed an

19  addiction to alcohol.

04:02:31  20  Q     Did he say anything at that time about drugs?

21  A     He did not.  Not at that time.

22  Q     Did you find out later that there was a problem with

23  drugs?

24  A     I did.  I found out that -- that his -- his addiction

04:02:42  25  included drugs.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:02:44   1   Q    And do you know which drugs?

           2   A    My knowledge -- he told me that it was cocaine and then

           3   it went into crystal meth.

           4   Q    Did you ever see him with the children at any time

04:02:59   5   where you suspected he was under the influence of either of

           6   those stimulants?

           7   A    Oh, there came a time where I did, yes.

           8   Q    But that wasn't initially like right when you were --

           9        *(Court Reporter requests clarification for the*

04:03:08  10        *record.)*

          11             THE COURT:  Repeat your question, please.

          12   BY MR. POWELL:

          13   Q    But did you see him at a time when you were filing --

          14   you know, starting your divorce proceedings where you

04:03:21  15   thought, yeah, he's under the influence of some stimulant,

          16   like cocaine or crystal meth?

          17   A    That subsequently was why I filed for divorce.

          18   Q    Did -- when you first found out that your husband had a

          19   drug and alcohol problem, when you first found that out, did

04:03:43  20   you learn anything about any other addictions at that time?

          21   A    Not at that time.

          22   Q    Okay.  After you filed for divorce, did you learn about

          23   any other addictions that he had?

          24   A    Well, again, I did find out about a third addiction.

04:03:59  25   And that's what led me to also ultimately file for divorce

04:04:04  1   on the heels of him relapsing; but, yes.

        2   Q    What was that addiction?

        3   A    It was sex addiction.

        4   Q    You said something about a relapse.  Let me take you

04:04:18  5   back.

        6        Is it true that Mr. Hardwick went into a rehab at

        7   some point when it first became knowledge to you at least

        8   that he was having an alcohol and substance abuse problem?

        9   A    That's correct, yes.  When we talked about it.

04:04:31 10   Q    I'm going to cut you off.  Did you support that?

       11   A    Absolutely.  We -- you know, listen.  My heart broke

       12   for me.  I'm a product of alcohol.  My father was an

       13   alcoholic, so we both agreed that rehab would be a way to

       14   go, and let's keep this marriage together.

04:04:50 15   Q    So was it a rehab where you go and you stay there?

       16   A    Yes.

       17   Q    And did you take the kids to visit him while you were

       18   in the rehab?

       19   A    Absolutely, yes.

04:04:59 20   Q    So when he finished the rehab, what's the next -- was

       21   there any other time after that where you found he was

       22   either in possession or under the influence of drugs?

       23   A    Yes.

       24   Q    When was that?  And I mean the next time.  The very

04:05:15 25   first time after the rehab.

04:05:17  1    A    Okay.  The first time after rehab, you're asking me the

2    time frame?

3    Q    Yeah.  I don't expect you to give me the date, ma'am.

4    A    That would be sometime in probably '95, '96.

04:05:36  5    Q    And do you know what that was?  How did you find him to

6    be under the influence or in possession of other drugs?

7    A    Well, there was some critical behaviors that were being

8    exhibited, and it had become quite chaotic in our lives.

9    And there was one time when he had -- he was becoming

04:05:59  10   psychotic.  And he had followed my breathing.  I was in bed

11   sleeping, and he had followed my breathing up the stairs

12   with a knife, and he kind of came to me over with a knife.

13   That was a wake-up call for me.

14          There were other behaviors where he was -- he had

04:06:19  15   put a hit out on the attorney for the estate of the -- of my

16   father-in-law's estate.  Gosh, I --

17   Q    So is it true that he went to a rehab and then he did

18   return to the home, or did he never again return to the

19   home?

04:06:36  20   A    Well, the intention was to return to the home, but he

21   left the rehab early.  And it was there that I found out

22   about the sex addiction.

23   Q    Okay.  How would visitation work after he'd come out of

24   the rehab and you two had definitely separated, and it was

04:06:56  25   over in terms of a marriage?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

204

| 04:06:58 | 1 | A    Well, visitation worked well until this secondary |
| | 2 | relapse happened. |
| | 3 | Q    Okay.  Which one is that?  The secondary? |
| | 4 | A    The one we just spoke of. |
| 04:07:08 | 5 | Q    Is that part of the 730 evaluation? |
| | 6 | A    It's a relapse that occurred after rehab.  And I think |
| | 7 | that is what compelled the 730 evaluation. |
| | 8 | MR. WATKINS:  Your Honor, I'm going to move to |
| | 9 | strike the last comment.  Lack of foundation. |
| 04:07:24 | 10 | Nonresponsive. |
| | 11 | THE COURT:  Sustained. |
| | 12 | MR. POWELL:  Is that just the part about she |
| | 13 | thinks that's what compelled it? |
| | 14 | THE COURT:  Yes. |
| 04:07:32 | 15 | MR. POWELL:  Okay. |
| | 16 | BY MR. POWELL: |
| | 17 | Q    Let's talk about that:  In the divorce proceedings, was |
| | 18 | there 730 evaluations conducted? |
| | 19 | A    There were. |
| 04:07:42 | 20 | Q    Do you know who did the first one? |
| | 21 | A    I believe it was Dr. Howell. |
| | 22 | Q    Was there any testing for drugs of your ex-husband at |
| | 23 | that time when you were going through that 730 evaluation? |
| | 24 | A    There was.  After a long confrontation, there was. |
| 04:07:55 | 25 | Q    And what does that mean, "long confrontation"? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:07:59  1   A      He denied that he was using.

        2   Q      At the time that the 730 evaluation, the first one with

        3   Dr. Howell was going on, was there supervised visitation or

        4   often referred to in here, monitored visitation going on for

04:08:12  5   dad as well?

        6   A      I don't believe at that time.

        7   Q      Okay.  You indicated he tested dirty during the first

        8   730 eval.

        9          Was there then monitored visitation?

04:08:22  10  A      I don't believe there was monitored visitation then.

        11  Q      Okay.  Do you remember any monitored visitation at all

        12  during the divorce proceedings before, let's say,

        13  November of 1999 when CPS became involved?

        14  A      No.

04:08:36  15  Q      So what kind of visitation was dad --

        16         (Court Reporter requests clarification for the

        17         record.)

        18             MR. POWELL:  Did I go too fast?

        19             THE COURT:  Apparently.  So what kind of

04:08:45  20  visitation was dad having at that time --

        21  BY MR. POWELL:

        22  Q      -- with the children?

        23  A      Shall I go ahead?

        24  Q      I think so.

04:08:58  25  A      Very liberal visitation.  It was always my intention

206

04:09:02  1   and his as well -- we both agreed we wanted the children to

2   have equal access to both of us, so it was liberal.  But it

3   started to get a little complex, because I had to be mindful

4   of possible safety issues.

04:09:16  5   Q    Did you learn that he had driven with the children in

6   the car while under the influence of drugs or alcohol at any

7   time during the divorce proceeding --

8              MR. WATKINS:  Leading.

9   BY MR. POWELL:

04:09:26 10   Q    -- and before CPS became involved in November of 1999?

11   A    I did.

12              THE COURT:  When there's an objection, you have to

13   wait for my ruling.

14              THE WITNESS:  I apologize.

04:09:36 15              THE COURT:  Overruled.

16              So the answer stands, ladies and gentlemen.

17              THE WITNESS:  I apologize.

18   BY MR. POWELL:

19   Q    Now, again, before CPS became involved -- and let me

04:09:48 20   make clear from your mouth, because what I say isn't

21   evidence -- that was in November of 1999, correct?

22   A    I apologize.  I've lost my train of thought now.  That

23   being what?

24   Q    When did CPS --

04:10:01 25              Okay.  Let's just start with this:  When did CPS

207

04:10:04  1    first ever become involved in your life?

2    A     Late November 1999.

3    Q     What about 1996?  Do you have any involvement with CPS

4    in the 1996 time frame?

04:10:17  5    A     There was.

6    Q     Okay.  What happened in 1996 that led to CPS

7    involvement after that time?

8    A     In '96, the children were exhibiting some behaviors

9    that caused concern.  And I took Kendall, in particular, to

04:10:46  10   her pediatrician and explained to him my, you know, complex

11   set of circumstances.  And he gave her a look/see and said

12   that because of the issues, he had to make the call to CPS.

13   Q     Now, "because of the issues."  What issues were you

14   discussing?

04:11:10  15   A     I shared with him what was going on in our marriage.

16   Q     And so he had to make a call to CPS, and he did?

17   A     I don't recall if he was the one that called or I did.

18   I do recall him giving me the option.  And I believe I

19   said -- he said, *Do you want me to call, or do you want to*

04:11:30  20   *call?*

21              MR. WATKINS:  Hearsay.

22              MR. POWELL:  Effect on the hearer, Your Honor.

23              THE COURT:  Overruled.

24   BY MR. POWELL:

04:11:42  25   Q     Then, as I understand it, there was a second time --

*DEBORAH D. PARKER, U.S. COURT REPORTER*

208

04:11:50    1    strike that.

            2           In your own words, what was the end result of

            3    whatever investigation CPS did that time?

            4    A    Thankfully, unsubstantiated.

04:12:00    5    Q    Which, if I'm understanding correctly, means they

            6    didn't find any proof that that occurred?

            7    A    They didn't believe that any harm had occurred,

            8    correct.

            9    Q    Now, in the 1996 time frame, you had seen these

04:12:19   10    behaviors, or -- let me ask you that:  Did you see these

           11    behaviors that you thought were concerning, or did someone

           12    else see them?

           13    A    Generally, it was others that saw, but I also -- I had

           14    witnessed one particular instance and then, obviously, the

04:12:41   15    secondary instance where a conversation took place.

           16    Q    All right.  Now, was there a point in time where

           17    Mr. Hardwick -- it became known to you that Mr. Hardwick was

           18    intending to get married?

           19    A    Sure.

04:12:59   20    Q    And who was he going to marry?

           21    A    Joy Whitney at the time.  She's now Hardwick.

           22    Q    Did you know if they had a prior relationship?

           23    A    They did.

           24    Q    And what was that?

04:13:12   25    A    Well, the individual that -- when my husband shared

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:13:15  1    that he had been having an affair, that was Joy Whitney.

2    Q    Ms. Hardwick -- Ms. Fogarty, did anything about the

3    manner in which your husband treated your relationship in

4    terms of relations with other people ever affect how you

04:13:41  5    treated him vis-à-vis the children?

6    A    I certainly tried not to let it affect me.  I stayed

7    focused on what the children needed, and I think he tried to

8    do the same.

9    Q    Let me ask you about that:  Him trying to do the same.

04:13:56  10   When you were in the Howell evaluation period, did you

11   perceive you and Mr. Hardwick as working together or against

12   each other?

13   A    Clearly, there was a conflict.  He didn't like me

14   holding him accountable.  He was ashamed of his current

04:14:14  15   state, so there were conflicts because I kept pressing

16   because I felt the duty to make sure our kids were safe.

17   Q    Okay.  Do you mean safe from sexual abuse?  Or do you

18   mean safe from alcohol and substance abuse?

19   A    All of the above.  There were three addictions that

04:14:32  20   were concerning.  And, you know, the sexual addiction

21   coupled with crystal meth, I didn't know.

22   Q    Would you say there have been times where you did

23   believe he had sexually abused Kendall?

24   A    I think there were times when I was led to believe it

04:14:52  25   was possible.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

210

04:15:04  1    Q      Forgive me, ma'am.  Was there a time where -- where the

2    visits started to change in terms of at least Kendall's

3    willingness to participate in the visits with father in the

4    time frame between '96 and '99?

04:15:27  5    A      Between '96 and '99?  Well, Kendall seemed to

6    consistently -- she seemed to be the one that most

7    challenged visitation from time to time; not always, but

8    from time to time.

9    Q      How about Preslie?  She's right here.  Did Preslie --

04:15:45  10   did she have difficulties with visitations with dad at any

11   time during 1996, 1999?

12   A      I think that there may have been times that she might

13   have exhibited a little anger for the most part.  Preslie

14   was very consistent and she seemed to enjoy her father as

04:16:08  15   much as she did me.  I do think she had an older sister that

16   she was looking up to and seeing all this behavior, and I

17   think it impacted Preslie from time to time.  But for the

18   most part, Preslie was very cordial, consistent.

19   Q      Now, when was the first time you ever took either of

04:16:28  20   the children to a therapist or psychologist for counseling?

21   A      It was -- I'm not certain of the time frame.  I'm -- I

22   recall where it was, and -- but I don't recall the time.

23   Q      Let me ask you this:  What was the name of the first

24   psychologist or therapist?

04:16:54  25   A      Dr. Mitchell.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:16:54   1   Q    Okay.  That's Marjorie Mitchell, correct?

2   A    Correct.

3   Q    Do you know if that was in, at least, 1999 time frame?

4   A    I was going to guess, and I know we're not supposed to

04:17:06   5   guess, so...

6   Q    What were the reasons -- at that time when you're

7   taking the children to Dr. Mitchell, what were the reasons

8   why you were taking the children to Dr. Mitchell?

9   A    Early on, it was for divorce transitional issues.  Dad

04:17:23  10   was remarrying and had a significant other in his life up to

11   before he was married.  We had to co-parent between '95 and

12   '99 when he got married, so there was a lot of time in

13   between there.  The children --

14        You know, we were just seeking guidance from

04:17:39  15   Dr. Mitchell to kind of help through some of those,

16   you know, challenging issues.

17   Q    Was there a time where the children -- strike that.

18        Did you ever attend a soccer game where there was

19   some kind of conflict between yourself and Mr. Hardwick

04:17:57  20   and/or his fiancée, Ms. Joy Whitney?

21   A    I would say it was less with him and it was more with

22   Ms. Whitney's mother.

23   Q    Okay.  In as succinct fashion as you can, please tell

24   us what was the conflict about.

04:18:18  25   A    It was over my concern for Kendall.  She had a high

212

04:18:22  1    sensitivity to dad bringing around the other family.  She

2    wanted just her dad and just me at her games, as she was

3    accustomed to.  She made that very clear in therapy.  Dad

4    agreed with her and said he wouldn't do that.  And the

04:18:40  5    following day he came with the entire family.  And I saw

6    Kendall's body language.  She was on the field at that time,

7    and I thought, Oh, gosh.  We're going to have a meltdown.

8    Q    That was what any conflict that day was about?

9    A    Absolutely, right.

04:19:05  10   Q    Now, was Dr. Mitchell, in your opinion, successful in

11   working with the children on the transition into this

12   blended family?

13   A    I think it's no -- it's nothing against Dr. Mitchell.

14   I think she did her best, but I think just -- Kendall's

04:19:27  15   sensitivities are complex.

16   Q    When you were with Dr. Mitchell, was that still a time

17   where dad was having second, third and fifth weekends?

18   A    I believe so.

19   Q    And how long did -- that first time period spent with

04:19:44  20   Dr. Mitchell, how long did that go on for?  A month?  Two

21   months?  A year?  Ballpark.

22   A    Six months.

23   Q    So that would have taken you to November of 1999?

24   A    Right.

04:19:58  25   Q    Okay.  Did anything happen in conversations with

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:20:06  1   Kendall in November of 1999 where you were concerned about

        2   inappropriate conduct?

        3   A    She and I had a conversation.  She had been with dad

        4   over the weekend, and I think it was a weekend at home with

04:20:21  5   me.  And she popped out of bed and jumped in bed with me and

        6   was just chattering.  And in that chatter -- I don't believe

        7   she intended to.  I don't think she had a motive or even

        8   understood what she said, but she said that she had been

        9   touched down there.

04:20:37 10         And I said, *Who touched you?*

       11         And she said, *Dad.*

       12         And so that concerned me.  I think it called for,

       13   you know, a neutral prospective and somebody who was trained

       14   to try to determine if that was just something very innocent

04:20:54 15   or if there was some meaning behind that.

       16   Q    So is that the full extent of her description of

       17   inappropriate conduct was just something about being touched

       18   down there by daddy?

       19   A    Absolutely.

04:21:08 20   Q    Hang on.  By that I mean, nothing more graphic?

       21   Descriptive?

       22   A    Nothing more graphic, or descriptive.  She wasn't

       23   trying to say that her dad was molesting her.

       24   Q    All right.  And you said you wanted to take her to

04:21:22 25   someone more neutral?

04:21:24  1    A    Well, in our 730 evaluation with Dr. Howell, he had

2    suggested because of the sexual addiction component, he

3    said, *I don't believe that your husband is a pedophile; but*

4    *if you ever see any sign that something inappropriate has*

04:21:41  5    *happened with your daughters, this is the person you take*

6    *them to.*  And that's Dr. Mitchell.

7    Q    Oh, is that how you -- is that part of how you ended up

8    coming to her in June of 1999?

9    A    It may well be her that her name was given to us

04:21:57  10   anyhow, and we were there for help in divorce.  I don't

11   recall.  But I do know, specifically, Dr. Howell was the one

12   that recommended Dr. Mitchell.

13   Q    So you took the child to Dr. Mitchell, correct?

14   A    I did, uh-huh.

04:22:14  15   Q    Are you aware whether Kendall disclosed some type of

16   sexual abuse beyond being touched down there?

17   A    I wasn't at the time.  I just know that she interviewed

18   with Dr. Mitchell.

19   Q    Did Dr. Mitchell come out and give you a blow by blow

04:22:30  20   of everything the child had said?

21   A    Dr. Mitchell did not give me specifics, but when she

22   out, she did tell me that she interviewed Kendall thoroughly

23   and that she believed that there was enough signs to suggest

24   abuse, and she believed that Kendall was extremely

04:22:45  25   consistent.  And because she was a mandated reporter, she

04:22:48  1   was going to have to call social services.

2   Q     Is anything about that visit to Dr. Mitchell in

3   November of 1999 have anything at all to do with court

4   proceedings and/or gaining an advantage in court

04:23:04  5   proceedings?

6   A     I don't see where it would gain an advantage in any

7   way, shape, or form.

8           MR. WATKINS:  Objection.  Nonresponsive.

9           THE COURT:  Overruled.

04:23:16  10          MR. POWELL:  Looking for --

11  BY MR. POWELL:

12  Q     So after this report was made or after Dr. Mitchell

13  indicated the need to make a report --

14  A     Uh-huh.

04:23:29  15  Q     -- did you become involved with Child Protective

16  Services?

17  A     The family did, yes.

18  Q     How did that start?  An interview?  Did they come out

19  to your house?  Go to the kids' school?  How?

04:23:42  20  A     Social worker, I believe, came to our home and

21  proceeded with an initial interview and gave me directions

22  that from that point forward that dad was to be monitored

23  and I was to make sure that Kendall was not exposed to dad,

24  but by, I guess, social services directive.

04:24:09  25  Q     Okay.  So did father continue to have visits after this

216

04:24:15    1    first investigation by CPS in 1999?

            2    A    I'm sure -- it was shocking for him, but I'm sure there

            3    was a time when he didn't initially but eventually, yes.

            4    Q    Okay.  Well, you would have had to take him for the --

04:24:30    5    take the children for the visits, would you not?

            6    A    Ultimately, I was.

            7    Q    I realize it's some time ago.  Is it fair to say that

            8    visits that were set up by CPS with the father, you would do

            9    your part and deliver the children?

04:24:44   10    A    I was required to.  And of course I would.

           11    Q    And by the way, Ms. Reales -- am I pronouncing that

           12    correctly?

           13    A    "Re-al-lis."

           14    Q    Did she have a driver's license in which she'd drive

04:24:55   15    people as well?

           16    A    She did.

           17    Q    Who was mostly responsible for transporting those kids

           18    for visits?

           19    A    I was.

04:25:04   20    Q    Is there ever a time in your life where you attempted

           21    to thwart father's visits with his children?

           22    A    Never.

           23    Q    Now, after the visit by CPS in November of 1999, at any

           24    point within the next 30 days or so, did Mr. Hardwick go to

04:25:28   25    court seeking to get custody of the children?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

217

04:25:30  1    A     It came to my attention that he did.

2    Q     Okay.  Well, it came to your attention.  If he goes to

3    court, didn't you have to go to court?

4    A     You know, I don't recall that particular hearing.  I

04:25:42  5    just know from the record that he made a request for

6    custody.

7    Q     Okay.  And did you end up having a second 730

8    evaluation as part of the family law divorce proceeding?

9    A     I believe that was sometime after the second relapse.

04:26:02  10   Q     Okay.  Hang on.  I might have missed a relapse.  You

11   told me about one relapse.  What do you mean by a "second

12   relapse"?

13   A     Well, he was using then and then he relapsed, so I

14   apologize.  It's semantics.  It's the same relapse.

04:26:21  15   Q     Are you aware of any relapses since that last one?

16   A     I don't believe so, no.  Huh-uh.

17   Q     Does that make you happy?

18   A     Absolutely.  Oh, yeah.

19   Q     Are you aware of the relationship that Preslie enjoys

04:26:39  20   with her father?

21   A     Very much so.

22   Q     Do you endorse it?

23   A     Completely.

24   Q     Do you know where Preslie lives right now?

04:26:47  25   A     I do.

04:26:47    1    Q    It's a loaded question.  Where does she live?

           2    A    She lives with me.

           3    Q    How long has she been living with you?

           4    A    Probably going on three years now.  What?  2013 maybe?

04:27:04    5    Q    Kendall, your daughter --

           6    A    Maybe 2014.  She was away at college part of the time.

           7    Q    Kendall, your daughter, she filed a lawsuit against the

           8    County of Orange and these same defendants, didn't she?

           9    A    She did.

04:27:19   10    Q    Did she live in your house at that time?

          11    A    Yes, she did.

          12    Q    How long had she been living in your house before she

          13    ever filed any kind of lawsuit against the County of Orange?

          14    A    Well, she began living with me as soon as she graduated

04:27:35   15    from high school.

          16    Q    Can you give us that year?

          17    A    She graduated in 2009.

          18    Q    Okay.

          19    A    She was about 18, 19 years old then.

04:27:47   20    Q    Let me ask you, ma'am:  Do you mean that, like, she had

          21    lived with dad prior to that and then graduates high school

          22    and then comes lives with you?  Is that what you mean?

          23    A    Correct.

          24    Q    And is that just in terms of primary residence in both

04:28:01   25    cases?  In both cases, she would still visit with both of

219

04:28:05  1    you, right?

2    A     She visited with both of us, correct.

3    Q     But when she files a lawsuit, do you know what year she

4    did that?

04:28:16  5    A     I'm afraid I don't offhand.

6    Q     Do you know how long she lived in your house after she

7    filed the lawsuit?  You know, a year?  Six months?

8    A     I want to say maybe three years.  Four years.

9    Q     Let me ask you about some things:  Did you ever tell

04:28:40 10    Kendall to lie about being abused by Mr. Hardwick?

11    A     No.

12    Q     Did you ever pressure Kendall to go see a medical

13    doctor who would help implant memories into her head?

14    A     No.

04:28:59 15    Q     Are you aware of any allegations by her of that nature?

16    A     Not in detail, but I've heard.

17    Q     And do you understand she dropped the lawsuit, correct?

18    A     She did.

19    Q     Was that after she moved in with Mr. Hardwick?

04:29:18 20    A     It -- I don't know if she was living with him at the

21    time; but, yeah, she was no longer living with me.  She

22    left -- she left my residence and --

23    Q     Where was she --

24    A     I believe she left with him.

04:29:33 25    Q     Would you know where she was living after she left your

04:29:36  1   residence?

2   A     That I don't know.  I believe she was living with him

3   and then she ended up getting an apartment.

4                 THE COURT:  All right.  It's 4:30, so we're going

04:29:44  5   to recess for today.  We'll resume tomorrow.  We'll begin at

6   9:00 a.m., so if you could do the same thing you did today,

7   which is arrived a little bit early, maybe 10 minutes early,

8   we'll get you all back into the jury room.  Keep in mind

9   there's always traffic and there's parking and getting

04:30:03  10  through security and all of that.

11                Also, do not discuss this case with each other or

12  anyone else, any family or friends.  Don't do any research

13  or communicate about it.  And we will see you tomorrow at

14  9:00 a.m.

04:30:21  15               If you could go ahead and take the jury back, I'm

16  going to stay on the bench for a minute.

17       (Jury out.)

18       (The following proceedings were had outside the

19       presence of the jury:)

04:30:48  20               THE COURT:  Usually we're in recess.  It's

21  difficult when I stay on the bench.  I make everything -- I

22  confuse everything by that.

23                If you could step down, please.  And you're just

24  excused for today.  So you can step outside, and I have some

04:31:02  25  issues to address with the attorneys.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

221

| | | |
|---|---|---|
| 04:31:05 | 1 | THE WITNESS:  Thank you. |
| | 2 | THE COURT:  Thank you. |
| | 3 | *(Pause.)* |
| | 4 | THE COURT:  All right.  Just briefly.  I know that |
| 04:31:35 | 5 | you have -- we have allotted eight days for the case.  I |
| | 6 | have heard the opening statements, and I've heard the |
| | 7 | beginning of the first witness.  I'm going to go back to the |
| | 8 | final pretrial conference order and just point something |
| | 9 | out.  There are two claims in the case, and the elements of |
| 04:31:56 | 10 | each claim is really, essentially, the same:  It's whether |
| | 11 | the defendants were acting under color of state law, and I |
| | 12 | believe that's been stipulated to. |
| | 13 | MR. POWELL:  We have that one stipulation. |
| | 14 | THE COURT:  We have one stipulation, so we don't |
| 04:32:15 | 15 | know any further evidence on that. |
| | 16 | So that leaves, really, two issues:  Whether the |
| | 17 | defendants made or participated in making misrepresentations |
| | 18 | or omissions that were deliberate or demonstrated a reckless |
| | 19 | disregard for the truth relating to the orders that were |
| 04:32:40 | 20 | issued and whether but for that dishonesty -- those |
| | 21 | misrepresentations or omissions -- the plaintiff would not |
| | 22 | have been removed. |
| | 23 | That -- |
| | 24 | MR. POWELL:  Or stayed. |
| 04:32:56 | 25 | THE COURT:  Or would have stayed, correct. |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

222

04:32:58   1          All right.  So those are -- but the key issue is,

2    but for that dishonesty, the Court which issued the order

3    would not have issued the order.  So the only thing in that

4    regard that is relevant is what was in front of the Court,

04:33:17   5    what was in front of the judge, what did the judge have as

6    that information in front of -- I usually say him or her,

7    but here we know it's him -- and did these

8    misrepresentations or omissions, to the extent that they are

9    proven and deliberate and/or made with reckless disregard,

04:33:37  10    did they cause that order to be issued.

11          All right.  That is relatively narrow.  I will

12    tell you right now that based on what I've heard in the

13    openings and what I'm hearing on the stand, you're going so

14    far beyond what is at issue in this case that I'm

04:33:57  15    second-guessing whether to give you eight days.  Do not even

16    think about asking for more than that.  But you don't need

17    eight days.  I'm going to start sustaining some relevance

18    objections.  And if there aren't relevance objections, I'm

19    going to start making *them sua sponte*.  Because I'm not

04:34:17  20    going to have the jury listen to days upon days of material

21    and then get three little questions at the end that will

22    have nothing to do with what you've spent all of their time

23    telling them about, okay?

24          It's very straightforward.  It's what were the

04:34:35  25    misrepresentations or omissions?  How do we know what was in

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:34:39  1   the defendant's head that can be circumstantial?  In other

2   words, why did they -- how can you show that they made these

3   falsehoods deliberately or with reckless disregard for the

4   truth?  And then why is it on one side that you would argue

04:34:59  5   that would have happened anyway on the other side?  No, this

6   was the key material that was in front of the judge at the

7   time.  So things that weren't in front of the judge aren't

8   relevant.  So most of what was just put in front of the jury

9   is not relevant.

04:35:18 10   So, again, I'm going to give you the time you need

11   to try the case but no more.  If it continues on like this,

12   you can expect to be ratcheted back.  So I would suggest

13   that you go very carefully back tonight and think, what

14   witnesses do I need to prove these elements or to refute

04:35:40 15   these elements to put on a defense, and I better put those

16   witnesses on first.  Because if you get far enough into this

17   and you don't have time, you're not getting more.

18   Okay.  I'm just telling you that, because that's

19   the scope of the case.  You gave it to me.  I agreed with

04:35:58 20   it.  That's what your witnesses need to be focused on.

21   That's what your documentary evidence needs to be focused

22   on.

23   MR. POWELL:  I'll do better myself, Your Honor.

24   Thank you.

04:36:06 25   THE COURT:  Thank you.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

224

04:36:06     1            Tomorrow morning, if you have any issues that need

             2    to be addressed before the jury comes in, make sure you're

             3    here early.  I will be.

             4            And have a nice evening.

04:36:16     5            MR. POWELL:  I will be discussing with Mr. Watkins

             6    the videos issue, because I think it kind of goes to what

             7    you were just talking about; and if so, we'll have an e-mail

             8    for you in the morning.

             9            THE COURT:  All right.  And any video where you

04:36:28    10    are making objections, I can't rule on them until I have

            11    what exactly you intend to put in front of me.  So make sure

            12    that's in my hands so that I can rule on objections so that

            13    we can cut that out of any video.  All right.

            14            THE CLERK:  All rise.

04:36:48    15        (At 4:36 p.m., proceedings were adjourned.)

            16

            17                            -oOo-

            18

            19

            20

            21

            22

            23

            24

            25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

CERTIFICATE

I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.

Date:   January 18, 2018

                        /s/DEBORAH D. PARKER
                        DEBORAH D. PARKER, OFFICIAL REPORTER

*DEBORAH D. PARKER, U.S. COURT REPORTER*